**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, as subrogee
of Glen Hunter,

       Plaintiff,

                                  Case No. 2:08 cv 11150

vs.                                    Hon. Denise Page Hood

                                    Magistrate Judge R. Stephen Whalen

ELECTROLUX HOME PRODUCTS INC.,

       Defendant.

_____

## ELECTROLUX HOME PRODUCTS INC.'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN TESTIMONY OF PLAINTIFF'S DISCLOSED EXPERT JACK SANDERSON

       Defendant Electrolux Home Products Inc., pursuant to Federal Rules of Evidence 104, 702, and 703 and this Court's Order of August 5, 2010, hereby moves *in limine* for this Court to exclude certain testimony of Plaintiff State Farm Mutual Automobile Insurance Company's disclosed expert Jack Sanderson.  In support of this motion, Electrolux states as follows:

       1.      In this subrogation action, State Farm claims that a General Electric gas dryer, which Electrolux designed and manufactured in November 2003, was defective, and that this alleged defect caused a fire in the home of its insured, the Hunters, on January 24, 2006.  (Am. Compl. ¶¶ 4, 6, 8.)[1]  To attempt to support this claim, State Farm offers testimony from fire investigator Jack Sanderson.

       2.      In his first report, dated August 22, 2006 (prior to the filing of this action), Mr. Sanderson opined as to the alleged cause and origin of the fire.  Specifically, he opined that the

---

[1] Copies of all exhibits referenced in this motion are appended to Defendants' accompanying brief in support.

fire originated in the dryer and was caused by "heat generated by friction of moving parts at the blower . . . ." (Sanderson Init. Rep. at 1, Aug. 22, 2006.)  He further opined "that the dryer was defective." (*Id.*)

3.      On August 21, 2009, approximately three years later, and after State Farm filed and served its Complaint, Mr. Sanderson prepared a "supplemental" report contradicting his prior report and offering nine entirely new opinions on several different and far-ranging areas of purported expertise ranging from fire cause and origin to clothes-dryer design and manufacture, disproportionate risk, warnings, other incidents, and a purported survey of clothes-dryer service providers, among others.  (Sanderson Supp. Rep. at 2-3, Aug. 21, 2009.)

4.      Federal Rule of Evidence 702 requires testimony in the form of expert opinions or scientific evidence be "based upon sufficient facts or data, . . . the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case."   As counseled by *Daubert* and its progeny, courts evaluate the reliability of expert testimony based on a set of non-exhaustive factors.  *See Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993)).  Expert testimony must not only be reliable, it must also be relevant. *See* Fed. R. Evid. 702; *see Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000).

5.      Mr. Sanderson is wholly unqualified to present the testimony that he offers in his report and elaborated on in his deposition.  Moreover, his methodology for his proffered testimony, where one even exists, is wholly unreliable and produces, by Mr. Sanderson's admission, results that are simply "wrong."

6.      Specifically, and as explained more fully in the accompanying brief, Mr. Sanderson offers the statistical opinion that "gas dryers, like the Hunters' unit, are

2

disproportionately at risk for fires." (Supp. Rep. at 2.) For this opinion, he relies primarily on his own personal experience that "we see way more of them." (Sanderson Dep. 146:22-23.) In addition to his utter lack of training, experience, and expertise[2] in the area of statistics, this *ipse dixit* opinion violates Rule 702 and *Daubert* because it is based solely on Mr. Sanderson's subjective observations, rather than an objective, scientific, and reliable methodology. Therefore, the Court should exclude it entirely.

7.    Mr. Sanderson also offers opinions on product defect. (*See* Supp. Rep. at 2-3.) Yet, he admits that his initial defect theory was completely "wrong." (Sanderson Dep. 201:20.) Instead, he now opines that the Electrolux dryers "encourage[] lint accumulation in the vent duct" as well as a "defective front seal" that causes lint to accumulate by the gas dryer's heater pan and burner. (Supp. Rep. at 2.) That lint by the burner ignites, then migrates through the heater pan, through the grill on the back of the dryer's drum, through the dryer's tumbling drum—which, in the Hunters' case, had wet sheets in it—through the lint screen, and into the vent duct, where it ignited the accumulated lint there, setting the dryer on fire. (*Id.*)

8.    By his own admission, Mr. Sanderson is not an expert in clothes-dryer design. (Sanderson Dep. 219:25-220:2). Beyond this admitted lack of expertise, the Court should exclude his defect testimony because it is based on flawed and serially erroneous methodology as well as wholly unsupported by any reliable testing (and, in fact, contradicted by Mr. Sanderson's own testing). Further, his defect opinions are not relevant because he failed to provide a valid, tested alternative feasible design, as required by Michigan statute. As a result, the Court should exclude any and all defect testimony from Mr. Sanderson.

---

[2] In fact, Mr. Sanderson readily admits that he is "not a statistician." (Sanderson Dep. 103:3-4.)

9.    Mr. Sanderson further opines as to the efficacy of the warnings provided by Electrolux for this dryer.  (*See* Supp. Rep., Ex. 3; Sanderson Dep. 221:3-13.)  This is another area in which he admitted to having no expertise.  (Sanderson Dep. 221:1-2.)  Moreover, his warnings opinions do not "fit" the facts of this case because (1) he cannot demonstrate that a different warning would have made any difference in the Hunters' actions, (2) he did not analyze the literature that accompanied the General Electric dryer owned by the Hunters, and (3) he failed to provide an alternative, reasonable warning, as required by Michigan law.  Additionally, his analysis, such as it is, consists solely of his subjective belief that the warnings are vague and confusing—a truly unscientific methodology.  These numerous flaws require the exclusion of his warnings testimony as well.

10.    Mr. Sanderson also makes several claims about the training and knowledge of Electrolux's authorized service providers.  (Supp. Rep. at 3.)  However, this proposed testimony, like other of his proposed testimony, is wholly irrelevant because, as he admits, the Hunters never had their dryer serviced (Sanderson Dep. 177:14-23), he has no service records of what happened with this dryer after it left Electrolux's hands (*id.* at 217:19-20), and, most importantly, service is not an issue in this case and he has no opinions with regard to service, (*id.* at 61:23-63:8).  Nonetheless, to support his service opinions, Mr. Sanderson offers a "survey" of a small sampling of Electrolux service providers.  (*See* Supp. Rep., Ex. 3-E.)  But Mr. Sanderson is not qualified to conduct or analyze such a "survey," and he admits he has no training or experience in conducting surveys.  (Sanderson Dep. 225:2-3.)  A plethora of fundamental methodological flaws also renders this "survey" devoid of any indicia of reliability.  Thus, the Court should exclude this irrelevant and inadmissible evidence.

11.     Mr. Sanderson is, at most, and without waiving Defendants' right to challenge his qualifications and testimony on this area at trial if offered, a fire-cause-and-origin witness. Whether he is qualified and offers competent reliable expert testimony is an issue that will need to be addressed at trial, as will the possible relevance of his testimony, given that there is no real dispute about the true cause and origin of this fire, which is that ignited lint caused the fire to originate within the dryer.  Anything beyond this true cause-and-origin opinion falls well outside any possible expertise Mr. Sanderson may have, and his flawed and often non-existent methodologies in these areas render his unqualified testimony all the more improper.

12.     To be clear, at this time, Electrolux is not challenging Mr. Sanderson's opinions that the fire originated in the laundry room and was caused by ignited lint within the dryer. Indeed, Electrolux shares that position on fire cause and origin.  What Electrolux challenges are his opinions that go beyond far beyond that and that are unqualified, unsupported, unreliable, and inadmissible under the Federal Rules, *Daubert*, and law of this Circuit.

13.     Pursuant to Local Rule 7.1(a), counsel for Electrolux sought consent for this motion from counsel for State Farm and, after explaining the nature of this motion and its legal basis, requested but did not obtain concurrence in the relief sought.

WHEREFORE, for these reasons, and for the reasons outlined in its accompanying brief, Electrolux respectfully requests that this Court grant its motion and exclude testimony from Jack Sanderson on proportionate risk (the fifth conclusion in his "supplemental" report), product defect (present in portions of the first, second, third, fourth, sixth, and seventh conclusions), warnings (the eighth and portions of the ninth conclusions in his "supplemental" report), and his "survey" of Electrolux Authorized Service Personnel (the eighth conclusion in his "supplemental" report).

DATED this 5th day of October, 2010.

Respectfully submitted,

_____/s/  James F. Hunt_____          _____/s/  Andrea L. Moody_____
JAMES F. HUNT (P31208)                            Andrea L. Moody (P61903)
Berry, Johnston, Sztykiel & Hunt                  Bowman and Brooke LLP
1301 W. Long Lake Road, Suite 250                 50 West Big Beaver, Suite 600
Troy, Michigan  48098                             Troy, Michigan 48084
Telephone: (248)-641-1800                         Phone: (248)-687-5300
Facsimile:  (248)-641-3845                        Facsimile: (248)-743-0422
jhunt@berryjohnstonlaw.com                        Andrea.moody@bowmanandbrooke.com

*Attorneys for Electrolux Home Products Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, as subrogee
of Glen Hunter,

       Plaintiff,

vs.

ELECTROLUX HOME PRODUCTS INC.,

       Defendant.

_____

Case No. 2:08 cv 11150
Hon. Denise Page Hood
Magistrate Judge R. Stephen Whalen

**ELECTROLUX HOME PRODUCTS INC.'S BRIEF IN SUPPORT OF ITS
MOTION *IN LIMINE* TO EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S DISCLOSED EXPERT JACK SANDERSON**

## STATEMENT OF ISSUES PRESENTED

1. Should the Court exclude testimony from Plaintiff's purported expert Jack Sanderson that Electrolux-manufactured dryers are statistically disproportionately at risk for fires, where Mr. Sanderson has admitted he is not a statistician and his methodology for this opinion consists solely of his personal observations of a sample that he admits suffers from selection bias?

> Defendant's answer: YES
> Plaintiff's anticipated answer:  NO

2. Should the Court exclude Mr. Sanderson's testimony on alleged defects in Plaintiff's insureds' Electrolux-manufactured dryer, where Mr. Sanderson admits he has no expertise in the field of design defect, has done no validating testing, has presented entirely contradictory defect opinions, applied the same flawed methodology that previously generated a conclusion he now claims is "wrong," and fails to articulate any alternative feasible designs, as required by Michigan law?

> Defendant's answer: YES
> Plaintiff's anticipated answer:  NO

3. Should the Court exclude Mr. Sanderson's testimony as to the efficacy of the warnings provided by Electrolux, where his opinions are irrelevant, he admits his lack of expertise in the field of warnings, and his opinions are based on his own subjective and untested analysis of literature that did not accompany the dryer at issue?

> Defendant's answer: YES
> Plaintiff's anticipated answer:  NO

4. Should the Court exclude Mr. Sanderson's testimony regarding a "survey" of Electrolux Authorized Service Personnel, where he can point to no evidence that Plaintiff's insureds ever even attempted to contact an authorized service provider to service their dryer, his opinions are irrelevant, and he failed to follow any documented or scientifically-reliable methodology in conducting the "survey"?

> Defendant's answer: YES
> Plaintiff's anticipated answer:  NO

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Pursuant to LR 7.1(d)(2), Electrolux Home Products Inc. states that the controlling or most appropriate authority for the relief sought are Federal Rules of Evidence 104, 702, & 703, and interpreting case law, including *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny, including *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997), *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398 (6th Cir. 2006), and *Pride v. BIC Corp.*, 218 F.3d 566 (6th Cir. 2000).

## INTRODUCTION

Electrolux asks this Court to exclude certain testimony of Plaintiff's disclosed expert Jack Sanderson. Mr. Sanderson's background is limited to fire cause and origin. He may be qualified to give opinions in certain cases, after applying a proper methodology, on the limited issue of fire cause and origin, which is his only area of arguable "expertise." But like a ship that has lost its way, Mr. Sanderson does not limit himself to those areas of testimony in which he is or may be qualified and in which he has applied a reliable methodology. Instead, his reports—both his original report and his entirely contradictory "supplemental" report—offer testimony in areas far outside his limited qualifications and based on unreliable methodologies.

Proper performance of their gate-keeping role requires courts to rein in those experts, like Mr. Sanderson, who wander outside the bounds of their qualifications and who seek to stretch their limited expertise to cover an array of topics on which they are wholly unqualified to testify and to present the jury with flawed evidence based on flawed methodology. Proper exercise of this Court's duty under the Rules of Evidence and interpreting case law compels doing exactly that with Mr. Sanderson and excluding his proffered testimony outside of the limited area of fire cause and origin.

3

## BACKGROUND

On January 24, 2006, a fire occurred in the home of Plaintiff State Farm Automobile Insurance Company's insureds, Glen and Mattie Hunter. (Am. Compl. ¶ 6.) At the time of the fire, the Hunters' 2003 General Electric ("GE") gas dryer, which Electrolux designed and manufactured, was not installed with the recommended type of venting. (Sanderson Dep. 29:25-30:13, June 18, 2010.)[1] Moreover, both parties agree that the dryer exhibited significant lint accumulation within the dryer cabinet. State Farm, as subrogee and relying on Jack Sanderson, now claims the Hunters' improperly installed Electrolux dryer was defective and that this alleged defect—and not the improper installation—caused the fire. (*See* Am. Compl. ¶¶ 6, 8.)

### Mr. Sanderson's Limited Qualifications

Mr. Sanderson graduated from the Indiana University School of Business in 1968. (Sanderson Dep. Ex. 34 (Ex. B—"Sanderson CV"), at 48, Aug. 22, 2006.) He is not an engineer. (Sanderson Dep. 219:18-19.) He has no training or education in the study of plastics, mechanical engineering, structural engineering, industrial engineering, electrical engineering, survey research, warnings, human factors, or consumer behavior. (*Id.* at 223:13-225:16.) His formal science education consists only of taking "high school physics" and a mail-order class in thermodynamics. (*Id.* at 223:17-24.)

After college, Mr. Sanderson first worked as an insurance underwriter, and in 1970, he became an insurance salesman. (*See* Sanderson CV at 49.) In 1972, he left his insurance job to become the chief of police at an area resort community. (*See id.*) That same year, without any training or schooling, he began investigating fires as chief of police. (*See id.* at 1 & 49.)

---

[1] All cited deposition pages are attached as Exhibit A.

Throughout his career, Mr. Sanderson has never designed a dryer. (Sanderson Dep. 219:23.) In fact, he has never designed any electrical appliance or consumer product. (*Id.* at 232:1-4.) He has also never written a product warning. (*Id.* at 232:5-6.) By his own admission, he is not an expert in design (*id.* at 219:25-220:2), human factors (*id.* at 220:8-11), ergonomics (*id.* at 220:12-13), or warnings (*id.* at 221:1-2), and he is "not a statistician," (*id.* at 103:3-4.) He is, at most, only a fire-cause-and-origin expert.

<u>Mr. Sanderson's Opinions—Old and New</u>

State Farm retained Mr. Sanderson January 2006 to determine this fire's cause and origin. (Sanderson Dep. 139:22-140:8.) By June 2006, Mr. Sanderson had formed his opinions with certainty—the fire originated in the laundry room and was caused by the dryer's blower housing.[2] Indeed, as Mr. Sanderson wrote to the State Farm subrogation specialist who hired him, "Although this dryer is rather badly burned, it's our opinion that this is another blower housing fire. . . . . Probably the best evidence is the homeowner's account of the fire. Clearly points to the blower housing scenario." (Sanderson Dep., Ex. 3 (Ex. D), at 48.) Mr. Sanderson concluded his communication by offering, "Let me know where you think you'll be heading with this <u>and we'll get you a report to match</u>." (*Id.* (emphasis added).)

And that he did. On August 22, 2006, Mr. Sanderson issued his first report that concluded: (1) the fire originated in the Hunters' laundry room while the dryer was operating; (2) evidence from the scene indicated that the fire originated in the dryer's blower housing; and (3) the fire started as a result of "heat generated by friction of moving parts at the blower and [] the dryer was defective." (Sanderson Dep., Ex. 36 (Ex. E—"Init. Rep.") at 1, Aug. 22, 2006.) He offered this opinion despite his failure to duplicate this friction theory in testing. (Sanderson

---

[2] For the Court's reference, a general clothes dryer schematic is attached as Exhibit C.

Dep. 240:19-22.)   Moreover, his original report never disclosed how or why the dryer's condition comprised a "defect," on what he based that opinion, what criteria he applied for his conclusion, or what methodology he used to arrive at that opinion.  Indeed, his Initial Report is devoid of any product-defect analysis whatsoever.  Instead, he merely asserted, "the appliance was defective."  (Init. Rep. at 4.)  That "expert" opinion stood for three years.

But, as Mr. Sanderson admits, despite his early conviction that this was "[c]learly" a "blower housing scenario" and despite his having authored a report to that effect, he was, in fact, "wrong."  (Sanderson Dep. 201:20.)  Mr. Sanderson claims that "not long after" he prepared his first report, he "knew that there was something else going on."  (*Id.* at 204:5-6.)   More specifically, after reading an article written by Electrolux's engineering experts and their report debunking his blower-housing-friction theory, Mr. Sanderson realized he was wrong, and that "there are other mechanisms that are involved" in Electrolux dryer fires.  (*Id.* at 242:14-243:15.)

With his prior defect theory disproven (in his words, "wrong"), and three years after his initial report, Mr. Sanderson provided a second, totally different opinion, which he claimed was merely a "supplement" to his earlier report.[3]  (*See* Sanderson Dep., Ex. 39 (Ex. F—"Supp. Rep.") at 1-2, Aug. 21, 2009.)  In his "supplemental" report, Mr. Sanderson abandoned his original blower-housing-friction theory in favor of an entirely new theory that the fire was caused not by a "defective" blower housing, but from the ignition of some quantity of accumulated lint by the dryer's gas burner, which caused a piece of ignited lint to travel through the grill on the back of

---

[3] This is not the only time Mr. Sanderson has revised his defect theory.  A court in this district has previously granted Electrolux's motion to compel where the initial "theory of friction-based ignition advanced by [the plaintiff's] purported expert, Jack Sanderson," had not been timely supplemented to address the fact that "Mr. Sanderson ha[d] revised his theory of causation regarding the alleged defect in the subject dryer unit."  *Pioneer State Mut. Ins. Co. v. Electrolux Corp.*, No. 06-14156, 2007 WL 3037719, at *1-2 (E.D. Mich. Oct. 17, 2007) (Pepe, J.).

the dryer's drum and through the dryer's tumbling drum—with the Hunters' wet sheets in it—through the lint screen, and into the vent duct, where it ignited more accumulated lint and set the dryer on fire.  (Supp. Rep. at 2.)  Overall, his "supplement" offers nine entirely new and previously undisclosed opinions covering substantive areas ranging from statistics (*see id.* at 2 (opining that gas dryers "are disproportionately at risk for fires")), to design defect (*see, e.g.*, *id.* (opining that "many Electrolux dryers" contain a "defective front seal" allowing lint accumulation)), warnings (*see id.* at 2-3), and purported survey evidence (*see id.* at 3).

<u>Purported Methodology and Bases for Mr. Sanderson's New Opinions</u>

Mr. Sanderson relies on his own "scientific methodology," which is "an ongoing process" that includes research, contacting dryer owners, and "thought experiments."  (Supp. Rep., Ex. 1 (Ex. G), at 2.)  These "thought experiments" are "thinking about how things happen and what may occur" and, as per Mr. Sanderson, do not need to be written down or committed to paper. (Sanderson Dep. 227:22-23; 229:18-22.)  Thus, neither he nor the Court has any record of his "thought experiments."  But more importantly, he admits that his "thought experiments" only, at best, "allow you to visualize what <u>can</u> happen, and then you may want to run tests after that, on the basis of that thought experiment."  (*Id.* at 229:23-230:5.)  Thus, "thought experiments" are not a substitute for actual, physical testing—they are, if anything, a precursor to such testing. (*See id.* at 231:8-13 (describing "thought experiments" as "a step sometimes on a route").)

According to Mr. Sanderson, while he bases his general overall methodology, including that relating to product defects and warnings, on *National Fire Protection Association 921: Guide for Fire and Explosion Investigation*, ("NFPA 921") (*see* Supp. Rep., Ex. 1, at 1; *see also* Sanderson Dep. 174:21-175:2), he actually created his own methodology for the purposes of litigation, and he is "continually adding and taking things out of it."  (Sanderson Dep. 174:5-20.)

Mr. Sanderson also applied his ever-changing "scientific methodology" to reach his initial opinions here—the ones he now admits were "wrong." (*Id.* at 200:3-7; 201:20.)

And while Mr. Sanderson has changed his opinions in this case, he admits the physical evidence regarding this fire remained unchanged from first report to his second. Indeed, he admitted that, despite calling his second report a "supplement," there was nothing about the physical evidence in this case that changed, and he admits that there was nothing that hindered his initial investigation that would justify this change. (Sanderson Dep. 185:5-12.) Moreover, Mr. Sanderson stated that he also "re-examin[ed]" and "re-inspect[ed]" his file on the Hunter fire and reviewed other "various documents" between his two reports (Supp. Rep. at 3), but admitted these documents were available when he provided his original report, he just "had not seen them." (Sanderson Dep. 197:25-198:10.) Thus, contrary to his own methodology, he did not perform thorough analysis and research of even readily available materials.

Moreover, although Mr. Sanderson acknowledges that the scientific method entails developing a hypothesis and then testing it before arriving at a final conclusion, (Supp. Report, Ex. 1, at 1 (acknowledging that NFPA 921 "describes the scientific method as the following: recognize the need (or identify the problem), define the problem, collect data, analyze the data, develop a hypothesis, test the hypothesis, and select a final hypothesis" (emphasis added))), he nonetheless does it the other way around. Similar to the cart-driven-horse example of his offer to deliver a "report to match" where Plaintiff wanted to go with this case, Mr. Sanderson's methodology is routinely one of "hypothesis to final hypothesis," without any other testing or validation of that hypothesis. Indeed, consistent with that approach, he has conducted no case-specific testing to replicate what he claims occurred in the Hunter's dryer on this day and in this fire. (Sanderson Dep. 117:1-8, 160:3-17, 250:11-255:9; *see also id.* at 150:5-8, 151:6-7

8

(admitting the lack of testing to support his statistics opinions in Conclusion 5).)  But even more importantly, his materials and admissions show that what testing he has performed either does not support his conclusions at all or contradicts them, yet that he nonetheless offers his conclusions anyway.

For example, just one month before authoring his initial report, Mr. Sanderson wrote to a colleague that "friction is still the issue with Electrolux manufactured dryers"—the position he has since abandoned because it was "wrong."  (*Id.* at 240:2-22.)  But, he admitted in that same letter, "we have not yet duplicated this event."  (*Id.* (emphasis added).)  And yet, he admits he was nonetheless willing to—and did—opine about this alleged "defect" mechanism even though he could not duplicate his theory.  (*Id.*)

The same is true with his conclusion that "[t]he defective front seal created airflow problems that resulted in many Electrolux dryers accumulating lint in the heater pan where that lint was ignited by the heater flame." (Supp. Rep. at 2 (Conclusion 6).)  In fact, just five months before authoring that conclusion, Mr. Sanderson explained in a letter to his fellow fire investigator David Beauregard that his own testing showed the opposite.  (Sanderson Dep., Ex. 42 (Ex. H) at 3.)  Mr. Beauregard had asked whether in Mr. Sanderson's lint accumulation study he had "document[ed] lint accumulation in areas behind the drum?  This would be beneficial in arguments involving ignition in that area."  (*Id.*)  Mr. Sanderson responded: "Here's what we found but its not going to be helpful to you:  there was no lint accumulation to speak of behind the drum, in the heater pan, or in the radiant shield (baffle)."  (*Id.* (emphasis added).)  He has produced no additional testing since that admission in which he was able to replicate his theory about alleged lint accumulation in the heater pan, as he offers in his Conclusion 6.  Thus, he has offered here a conclusion that his own testing did not support and, in fact, contradicted.

9

## ARGUMENT

This Court serves a gate-keeping role to ensure that testimony in the form of expert opinions or scientific evidence is "based upon sufficient facts or data, . . . the product of reliable principles and methods, and [that] the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *see Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007). The party offering expert testimony bears the burden of establishing these elements. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993)).

Courts evaluate the reliability of expert testimony based on a set of non-exhaustive factors which include: "(1) whether a theory or technique can be or has been tested; (2) whether the technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error and the existence of standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance in a relevant scientific community." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Daubert*, 509 U.S. at 593-94). Courts should apply these factors with "greater rigor" if an expert is a "quintessential expert for hire." *Johnson*, 484 F.3d at 435.

Moreover, expert testimony must not only be reliable, it must also be relevant. *See* Fed. R. Evid. 702 (stating that expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue"); *see Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000). For expert testimony to be relevant, it "must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 592).

Ultimately, the vast majority of Mr. Sanderson's proposed testimony is the product of unreliable methodologies in areas in which he lacks the requisite qualifications. Such unreliable testimony will not assist the jury and fails to meet the standards for admissibility under *Daubert*. Therefore, this Court should exclude it.

## I.   Mr. Sanderson's methodology for his opinion that Electrolux dryers are statistically disproportionately at risk for fires lacks any legitimate scientific basis and is therefore inadmissible.

Mr. Sanderson opines that "gas dryers, like the Hunters' unit, are disproportionately at risk for fires." (Supp. Rep. at 2.) This is a statistics opinion, which Mr. Sanderson is wholly unqualified to give. Even if he were, his testimony on this topic is based on a wholly subjective, speculative, and unreliable methodology. Accordingly, the Court should exclude it entirely.

### A.   Mr. Sanderson is not qualified to offer proportional-risk testimony.

When evaluating proposed expert testimony, "[t]he trial court must determine whether the expert's training and qualifications relate to the subject matter of his proposed testimony." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997), *overruled on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 515 (6th Cir. 1998). Thus, an expert cannot offer opinions that exceed the scope of that expert's particular qualifications. *See Smelser*, 105 F.3d at 303-05; *see also Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 479 (6th Cir. 2008) (affirming a trial court's decision to exclude a mechanic's accident reconstruction testimony, which was outside the scope of his expertise). In other words, "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) (emphasis added).

As one reference source notes, for experts conducting statistical regression analysis, as Mr. Sanderson attempts with his "disproportionate risk" opinions, "[a] doctoral degree in a discipline that teaches theoretical or applied statistics . . . usually signifies to other scientists that the proposed expert meets this preliminary test of the qualification process."   Daniel L. Rubinfield, *Reference Guide on Multiple Regression* 200-01, in *Reference Manual on Scientific Evidence* (Fed. Jud. Ctr. 2000) (Ex. I).  Another indicator of sufficient qualifications to offer this type of statistics testimony is authoring "[p]ublications relating to regression analysis in peer-reviewed journals, active memberships in related professional organizations, courses taught on regression methods, and practical experience with regression analysis." *Id.* at 201.

Mr. Sanderson lacks any of these qualifications and, therefore, is not qualified to answer the specific question of whether Electrolux dryers are disproportionately at risk for fires, as he claims.  He admits that he has no statistical background, save for a single class in college, which he cannot recall if it was introductory in nature (likely because it has been over forty years since he took it).  (Sanderson Dep. 224:19-225:1.)  Since that time, he has not received any additional education or training in statistics.  (*See* Sanderson CV, app.A.)  He has no peer-reviewed publications on this topic, (*see id.*, app.B), no memberships in related professional organizations, (s*ee id.* at 49-50), and has not taught any courses in this field, (*see id.*, app.C).

In short, as he conceded, he is "not a statistician."  (Sanderson Dep. 103:3-4.)  His total lack of relevant and appropriate qualifications in this area renders his proposed testimony entirely unreliable and inadmissible.  *See Smelser*, 105 F.3d at 303; *Berry*, 25 F.3d at 1351.

### B.      The methodology underlying Mr. Sanderson's "disproportionate risk" opinion lacks any grounding in science or the scientific method.

Even if he were qualified to opine in this area, which he is not, Mr. Sanderson's methodology for his disproportionate-risk testimony fails to satisfy any of the indicia of

reliability outlined in *Daubert* and subsequent cases.  He bases this opinion merely on "our experience" that "we see way more of them [i.e., Electrolux dryers]," (Sanderson Dep. 146:22-23), as well as talking to "other groups like ours that investigate fires," whom he claims "see vastly more numbers of Electrolux dryers," (*id.* at 148:11-13).  He has also "spoken informally with at least two different insurance companies as to what their experience has been."  (*Id.* at 150:13-14.)  His "methodology" could not be less scientific.

Mr. Sanderson attempts to evade methodological scrutiny of his disproportionate-risk conclusion by claiming it is not a hypothesis and not a theory at all.  (*Id.* at 153:23-154:6 ("I don't think that's a hypothesis. . . . You're making this into a theory of some sort, and I'm just telling you this is my experience and what I've seen.").)  Mr. Sanderson offered his disproportionate-risk musing as an expert "conclusion."  As such, it must pass *Daubert* muster or be excluded.  It does not.  Therefore, it is inadmissible.

### 1.    Mr. Sanderson has failed to test scientifically this opinion.

A key reliability factor is "whether a theory or technique can be or has been tested." *Mike's Train House, Inc.*, 472 F.3d at 407; *see Daubert*, 509 U.S. at 593.  This factor is critical because "[p]roposed [expert] testimony must be supported by appropriate validation."  *Pride*, 218 F.3d at 578 (quoting *Daubert*, 509 U.S. at 591) (alterations in original).  Failing to test a theory in a reliable manner through the use of generally accepted scientific principles in that discipline renders that theory unreliable and inadmissible.  *See id.*  For testimony hinging on statistical analysis, appropriate testing requires following generally accepted statistical principles and accounting for obvious variables. *See People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537-38 (7th Cir. 1997) ("[A] statistical study that fails to correct for salient explanatory

variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court.").

Here, Mr. Sanderson admitted that he has "not gone about making a study" to test his opinion that Electrolux dryers are allegedly disproportionately at risk for fires—nor does he plan to in the future.  (Sanderson Dep. 150:17-151:6-7; *see id.* at 153:19-21.)  He also failed to set up any systematic approach to determining the relative market share of dryer fires.  (*Id.* at 150:5-8.)  He has not consulted with statisticians or other professionals to establish such a systematic approach either, (*id.* at 150:9-16).  In his words, "I can just say that anywhere you go, there are lots of them."[4]  (*Id.* at 151:11-12.)  In fact, during his deposition, Mr. Sanderson expressly disavowed that his views were "a theory of some sort," rather, he stated: "I'm just telling you this is my experience and what I've seen.  You can take it for what it's worth."  (*Id.* at 154:4-6.)

This utter lack of any substantive analysis renders his opinion the product of unsubstantiated, subjective speculation.  *See Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) ("Personal observation is not a substitute for scientific methodology and is insufficient to satisfy *Daubert*'s most significant guidepost."); *see also Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) ("[T]he theory here easily lends itself to testing and substantiation . . . such that conclusions based only on personal opinion and experience do not suffice.").

Notably, although resolving conflicts between expert opinions is left to the jury, the report provided by Drs. Steffey and Wood reveals that a scientifically sound method does exist

---

[4] Mr. Sanderson also admits, as he must, that his sample suffers from selection bias, (*id.* at 281:12-24), which is a "[s]ystematic error due to non-random selection of subjects for study." David Kaye & David A. Freedman, *Reference Guide on Statistics* app.A 172, in *Reference Manual on Scientific Evidence* (Fed. Jud. Ctr. 2000) (Ex. J).

that could test Mr. Sanderson's assertion.  *See Tamraz v. Lincoln Elec. Co.*, __ F.3d __, 2010 WL 3489002, at *9 (6th Cir. Sept. 8, 2010) (noting that "[c]omparisons between [each party's experts'] methodologies . . . may be instructive").  Unlike Mr. Sanderson, Drs. Steffey and Wood determined the relative market share for Electrolux dryers.  (*See* Steffey & Wood Rep. (Ex. K) at 5.)  They then examined a representative statistical sample of all dryer fires.  (*See id.* at 4-5.)  Finally, they performed a statistical analysis on this sample to reach a conclusion that was statistically significant.  (*See id.* at 6-8.)  This scientific methodology stands in stark contrast to the entirely subjective and unscientific approach used by Mr. Sanderson and further indicates that his testimony lacks any scientific foundation.  As such, it fails this key reliability factor.

### 2.    Mr. Sanderson has not subjected this opinion to peer review.

Mr. Sanderson's theory has not been published and, thus, not been subjected to peer review.  (Sanderson Dep. 148:2-4); *Daubert*, 509 U.S. at 593 (discussing the factor of "whether the theory or technique has been subjected to peer review and publication").  He has not seen any published literature about the relative risk of dryer fires by manufacturer that would support his claims.  (*Id.* at 149:10-14.)  His disproportionate-risk opinions fail this factor entirely.

### 3.    The known or potential rate of error further indicates unreliability.

When assessing proposed expert testimony, "the court ordinarily should consider the known or potential rate of error."  *Daubert*, 509 U.S. at 594.  The lack of a known error rate weighs against the admission of proposed expert testimony.  *See, e.g., Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000).

Mr. Sanderson has no known error rate for his disproportionate-risk methodology because he has no methodology.  He merely made rough observations and spoke with some people informally about their observations.  However, a proper analysis shows that Electrolux

15

dryers have proportionately <u>less</u> risk of being involved in a fire than competitor products.  (*See* Steffey & Wood Rep. at 8.)  In other words, a proper, scientific methodology shows that Mr. Sanderson's unscientific approach yields statistics conclusions that are incorrect.  Thus, if anything, the error rate for his disproportionate-risk methodology is 100%.

> **4.   Mr. Sanderson's methodology has been rejected by both the relevant scientific community and federal courts.**

The general acceptance (or lack thereof) of an expert's methodology is also relevant. *Daubert*, 509 U.S. at 594.  In the statistical realm, as one reference source states, "[a]n analysis is only as good as the data on which it rests."  Kaye & Freedman, *supra*, at 90.  Similarly, "[t]he inferences that may be drawn from a study depend on the quality of the data and the design of the study."  *Id.* at 115.  Reliance on "anecdotal evidence" is frowned upon as often being "quite misleading," *id.* at 91, and purely subjective analyses based on unrepresentative samples should be rejected.

Mr. Sanderson's data set is unrepresentative and suffers from admitted selection bias.  (Sanderson Dep. 281:12-24.)  This poor data set and lack of a properly designed study preclude any reliable inferences.  *See* Kaye & Freedman, *supra*, at 115.  Moreover, the scientific community rejects his reliance on purely anecdotal and subjective evidence.

Federal courts reject this approach as well.  The Supreme Court outlined in *Daubert* that "'knowledge' connotes more than subjective belief or unsupported speculation."  509 U.S. at 590.  Yet, Mr. Sanderson relies on "our experience" as the methodology underlying his disproportionate-risk opinion.  (Sanderson Dep. 146:22-23.)  "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is <u>not an expert</u> as Rule 702 defines that term. . . . As we so often reiterate, 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'"  *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,

395 F.3d 416, 419-20 (7th Cir. 2005) (quoting *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (emphasis added)).   Yet, unsupported, subjective speculation masquerading as expert statistics testimony is all Mr. Sanderson offers.   As gatekeeper, this Court must protect the jury from Mr. Sanderson's disproportionate-risk testimony and exclude it entirely as nothing more than the product of an unreliable methodology.

II.   **Mr. Sanderson's defect opinions are entirely inadmissible, both for lack of qualifications and lack of reliable methodology.**

Mr. Sanderson's cause-and-origin analysis should have ended once he determined the origin—"the fire originated in the Hunters' laundry room while the dryer was operating" (Init. Rep. at 1)—and the cause—"the cause is the lint is ignited" (Sanderson Dep. 272:18).   But he did not stop there.   Instead, he ventured into the realm of what he calls "more advanced or more in-depth analysis of a specific aspect of the cause."   (*Id.* at 223:5-11.)   In this case, this "more advanced" analysis wanders into attempting to answer the question of "why that lint accumulates" and to provide a theory on a complex lint-ignition-and-migration scenario.   (*Id.* at 272:18-273:2.)   In so doing, and in offering his unnecessary and unsupported claims for how the lint ignited and caused this particular fire, Mr. Sanderson wanders far outside the proper confines of cause-and-origin analysis and into pure and unfounded speculation.   *Weisgram v. Marley Co.*, 169 F.3d 514, 519 (8th Cir. 1999), *aff'd* 528 U.S. 440 (2000) (explaining that even a qualified fire investigator does not have "free rein to speculate" on unsupported matters); *see also* NFPA 921, at 921-120 (2008 ed.) (Ex. L) (discussing the need for fire investigators to associate qualified experts in areas outside the investigator's expertise).

Specifically, his "defect" opinions comprise three aspects.   First, he claims the design of Electrolux dryers causes lint to accumulate in the vent duct.   (Supp. Rep. at 2.)   Second, he claims that a "defective front seal" caused "accumulating lint in the heater pan."   (*Id.* (emphasis

added).)  Third, he claims the "lint that accumulates in the heater pan at the rear of the dryer is ignited by its proximity to the appliance's gas burner." (*Id.*)  "Lint ignited by the burner is then blown into the drum where the load <u>can sometimes be ignited</u>." (*Id.* (emphasis added).) "Burning particles <u>can</u> also be blown completely through the drum into the vent duct where even more lint is often present.  That lint <u>can</u> be ignited, which, in turn, ignites plastic components located there, often causing a major fire." (*Id.* (emphases added).)  Thus, the linchpin to his whole theory is lint accumulating and igniting at the heater pan at the rear of the dryer, near the gas burner.  Without the ignition of that lint in the heater pan or at the rear of the drum, there is no ignition, there are no migrating "particles," and there is no fire.  Yet, his own testing showed "no lint accumulation to speak of" at the rear of the dryer "behind the drum" or "in the heater pan." (Sanderson Dep., Ex. 42, at 3.)

Mr. Sanderson conjures up this elaborate and unfounded scenario solely to offer "defect" opinions that are both totally unnecessary and completely outside of the limited cause-and-origin analysis for which he was retained.  Moreover, even if it were a proper part of his assignment, Mr. Sanderson admittedly lacks qualifications in the field of product defect.  In addition, even if product-defect testimony were within his assignment and his qualifications—which it is not—his testimony is not only wholly unreliable, but per Michigan products liability law, it is irrelevant. Accordingly, the Court should exclude it in its entirety.

### A.    Mr. Sanderson is admittedly unqualified to offer product-defect opinions.

Mr. Sanderson is not an expert in clothes-dryer design, nor does he claim to be one. (Sanderson Dep. 219:25-220:2.)  Indeed, he should not, given his admitted lack of qualifications in any relevant aspect of dryer design.  (*See id.* at 219:18-19; 223:13-224:18.)  In fact, Mr. Sanderson's only training or education in any area even remotely related to the design of

complex electrical and mechanical appliances was high school physics and a mail-order thermodynamics course. (*Id.* at 223:16-24.) Not surprisingly, given his lack of experience and training, he has never designed a dryer, (*id.* at 219:23), or any electrical appliance or consumer product. (*Id.* at 232:1-4.) In short, he has no training or qualifications that "relate to the subject matter of his proposed testimony"—namely, alleged clothes-dryer design defects. *See Smelser*, 105 F.3d at 515. His total lack of qualifications, combined with his admitted lack of expertise in the field, mandates excluding his design-defect testimony.

**B.     The methodology underlying Mr. Sanderson's "defect" opinion is patently unreliable.**

Proposed expert testimony "must be supported by appropriate validation." *Daubert*, 509 U.S. at 591. A "key question" when evaluating a theory is "whether it can be (and has been) tested." *Id.* at 593. Indeed, "*Daubert* teaches that expert opinion testimony qualifies as scientific knowledge under Rule 702 only if it is derived by the scientific method and is capable of validation." *Smelser*, 105 F.3d at 304 (emphasis added). Subjective beliefs and unsupported speculation must be excluded—the district court cannot simply "tak[e] the expert's word for it." Fed. R. Evid. 702 advisory committee's note (2000); *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing in . . . the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Generally, what the Court knows about the methodology underlying Mr. Sanderson's defect testimony is that it produces results that he admits are completely incorrect. (Sanderson Dep. 242:14-243:15.) His same allegedly "rigorous methodology" produced his initial blower-housing-friction conclusion, which he once firmly held but now admits was "wrong." (*Id.* at 200:3-7; 201:20.) Thus, Mr. Sanderson admits his own methodology produces erroneous results.

Moreover, the Court also knows that Mr. Sanderson is willing to offer opinions without any validating testing to duplicate his theories, as he did here with his original blower-housing opinion, for example. (*Id.* at 240:19-22.) He is also willing to offer conclusions that his own testing rebuts. (*Id.*, Ex. 42, at 3.) And this Court also knows that he is willing to tailor his reports "to match" what his clients want him to say. (*Id.*, Ex. 3, at 48.)

In similar circumstances, the Sixth Circuit has affirmed the exclusion of such flawed expert testimony. In *Coffey v. Dowley Manufacturing, Inc.*, the plaintiff was injured while using an automotive repair tool. 89 F. App'x 927, 928 (6th Cir. 2003). The plaintiff offered design-defect testimony from a mechanical engineering professor whose initial report described a purely analytical technique with no physical testing. *Id.* at 930. Later, the professor admitted that this initial report was based on a critical error, and he provided new opinions. *Id.* at 930-31. The professor's analysis also included numerous assumptions and "guesstimations" that were refuted by the physical testing conducted by the defendant's expert. *See id.* at 931-32.

The Sixth Circuit affirmed the trial court's exclusion of this testimony, emphasizing the that expert's initial analysis produced incorrect results, likely due to his lack of testing. *Id.* at 930. The court also stated that the fact that he "did not immediately recognize this shows his inexperience with the subject matter." *Id.* Thus, the admission that his initial report was incorrect and his abandonment of its conclusions required excluding his testimony. *See id.*

Like the expert at issue in *Coffey*, Mr. Sanderson provided an initial report that, by his own admission, was "wrong." (Sanderson Dep. 201:20.) Yet, he did not immediately recognize that his methodology and the results it produced were erroneous—in fact, it took him three years (and a peer-reviewed publication by Electrolux's engineering experts), before he "supplemented" his initial report to correct his admittedly-erroneous opinions. (*Id.* at 242:14-243:15; *see* Supp.

20

Rep. at 1-2.)  The fact that it took him so long to recognize his own error reflects his admitted lack of expertise in design issues and his general lack of experience in dryer-design issues.  (*Id.* at 219:25-220:2.)  Indeed, Mr. Sanderson blames his initial blower-housing error on his lack of experience.  (*Id.* at 201:9-203:14.)  Thus, as in *Coffey*, this Court should reject Mr. Sanderson's defect testimony as being the result of a flawed and serially erroneous methodology.

Additionally, in *Smelser*, the plaintiff's expert opined that a vehicle's shoulder belt, but not its lap belt, was defective and caused the plaintiff to jackknife during a crash.  *Smelser*, 105 F.3d at 303-04.  The Sixth Circuit held that this expert's opinion "cannot be based on 'good science'" because he failed to perform any testing to support his several aspects of his opinions, did not adequately document testing conditions and the rate of error, and failed to consider the actual conditions of the product at issue.  *Id.* at 304.  On the last factor, the expert did not discover, use, or consider how the restraint system was mounted in the vehicle or explain how that could affect the relevance of his tests.  *Id.* at 304-05.  Accordingly, the Sixth Circuit held that the district court committed reversible error by admitting this testimony.  *Id.* at 305.

Mr. Sanderson's defect opinions suffer from similar fatal flaws.  His whole theory falls apart unless he can replicate and produce reliable testing to show, to a reasonable degree of scientific certainty, that the lint buildup—which he claims is caused by the "defective" front seal and which was merely "at risk of ignition"—not only ignited, but caused an ignited lint ember to migrate from the heater pan, into the back of the dryer drum, through the dryer drum with its tumbling, wet sheets,[5] through the lint screen, and into the vent duct, where it then lodged,

---

[5] Mr. Sanderson confirms that the Hunter dryer had been operating for only ten minutes when the fire started (Sanderson Dep. 217:8-9), and that he would not expect the wet sheets to have been dry in that amount of time.  (*Id.* at 125:20-22; *see also id.* 274:17-21 ("I don't think they're ever going to be dry in fifteen minutes.  The dryer just doesn't work that fast."); 275:4-23).

igniting more lint, which in turn ignited neighboring plastic.  (*See* Supp. Rep. at 2.)  Yet, he has not even attempted such testing.  (*See id.* at 257:5-9); *see also Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 645 (8th Cir. 2009) ("NFPA 921 requires appropriate data analysis and testing.  Further, NFPA 921 suggests that fire theories involving an appliance be substantiated by testing of exemplar appliances.").

Moreover, his report offers this complex scenario as merely a possibility, couched in terms of "can" and "sometimes."  (Supp. Rep. at 2.)  And he previously acknowledged the complex variables in his migrating-ember accumulation/ignition scenario, admitting "[o]bviously, the <u>odds</u> of getting everything 'just right' to cause a fire are <u>very small</u>." (Sanderson Dep., Ex. 37 (Ex. M), at 13 (emphases added).)  Indeed, "getting everything 'just right'" includes first having a sufficient accumulation of lint, as Mr. Sanderson claimed the Hunter dryer may have had.  But he has not tested to duplicate this unknown amount of lint under the Hunters' operating conditions.  To the contrary, his only accumulation testing showed "no lint accumulation to speak of . . . in the heater pan . . . ."  (Sanderson Dep., Ex. 42 at 3.)

Next, his "just right" scenario requires special conditions to cause the accumulated lint to be ignited specifically by the burner.  But he has not defined what those conditions are or demonstrated through reliable testing how and why they occurred in the Hunter dryer as a result of a "defect."  Indeed, Mr. Sanderson concedes that significant lint accumulation inside the dryer cabinet can occur without a defect, due instead to vent restriction from improper venting. (Sanderson Dep. 121:25-122:13.)

Next, he requires an ignited piece of lint big enough to be pulled up from the heater pan area to the back of the drum and remain lit, and yet small enough to fit through the grates at the back of the drum.  But he has no idea how big the lint piece was that he claims ignited and

migrated through this dryer—he has not even tried to determine that. (*Id.* at 248:12-249:3.) Instead, he relies on a report from the Consumer Product Safety Commission, but he admits that this report did not use real dryers in its testing. (*Id.* at 249:7-16.) In fact, the CPSC test set-up was so wildly dissimilar to any real-world conditions that the Supreme Court of Texas recently reversed a verdict in a dryer-fire case based on a plaintiff's expert's reliance on the report to support very similar opinions to what Mr. Sanderson offers. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631 (Tex. 2009); *see also* U.S. Consumer Prod. Safety Comm'n, *Final Report on Electric Clothes Dryers and Lint Ignition Characteristics* 73-74 (May 2003) ("2003 CPSC Report") (showing pictures of the test set-up, which did not involve a real dryer at all), *available at* http://www.cpsc.gov/library/foia/foia03/os/dryer.pdf (Ex. N).

Moreover, the *Camacho* court explained that not only did the configuration and operation of the test equipment "differ[] significantly" from a real dryer, but the lint pieces the CPSC used were "larger and heavier than any pieces of lint that evidence showed (1) would have been in the dryer cabinet to begin with and (2) could have been airborne or pulled by the dryer's airflow from the cabinet base into the heater box." 298 S.W.3d at 641. Like the Camachos' expert, Mr. Sanderson has offered no evidence to support that lint of the size used in the CPSC tests was present in the Hunters' dryer or could have reacted as he claimed.

But the flaws in Mr. Sanderson's migrating-ember theory do not stop there. He must still get the ignited ember of unknown size through the tumbling load of laundry. For this problem, he again turns to the CPSC report, claiming it showed "there was a tendency for the load [in an Electrolux dryer] to 'ride the drum' rather than tumble." (Sanderson Dep., Ex. 37, at 10.) In fact, the CPSC report "observed that, after a period, the load stopped tumbling and began to ride along the sides of the rotating drum." (2003 CPSC Report at 54.) The report never discloses

how long that "period" was after which this phenomenon was observed. Thus, Mr. Sanderson cannot say with any probability whether it would have occurred within the ten minutes the Hunters' dryer was running before the fire. (Sanderson Dep. 217:8-9.) Moreover, the CPSC test used ten towels (2003 CPSC Report at 54), not sheets, like the Hunters' load (Sanderson Dep. 217:9-10 ("The load was sheets.")).

Despite all these significant differences, Mr. Sanderson never ran any physical testing to determine whether a load of wet sheets running for only ten minutes would ever "ride the drum," as he speculated. Rather, he completely dismissed the notion of conducting any physical testing to validate and replicate his lint-migration theory because it would require "perfect conditions," and "[s]uch perfect conditions would likely take years to duplicate." (Sanderson Dep., Ex. 37, at 13.) Perhaps, but running a test and failing to duplicate a theory is part of the scientific method, which Mr. Sanderson fails to appreciate. Moreover, he also never explained why he failed to test a wet load of sheets running for only ten minutes to observe whether that load—the Hunter load—would ever "ride the drum." For, if it would not, then his lint-migration theory would crumble, given his acknowledgement that a "tumbling load being dried in the appliance would create an effective barrier to prevent burning embers from traveling from the rear of the drum, through the load to the front of the dryer and out the vent duct." (*Id.* at 9-10.)

However, despite his statement that a tumbling load of wet laundry would block a burning ember from reaching the lint screen and entering the vent duct, in testing he conducted only <u>after</u> providing his final conclusions here, he purports to have shown that an ember can, in fact, make it through a tumbling load of laundry. (Sanderson Dep., Ex. 30 (Ex. O) at 6-7 (describing the single September 2009 test run).) However, this testing—like all his testing—

was not conducted to replicate his theories about what occurred in the Hunter dryer, but was instead conducted under substantially different—and manipulated—conditions.

Specifically, his one test run used a new 2007 Frigidaire gas dryer, not a two-year-old 2003 GE dryer, like the Hunters. (*Id.*) He vented the test dryer differently, using rigid metal exhaust duct instead of the Hunters' flexible foil venting. (*Id.*) He artificially added lint of some unknown composition and quantity to the heater pan assembly, instead of running the dryer under normal operating conditions to accumulate lint, as he claims happened in the Hunters' dryer. (*Id.*) He never explained how his unknown quantity of lint manually added to the test dryer's heater pan would have compared with the Hunter dryer either in terms of quantity or location. This is particularly significant, given that his own testing showed that lint would <u>not</u> accumulate in the heater pan in any significant quantity. (*Id.*, Ex. 42, at 3.) He also affixed lint (of unknown composition and quantity) to the lint screen, despite the fact that Mrs. Hunter told Mr. Sanderson that she cleaned her lint screen between every load. (*Id.*, Ex. 30, at 6-7; *see also* Sanderson Dep. 248:1-4.) In addition, Mr. Sanderson only obtained ignition of the artificially planted heater-pan lint by momentarily restricting the exhaust airflow—which caused the flame on the gas burner to surge—and then removing the restriction, even though he has never pointed to any evidence to support that this momentary restriction and subsequent flame surge occurred in the Hunters' dryer. (*Id.*, Ex. 30, at 6.) Also, he never explains when during the course of the drying cycle this artificial lint ignition took place, even though he knows the Hunter fire occurred within the first 10 minutes of that cycle. (*Id.*; *see also* Sanderson Dep. 217:8-9.)

In short, Mr. Sanderson offers nothing to show any similarity, much less substantial similarity, between his single September 2009 test run and the Hunter dryer, such that his test could ever be deemed to reliably and scientifically support his specific opinions about what

specifically happened in the Hunter dryer.  In other words, he fails to close the analytical gap. *See Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Moreover, even after his lone September 2009 test, the most he could conclude was that if you artificially pack lint onto the heater pan and artificially restrict the airflow to cause the burner to flare up, the artificially-placed lint "<u>can</u> become ignited" and burning embers "<u>can</u> be drawn through the drum" and "<u>can</u>" ignite lint artificially placed on the lint screen.  (Sanderson Dep., Ex. 30, at 6 (emphases added).)   At most, he has shown only what "can" happen in different dryer under entirely artificial conditions—not what probably did happen in this dryer on this day under the Hunters' conditions.  Moreover, this testing, like his prior testing, still never shows that lint will naturally accumulate near the burner, that it will ignite without artificial intervention, and that the ignited lint will or even can migrate from the burner, through the heater pan, through the rear of the drum, through the drum itself and its tumbling load of wet sheets, through the lint screen and into the vent duct, and thereupon ignite more naturally-accumulated lint and actually cause a fire, as he claims occurred in the Hunter dryer.  Thus, his testing is not only unscientific, but it fails even to attempt to support his conclusions.  *Presley*, 553 F.3d at 646 ("Testing, which is actually performed, must be appropriate and must analytically prove the expert's hypothesis.")

As the *Camacho* court explained, lint accumulation/ignition/migration/ignition theories like Mr. Sanderson's are susceptible to case-specific "testing and examining for reliability."  298 S.W.3d at 642.  His failure to perform such scientific tests shows plainly the unreliability of his methodology.

**C.     The lack of any viable alternative feasible design renders Mr. Sanderson's defect opinions entirely irrelevant and inadmissible.**

In Michigan, "the mere fact that an injury could have been prevented by the existence of an additional safety precaution is not enough to state a prima facie design defect case." *Carpenter v. Rust Eng'g Co.*, 25 F.3d 1047, 1999 WL 198191, at *2 (6th Cir. May 19, 1994). Rather, to establish a production-defect claim,[6] a plaintiff must prove that "a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal or greater risk of harm to others." Mich. Comp. Laws § 600.2946(2); *see also Owens v. Allis-Chalmers Corp.*, 414 Mich. 413, 427-28, 326 N.W.2d 372, 378-79 (Mich. 1982) (concluding that a plaintiff did not establish a prima facie case of design defect when no evidence was presented as to the cost, effect, or reasonableness of a proposed alternative design). An expert opinion that merely critiques the chosen design but is unable to propose a specific replacement feature fails to establish a design defect. *See Hamann v. Ridge Tool Co.*, 213 Mich. App. 252, 260 n.7, 539 N.W.2d 753, 757 n.7 (Ct. App. 1995).

An alternative production practice is only practical and feasible if it was "developed, available, and capable of use in the production of the product and was economically feasible for use by the manufacturer." Mich. Comp. Laws § 600.2946(2). A proposed alternative practice is evaluated "at the time the specific unit of the product left the control of the manufacturer." *Id.*

Additionally, one cannot merely propose an alternative design without testing it—indeed, proposing a design without testing is decidedly <u>un</u>scientific. *See, e.g.*, *Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 618 (6th Cir. 2001) (applying Michigan law); *see also Johnson*, 484

---

[6] The term "production" includes "manufacture," "design," "warning," and "instructing." Mich. Comp. Laws § 600.2945(i).

F.3d at 433 (noting that an expert's "complete failure to test his proposed [alternative] design cuts heavily against him"); *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007) ("'In alternative design cases, we have consistently recognized the importance of testing the alternative design' as a factor that the district court should consider in evaluating the reliability of the proposed expert testimony." (quoting *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001)).

Overall, to meet this "stringent standard" for showing design defect, an expert must produce "compelling, empirical evidence of an alternative design" that "objectively show[s] acceptability, utility, feasibility (including cost), and general safety of the proposed alternative design vis-à-vis the allegedly defective design." *Kraft v. Dr. Leonard's Healthcare Corp.*, 646 F. Supp. 2d 882, 889-90 (E.D. Mich. 2009) (quoting *Fisher v. Kawasaki Heavy Indus., Ltd.*, 854 F. Supp. 467, 471 (E.D. Mich. 1994)).

Mr. Sanderson's Rule 26 disclosure contained no mention of any alternative feasible design. (*See* Supp. Rep. at 2.) During his deposition, Mr. Sanderson mentioned for the first time three possible alternative designs: an add-on device for dryers that indicates when there is insufficient air flow, (Sanderson Dep. 78:10-23); a heater shield baffle that appeared in later-model Electrolux dryers, (*id.* at 77:2-25); and a redesigned front seal from Electrolux dryers manufactured between December 2004 and July 2006, (*id.* at 132:11-134:1). The untimeliness of these opinions warrants excluding them outright. *See* Fed. R. Civ. P. 26(a)(2)(B)(i). Regardless, none of his alternatives suffice to establish viable alternative feasible designs.

### 1.    Mr. Sanderson's new "add-on light" opinion is flawed.

Mr. Sanderson offered as an alternative design an "add-on light" that alerts a consumer when there is an obstructed air flow in their dryer. (Sanderson Dep. 78:10-23.) But he has never

purchased this device and does not even know who manufactures it.   (*Id.* at 79:14-21.) Regardless, this device fails as a viable alternative feasible design under Michigan law for several reasons.

First, it does not satisfy the requirement that the alternative design "would have prevented the harm."  Mich. Comp. Laws § 600.2946(2).  Mr. Sanderson admitted that he did not know if an airflow indicator light would have prevented the Hunter fire.  (Sanderson Dep. 78:15-17 ("Well, I can't answer the question whether I know it would prevent—it would have prevented the fire in the Hunter dryer . . . .").)

Second, Mr. Sanderson cannot demonstrate that this "alternative" was feasible or practical.  In fact, he has *never even seen* this add-on device, much less tested it.  (*Id.* at 79:14-16.)  He also does not know if this add-on would have any adverse impact on the performance or safety of the dryer.  (*Id.* at 79:22-25.)

The Sixth Circuit explained, "an expert who testifies that a product could have been designed differently, *but who has never made or seen the alternative design he proposes*, and therefore has no idea of its feasibility, utility, or cost, does not make out a prima facie case that a reasonable, practicable, and available alternative design was available."  *Peck*, 237 F.3d at 618 (applying Michigan law) (emphasis added).  Mr. Sanderson's "add-on device" testimony wholly fails this test.  It is, therefore, inadmissible under Michigan law.

## 2.  Mr. Sanderson's new "heater-shield baffle" opinion is flawed.

Mr. Sanderson's second proposal—the heater-shield baffle—likewise fails to satisfy the alternative-feasible-design requirement.  According to him, this baffle "first appear[ed]" in Electrolux dryers in 2007.  (Sanderson Dep. 76:25-77:4.)  He believes it is an improvement because it "tends to provide a space farther from an ignition source where lint that passes through

the back of the drum can be caught." (*Id.* at 77:14-16.)  Again, however, he could not opine that this alternative design feature would have prevented the Hunter fire.  *See* Mich. Comp. Laws § 600.2946(2).  He "[didn't] know" if it "would have prevented [the fire]," but rather "think[s] it makes it less likely." (Sanderson Dep. 77:9-10.)  Specifically, he stated that "there's <u>maybe</u> a less likelihood of lint accumulating in the heater pan where it's pretty easy to ignite." (*Id.* at 77:16-18 (emphasis added).)  His inability to offer anything more than rank speculation is not surprising, given his failure to conduct any testing of a dryer containing this shield to determine whether this design would have produced the changes he believed.  (*Id.* at 78:5-9; 134:21-23.) His testimony is entirely baseless, speculative, unsupported, and, therefore, inadmissible.

### 3.    Mr. Sanderson's new "thicker front seal" opinion is flawed.

The third proposed design change—the redesigned front seal—similarly fails to satisfy the requirements of an alternative feasible design.  Primarily, it is unclear whether Mr. Sanderson even endorses the redesigned front seal as an alternative feasible design—the most he will say about it is that "[t]he history of problems with it [i.e., the redesigned seal] seems to be much less." (Sanderson Dep. 133:21-22.)  Thus, not only did Mr. Sanderson fail to disclose the redesigned front seal as a viable alternative in either of his two reports, but even in deposition, he failed to articulate it as such.  This failure should bar this testimony at trial entirely.

Moreover, Mr. Sanderson's testimony reveals the flaws in his analysis.  Specifically, he explained that from December 2004 to July 2006, Electrolux used a thicker seal that was "fabricated out of a different material." (*Id.* at 133:4-5.)  He did not know the fabrication blend of this new seal. (*Id.* at 133:6-9.)  He has not tested it. (*Id.* at 134:24-135:2.)  All that he knows is that it was "thicker" and "different." (*Id.* at 133:12-14.)  He has no proof whatsoever that this "different" seal would have made any difference in this case.

30

Michigan law requires more than a claim that there was a "different" way to design a product. It requires "compelling, empirical evidence" of "acceptability, utility, feasibility (including cost), and general safety" of the alternative design compared to the seal in the Hunters' dryer. *See Kraft*, 646 F. Supp. 2d at 889-90. It also requires reliable proof that the alternative "would have prevented the harm . . . ." Mich. Comp. Laws § 600.2946(2). The mere fact that this different seal was included in Electrolux dryers manufactured after the Hunters' dryer is entirely insufficient to make this showing. *See id.* And without the required "compelling" evidence on the required issues, the fact that Electrolux manufactured a "different" design after the Hunters' dryer is nothing more than irrelevant trivia.

## III. **Mr. Sanderson's testimony on product warnings is unqualified, irrelevant, and based on an entirely unreliable methodology.**

Mr. Sanderson has offered warnings testimony in two respects. First, he claims that Electrolux did not sufficiently warn consumers about putting their dryers "in close proximity to their vents." (Sanderson Dep. 221:3-13.) Second, he included with his supplemental report a critique of the warnings in Electrolux's owner's manual. (*See generally* Supp. Rep., Ex. 3 (Ex. P).) All of this proposed testimony is inadmissible.

To prove its failure to warn claim under Michigan law, State Farm must show that Electrolux "(1) had actual or constructive knowledge of the alleged danger; (2) had no reason to believe that consumers would know of this danger; and (3) failed to exercise reasonable care to inform consumers of the danger." *Peck*, 237 F.3d at 619 (citations omitted). The standard of care under the duty to warn includes "the dissemination of such information, whether styled as warning or instructions, as is appropriate for the safe use of its product." *Antcliff v. State Employees Credit Union*, 414 Mich. 624, 638, 327 N.W.2d 814, 820 (1983).

31

Moreover, a valid failure-to-warn claim requires the plaintiff to prove causation—i.e., that if the manufacturer had warned of the danger, the plaintiff would have altered his or her behavior in some fashion to avoid the harm. *See, e.g.*, *Banks v. Eaton Corp.*, No. 235203, 2002 WL 31951240, at *2-3 (Mich. Ct. App. Dec. 6, 2002); *see also Miller v. Ingersoll-Rand Co.*, 148 F. App'x 420, 425 (6th Cir. 2005) ("A plaintiff has the burden of proving that the defendant's failure to warn was the proximate cause of his injury, a showing which typically is established by proof 'that the plaintiff would have altered his behavior in response to a warning.'" (quoting *Allen v. Owens-Corning Fiberglass Corp.*, 225 Mich. App. 397, 406, 571 N.W.2d 530, 535 (Ct. App. 1982))).

Against this legal backdrop, it is apparent that Mr. Sanderson's warnings opinions are both irrelevant and based on an unreliable methodology, as well as outside of his qualifications. Accordingly, the Court should exclude them in their entirety.

### A.   Mr. Sanderson lacks the qualifications to opine on product warnings.

As the outset, Mr. Sanderson, himself, admits that he is not an expert in warnings. (Sanderson Dep. 221:1-2.) This admission should end the discussion, as any claims attacking Electrolux's product warnings would involve specialized knowledge beyond the ken of a lay jury and requiring expert testimony. *See Early v. Toyota Motor Corp.*, 277 F. App'x 581, 585-86 (6th Cir. 2008) (affirming a district court's decision that an expert was not qualified to give warnings testimony when, in part, the expert "made no assertion that he was an expert on warnings"); *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 245 n.12 (3d Cir. 2008) (noting the need for expert testimony to support a claim that product warnings were ineffective, misleading, or defective); *Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir. 1998) (noting the importance of proper qualifications for an expert providing warnings opinions, because such

opinions involve analysis of "[q]uestions of display, syntax, and emphasis" (quoting *Walton v. Sherwin-Williams Co.*, 191 F.2d 277, 285-86 (8th Cir. 1951))).

However, even if the Court were to look past his admitted lack of expertise, it is evident that Mr. Sanderson is utterly unqualified to opine on warnings given his lack of training, education, or experience in the field. He has no training or education in warnings. (Sanderson Dep. 225:4-5.) He is not a member of the American National Standards Institute ("ANSI"), a professional organization that provides warnings standards, and he has never sat on an ANSI standards committee. (*See* Pl.'s Resp. Electrolux's Req. for Prod. No. 2, Nov. 30, 2009 (Ex. Q).) He has never written a warning. (Sanderson Dep. 232:5-6.) Overall, there is simply nothing in Mr. Sanderson's background that would qualify him to evaluate the efficacy of a product warning and to opine as to any alleged defects in a product's warnings. *See Patterson v. Cent. Mills, Inc.*, 64 F. App'x 457, 462 (6th Cir. 2003) (holding that a trial court properly excluded a warnings expert's opinions when the expert had never written a warning for the type of product at issue, lacked specific education or training on warnings, and had never written a peer-reviewed article on warnings).

### B.    Mr. Sanderson's warnings opinions are irrelevant.

Mr. Sanderson's opinions relating to the warnings and instructions provided by Electrolux do not "fit" the facts of this case for two main reasons.

First, Mr. Sanderson admits that he cannot answer the primary question for which his testimony relating to warnings would be arguably relevant—specifically, whether a different warning would have made any difference in this case. Indeed, he explained that his belief that Electrolux should have warned of putting its dryers "in close proximity to their vents" was not causally related to preventing this fire. (Sanderson Dep. 221:14-222:8.) Moreover, any alleged

33

defect in the dryer's owner's manual's warnings or installation instructions would be similarly irrelevant because Mattie Hunter testified that she did not read the literature that accompanied her dryer.  (*See* M. Hunter Dep. (Ex. R) 32:1-6, Sept. 23, 2008.); *see Allen*, 225 Mich. App. at 406-07, 571 N.W.2d at 535; *Banks*, 2002 WL 31951240, at *2-3.

Second, Michigan's requirement of "a practical and technically feasible alternative production practice" applies equally to warnings claims.  *See* Mich. Comp. Laws § 600.2946(2) (stating that this requirement applies to all "production" defect claims); *see also id.* § 600.2945(i) (defining "production" to include "warning" and "instructing").  An expert's failure to propose alternative warnings renders his or her testimony deficient, unreliable, and irrelevant.  *See Brown v. Raymond Corp.*, 432 F.3d 640, 648 (6th Cir. 2000) (affirming a trial court's decision to exclude warnings testimony based on the expert's "failure to propose alternative warnings subject to empirical testing"); *see also Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000) ("The fact that [an expert] never even drafted a proposed warning renders his opinion akin to 'talking off the cuff' and not acceptable methodology.").

Mr. Sanderson has not proposed any alternative warnings, other than to observe that "[o]ther manufacturers put on warnings on [sic] their dryer in close proximity to their vents saying what you should or should not do."[7]  (Sanderson Dep. 221:7-8.)  This vague musing fails to make the statutorily-required showing that an alternative "would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without

---

[7] Although he did not mention it during his deposition, in his supplemental report, Mr. Sanderson also claims an "hour meter" could be added to Electrolux dryers.  (Supp. Rep., Ex. 3, at 6.) However, he fails to demonstrate how this "meter" was "practical and technically feasible" at the time the Hunters' dryer was manufactured, Mich. Comp. Laws § 600.2946(2), other than to speculate that it "would not be difficult to install."  (Supp. Rep., Ex. 3, at 6.)  He likewise fails to explain how it would have made a difference in this fire.

creating equal or greater risk of harm to others."  Mich. Comp. Laws § 600.2946(2).  For this reason, even if Mr. Sanderson could demonstrate that a different warning would have resulted in a different outcome—which he cannot—and even if he had analyzed the right set of instructions and warnings—which he did not—his warnings opinions would still lack any "fit" to this case.

>   **C.    Mr. Sanderson's warnings opinions are based on an unreliable methodology.**

Mr. Sanderson's methodology, such as it is, consists of nothing more than his own subjective, unqualified assertions that certain language in various literature—none of which accompanied the dryer at issue—is vague or confusing.  (*See generally* Supp. Rep., Ex. 3.)  Such methodology is precisely the type of "subjective belief" and "unsupported speculation" that *Daubert* requires to be excluded.  *Daubert*, 509 U.S. at 590.  In fact, there is no methodology at all, there is only Mr. Sanderson's "say so," which is no basis for expert testimony.

**IV.    Mr. Sanderson's alleged "survey" of Electrolux Authorized Service Personnel likewise suffers from multiple failings.**

Mr. Sanderson also offers "expert" opinion testimony on the training and knowledge of Electrolux's authorized service providers, even though he first admits that he has "no information whether an authorized servicer cleaner the Hunters' dryer as instructed in Electrolux manuals."  (Supp. Rep. at 3.)  Despite the lack of evidence about what information or knowledge these providers might have conveyed to the Hunters—because the Hunters never called any— Mr. Sanderson nonetheless offers to criticize Electrolux on this issue anyway.

First, he claims that "research indicates Electrolux does not train its authorized service personnel to clean the interiors of dryers."  (*Id.*)   He next claims, "few, if any, of the servicers we spoke with said users requested that they perform" the annual maintenance outlined in Electrolux's owner's manual.  (*Id.*)   Finally, he claims that "representatives of many of the

authorized services we contacted said they don't do such work.  They said they only service appliances that do not work."  (*Id.*)

These opinions are based on a purported "survey" that Mr. Sanderson conducted of a small sampling of Electrolux Authorized Service Providers.  (*See* Supp. Rep., Ex. 3-E (Ex. S).)  This purported "survey" is not only entirely irrelevant, but it is unquestionably unscientific and unreliable, rendering any testimony based on it wholly inadmissible.

### A.    Mr. Sanderson is not qualified to conduct or opine on his "survey."

When faced with survey evidence, a key question for courts is whether the purported expert who designed, conducted, or analyzed the survey was qualified to do so.[8]  *See* Shari Seidman Diamond, *Reference Guide on Survey Research* 238, in *Reference Manual on Scientific Evidence* (Fed. Jud. Ctr. 2000) (Ex. T).  Experts that design, conduct, and analyze a survey "generally should have graduate training in psychology . . ., sociology, marketing, communication sciences, statistics, or a related discipline," including courses specifically pertaining to survey research methods and related survey-specific topics.  *Id.*

Mr. Sanderson lacks the requisite training, education, or experience to conduct reliable survey research.  He has <u>no</u> education or training in this field.  (Sanderson Dep. 225:2-3.)  His reference bibliography lacks any sources for survey research.  (*See* Supp. Rep., Ex. 6 (Ex. U).)  Overall, he simply has no experience to qualify him to conduct a scientifically reliable survey.

### B.    This "survey," and its associated opinions, lack any relevance.

Mr. Sanderson admits the lack of any relevance in his survey testimony by confirming that he has "no information" whether the Hunters ever contacted a service provider or attempted

---

[8] Mr. Sanderson's lack of qualifications negates both his ability to interpret his survey under Rule 702 and *Daubert*, as well as the reliability of the survey itself, including whether it is "of a type reasonably relied upon by experts in the particular field."  Fed. R. Evid. 703.

36

to obtain a cleaning by one of them.  (Supp. Rep. at 3; Sanderson Dep. 177:19-23.)  In addition, he admits that, despite his supplemental report, he has no affirmative opinions with regard to service.  (Sanderson Dep. 62:13-63:12.)

Moreover, the survey was additionally irrelevant because Mr. Sanderson and others performed it "posing as a customer wanting to have a Frigidaire dryer cleaned."  (Supp. Rep., Ex. 3-E, at 1.)  This was an Electrolux-made GE-branded dryer, not a Frigidaire.  Whatever the surveyed service providers said about servicing a Frigidaire dryer is wholly irrelevant.

Also, if Mr. Sanderson had truly performed "research" on this issue, he would have known that Electrolux service providers do not service GE dryers like the Hunters'.  As the GE website explains, "GE does not outsource its service but is the only manufacturer that services all its appliances in-house."   Repairing Your GE Appliance, http://www.localgeappliancerepair. com/repair-service/US-National (last visited Oct. 5, 2010) (Ex. V).

### C.    The "survey" contains numerous fundamental methodological flaws and lacks any indication of reliability.

A proper, admissible survey, like other expert evidence, requires application of a reliable methodology.   Accordingly, a court should give little weight to a survey containing methodological errors. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518 (6th Cir. 2007).  Moreover, as this Court has previously noted, when evaluating a survey, it is important to examine if it "was conducted in anticipation of litigation and by persons connected with the parties or counsel or by persons aware of its purpose in the litigation."  *See Volkswagen AG v. Dorling Kindersley Publ'g, Inc.*, 614 F. Supp. 2d 793, 805-06 (E.D. Mich. 2009) (quoting *Manual for Complex Litigation (Fourth)* § 11.493 (2004)).  Mr. Sanderson's purported survey is irretrievably flawed, failing all of the hallmarks of reliability.

Primarily, his survey is unquestionably litigation-driven, having been conducted solely for the purposes of this and other litigation that Mr. Sanderson has against Electrolux. (*See generally* Supp. Rep., Ex. 3-E (showing the survey being conducted in February 2009, approximately one year after State Farm first commenced this action); *see id.* at 1 (showing the survey was conducted as part of Mr. Sanderson's retention for the investigation of Electrolux dryer fires).) Such litigation-driven methodologies should be viewed by this Court with suspicion. *See Mike's Train House, Inc.*, 472 F.3d at 408 ("We have been suspicious of methodologies created for the purpose of litigation."). Indeed, Mr. Sanderson is a fire cause-and-origin investigator; conducting telephone surveys is wholly outside of that work. Moreover, a more detailed examination of Mr. Sanderson's methodology for this survey—such as it was—confirms the suspicions on several levels.

First, his methodology consisted of Mr. Sanderson and undisclosed others calling twenty-six service providers in twenty states. (Supp. Rep., Ex. 3-E.) He fails to explain why these twenty-six providers were chosen, why only twenty-six were surveyed, how and why the twenty states were selected, whether this sampling was statistically significant and reliable given the scores of service providers throughout the country, or any other factors that would confirm the reliability of such a limited sampling. Indeed, how and why Mr. Sanderson selected the various providers remains a puzzling mystery, considering he included two service providers from Vero Beach, Florida, and two from Douglasville, Georgia, yet he never contacted the authorized service provider located less than seven miles from the Hunters' home. (*See* Supp. Rep., Ex. 3-E, at 7-12); *see also* Electrolux Service Locator, http://www.electroluxappliances.com/servicelocator (last visited Oct. 5, 2010) (Ex. W) (listing RSI Appliance Service in Livonia, Michigan as an authorized service provider for all Electrolux products).

His bizarre distribution reveals this sampling to be what one court, in rejecting a similarly flawed and unreliable survey, described as a "convenience sample," as opposed to a scientific "representative sample." *DeKoven v. Plaza Assocs.*, 599 F.3d 578, 581 (7th Cir. 2010); *see also* Diamond, *supra*, at 241 ("A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant."). Indeed, Mr. Sanderson has provided absolutely nothing to show that his sampling is in any way "representative" of Electrolux's service providers.

Second, Mr. Sanderson and his other surveyors failed to document any of their work. There are no tape recordings of the calls and no transcripts. Thus, there is no objective evidence of what the respondents actually said—there are only Mr. Sanderson's "summaries" of what those people spoken with supposedly said. (*See* Supp. Rep., Ex. 3-E.) As a result, one must simply take Mr. Sanderson's word on the conclusions he drew from his calls, such as that one provider allegedly "didn't seem to know about cleaning." (*Id.* at 3.) As the Sixth Circuit has recognized, the lack of recordings and documentation renders this survey unreliable and invalid. *See Smelser*, 105 F.3d at 304; *see also* Diamond, *supra*, at 264-65 (stating that an interviewer should "record verbatim the respondent's answers, to indicate explicitly whenever they repeat a question to the respondent, and to record any statements they make to or supplementary questions they ask the respondent").

Third, the survey lacks any consistent protocol whatsoever. There was no script—at least, none which Mr. Sanderson has produced—of what was to be asked of each service provider in each call. The survey claims the surveyors "called the providers, posing as a customer wanting to have a Frigidaire dryer cleaned," but there is no indication of exactly what was said, nor is the any assurance that the same thing was said by each of the various surveyors

in each call.  (*See generally* Supp. Rep., Ex. 3-E.)  Thus, there is no way to evaluate the accuracy and reliability of the survey.

The numerous protocol and other deficiencies in this "survey" render it wholly unreliable.  Thus, this Court should exclude the results of Mr. Sanderson's "survey" and the flawed testimony that flows from it.

## CONCLUSION

Proper performance of this Court's "gate-keeper" role compels slamming the gate shut on Mr. Sanderson's unqualified, unreliable, irrelevant, and inadmissible "expert" opinions.  For the foregoing reasons, Electrolux asks this Court to grant its motion and preclude Plaintiff's expert Jack Sanderson from offering testimony on proportionate risk, product defect, warnings, and his "survey" of Electrolux Authorized Service Personnel, as outlined above.


DATED this 5th day of October, 2010.

                                                        Respectfully submitted,


_____/s/  James F. Hunt_____              _____/s/  Andrea L. Moody_____
JAMES F. HUNT (P31208)                                 Andrea L. Moody (P61903)
Berry, Johnston, Sztykiel & Hunt                       Bowman and Brooke LLP
1301 W. Long Lake Road, Suite 250                      50 West Big Beaver, Suite 600
Troy, Michigan  48098                                  Troy, Michigan 48084
Telephone: (248)-641-1800                              Phone: (248)-687-5300
jhunt@berryjohnstonlaw.com                             Andrea.moody@bowmanandbrooke.com

*Attorneys for Electrolux Home Products Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 5, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: shessen@kreisenderle, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant: None.

DATED: October 5, 2010          */s/ James F. Hunt*_____
                                         JAMES F. HUNT (P31208)
                                         Berry, Johnston, Sztykiel & Hunt
                                         1301 W. Long Lake Road, Suite 250
                                         Troy, Michigan  48098
                                         Telephone: (248)-641-1800
                                         Facsimile:  (248)-641-3845
                                         jhunt@berryjohnstonlaw.com
                                         *Attorney for Electrolux Home Products Inc.*