# EXHIBIT A

JACK L. SANDERSON
June 18, 2010

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

STATE FARM MUTUAL AUTOMOBILE

INSURANCE COMPANY, as Subrogee

of Glen Hunter,

        Plaintiff,

    vs.             Case No. 2:08 cv 11150

                    Hon. Denise Page Hood

ELECTROLUX HOME PRODUCTS,  Mag. Judge R. Stephen Whalen

INC., and HOME DEPOT U.S.A.,

INC.,

        Defendants.

_____

      The Deposition of JACK L. SANDERSON,

      Taken at 2026 Plaza Drive,

      Benton Harbor, Michigan,

      Commencing at 8:52 a.m.,

      Friday, June 18, 2010,

      Before Peggy S. Savage, CSR-4189, RPR.



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 6

 1  Benton Harbor, Michigan

 2  Friday, June 18, 2010

 3  8:52 a.m.

 4

 5                    JACK L. SANDERSON,

 6       was thereupon called as a witness herein, and after

 7       having first been duly sworn to testify to the truth,

 8       the whole truth and nothing but the truth, was

 9       examined and testified as follows:

10                         EXAMINATION

11  BY MS. EZELL:

12  Q.   Mr. Sanderson, did you receive a Notice of Deposition

13       today?

14  A.   Not today, no.

15  Q.   Regarding your deposition for today.

16  A.   Yes.

17  Q.   And you were given notice.  Is this a copy -- will you

18       mark this, please.

19                    MARKED FOR IDENTIFICATION

20                    DEPOSITION EXHIBIT 1

21                    8:52 a.m.

22  BY MS. EZELL:

23  Q.   Mr. Sanderson, have you received a copy of what has

24       been handed to you as Exhibit 1 to your deposition?

25       Did you receive a copy of that?



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 29

1         the boxes of these, and it is my intention that just a

2         copy of the box would be marked as an exhibit.  But

3         for purposes of trial, that the box and its contents

4         would be brought to trial and made available to

5         counsel.  Can I get an agreement to that?

6                    MR. HESSEN:  You want me to agree today to

7         bring it to trial for sure in the event that counsel

8         needs it or am I going to get a request prior to

9         trial?

10                    MS. EZELL:  Well, this is the request, if

11         you'll agree; and if not, you'll get another request.

12                    MR. HESSEN:  I would -- I would like -- I'm

13         not disagreeing with you, but I would like you to

14         instruct trial counsel to send a request prior to

15         trial.

16                    MS. EZELL:  All right.

17    BY MS. EZELL:

18    Q.    As you sit there today, do you have an understanding

19          as to whether or not Exhibit 7 was the recommended

20          ducting for the Hunter dryer?

21    A.    There is an exception under the GE installation rules

22          that would permit it, yes.

23                    MS. EZELL:  Move to strike, non-responsive.

24    BY MS. EZELL:

25    Q.    Do you have an understanding, as you sit there today,



JACK L. SANDERSON
June 18, 2010

Page 30

1      sir, whether or not Exhibit 7 was the recommended

2      ducting for the Hunter dryer?

3   A.  I don't believe it's the recommended venting.

4   Q.  All right, sir.  Do you have an understanding, as you

5      sit there today, whether or not Exhibit 8 was the

6      recommended ducting for the Hunter dryer?

7   A.  I don't believe it's the recommended venting.

8   Q.  All right.  Do you have an understanding, sir, as you

9      sit there today, as to whether or not the Hunter dryer

10      was installed with venting similar to Exhibit 7 or

11      Exhibit 8?

12   A.  I think it would be very similar to both of those,

13      yeah.

14   Q.  All right.

15   A.  You're saying it's the same as both?  I'm not sure

16      that those are exactly the same.

17   Q.  I'm not saying anything.  I just want to get your

18      answer.

19          MS. EZELL:  So I would move to strike

20      everything starting with the word you.

21   BY MS. EZELL:

22   Q.  The next thing along the wall is the Appliance Service

23      News, and we have three binders, starting in

24      August 1998 and going through April of 2010.  In what

25      way has this periodical been of assistance to you in



JACK L. SANDERSON
June 18, 2010

Page 62

1          which dryers service methodology has changed affect
2          the opinions that you're prepared to render?
3     A.   It's conceivable it might support my opinions
4          depending on which questions you ask.
5     Q.   In what way would it support your opinions?
6     A.   You may say has it always been done that way, and I
7          can say, well, let me look and see with an earlier
8          dryer or a later dryer if it's done that way before or
9          if it's still done that way later.
10    Q.   What aspect of service are you referring to?
11    A.   It could be any kind of service.  It's a service
12         manual.
13    Q.   As you sit here right now, do you have any affirmative
14         opinions with regard to change in service approach,
15         instruction, or methodology that is relevant to the
16         opinions that you're prepared to render in the Hunter
17         case?
18    A.   I couldn't give you one just standing here, because I
19         don't know what questions you might ask or what things
20         you might challenge me on.
21    Q.   Yes, sir.
22    A.   So I don't know the answer to that.  There's not any
23         way to know the answer to that.
24    Q.   Yes.  And my question was, with regard to your
25         affirmative opinions.  So if I was to ask you, and at


BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 63

1       some point I will, what are your opinions in this
2       case, do you have opinions that relate to the
3       evolution of approach to service with regard to the
4       dryers and the Electrolux company?
5   A.  As it stands right now, I don't see that service is
6       specifically an issue in this, so I would have to say
7       no.  You may argue that it is and then I would have to
8       change my opinion.
9   Q.  All right.  So you may have something to respond to,
10      but affirmatively you have no opinions with regard to
11      service; is that fair?
12  A.  I think that's probably fair.
13  Q.  All right, sir.  We have another copy of ANSI Z 21.5.1
14      with flags.  Is there anything new to be gained from
15      this?  Are there flags on any points we haven't
16      previously discussed?
17  A.  Maybe.
18              MS. EZELL:  All right.  You can go ahead
19      and mark this one.
20              MARKED FOR IDENTIFICATION
21              DEPOSITION EXHIBIT 15
22              10:26 a.m.
23              THE WITNESS:  Actually, it did bring
24      something to mind that I had not flagged in the other
25      one.



JACK L. SANDERSON
June 18, 2010

Page 76

```
 1        of the Hunters' dryer, so I guess I really haven't
 2        reviewed looking for those things.
 3   Q.   Yes, sir.  But as you sit here today, that's the only
 4        one that you have in front of mind?
 5   A.   Well, yes and it's -- it come to mind because you
 6        asked the question, and the way you asked the question
 7        was about that specifically, and we were talking about
 8        the seal, the felt.  There may be other ones, but I --
 9        I just don't recall them off the top of my head.
10   Q.   Yes, sir.  And to your way of thinking, as you sit
11        there today, has Electrolux made any changes to their
12        equipment or their parts that would have prevented the
13        fire which occurred in the Hunter dryer since the time
14        of manufacture of that dryer?
15   A.   I think so.
16   Q.   Tell me when and tell me what.
17   A.   Oh, I'd have to look at the parts manual to see when.
18        I can't tell you off the top of my head.  It may be
19        2007.
20   Q.   I'm going to hand you the Electrolux parts manual
21        binder and see if that helps you.
22                     MARKED FOR IDENTIFICATION
23                     DEPOSITION EXHIBIT 18
24                     10:48 a.m.
25                     THE WITNESS:  It first appears in 2007.
```



JACK L. SANDERSON
June 18, 2010

Page 77

1    BY MS. EZELL:

2    Q.    All right.  And what first appears in 2007?

3    A.    It's a component that they referred to as a heater

4          shield baffle.

5    Q.    Okay.  Does it have a part number?

6    A.    3204254.

7    Q.    And in what way would that have prevented the fire

8          which occurred in the Hunter dryer?

9    A.    I don't know that we can say it would have prevented

10         it.  I think maybe it makes it less likely.

11   Q.    All right, sir.  In what way does part 3204254 heater

12         shield baffle make the fire which occurred in the

13         Hunter dryer less likely?

14   A.    It tends to provide a space farther from an ignition

15         source where lint that passes through the back of the

16         drum can be caught.  In other words, there's maybe a

17         less likelihood of lint accumulating in the heater pan

18         where it's pretty easy to ignite, instead it will

19         accumulate in the heater shield baffle.  It also tends

20         to reduce, once lint gets in it, the number of

21         perforations in the back of the drum; and, therefore,

22         for the given amount of air that comes through, it

23         comes through at a higher velocity and may make it

24         less likely for lint to go from the drum into the

25         heater pan and baffle -- heater shield baffle.



JACK L. SANDERSON
June 18, 2010

Page 78

```
 1   Q.   Have you given me all the reasons in which that
 2        component makes the fire in the Hunter dryer less
 3        likely?
 4   A.   I think so.
 5   Q.   All right.  Is there -- have you done any testing or
 6        evaluation with that component added to a Hunter dryer
 7        in order to evaluate whether or not a fire was or was
 8        not less likely?
 9   A.   We have not.
10   Q.   Setting aside Electrolux and their product changes and
11        additional equipment, is there any additional
12        equipment or parts that have been manufactured by you
13        or by anybody, that you're aware of, that would have
14        prevented the fire that occurred in the Hunter dryer?
15   A.   Well, I can't answer the question whether I know it
16        would prevent -- it would have prevented the fire in
17        the Hunter dryer, but there is someone, and I don't
18        know who it is, that's manufacturing an add-on device
19        for dryers that gives you an indicator light if you
20        don't have good air flow through it, but I -- and I've
21        seen it, but I don't have one, and I'm not even sure
22        where I've seen it.  But your question brings that to
23        mind, and that might have.  I don't really know.
24   Q.   All right.  So as you sit here, to a reasonable degree
25        of scientific certainty, you have no idea whether or
```



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 79

1     not the indicator light about air flow would or would

2     not have prevented the fire, correct?

3  A.  That's correct, we've never tested one.  I've never

4     seen one.

5  Q.  Yes, sir.  In fact, an indicator light doesn't prevent

6     anything, does it?

7  A.  No.  It gives an indication of a problem to a

8     consumer.

9  Q.  Right.  And if this is a consumer that has had other

10     indications of a problem, an indicator light is just

11     another sign that they can ignore?

12  A.  If they have other indications of a problem, I guess

13     it would be another thing that they could ignore.

14  Q.  All right, sir.  And you've never purchased an

15     indicator light?

16  A.  I have not.

17  Q.  You've never seen an indicator light?

18  A.  I have not.

19  Q.  As you sit there, you don't know the manufacturer of

20     the indicator light?

21  A.  I don't.

22  Q.  And you don't know what adding an indicator light to a

23     dryer could do as far as adverse impacts on the

24     performance or the safety of a dryer?

25  A.  I don't, no.



JACK L. SANDERSON
June 18, 2010

```
 1          maybe there's 250 more than Electrolux.  I don't know
 2          what that number would be.  But that way you could
 3          give some -- there would be testing of the data.  I'm
 4          not a statistician, but I've read enough about
 5          statistics to know that you need to have good data or
 6          to verify your data, and it looks to me like they
 7          haven't done any of that.
 8     Q.   All right, sir.  You have two binders here, which I
 9          have marked as Exhibits 15 and 16, entitled Electrolux
10          Expert Reports.  What is the purpose of these binders
11          being included in your materials?
12     A.   Go back and clarify a little bit on the Exponent
13          report.  Those are some answers that I gave you as to
14          why there's difficulties with the studies and why they
15          may be underreported, but there are other issues, and
16          I'm not limiting myself to the ones we discussed.
17                    Now, what do you want to know about the
18          expert reports?
19     Q.   Well, what else is wrong with the studies?
20     A.   We know that Electrolux does their best to discourage
21          people, apparently, from reporting claims.  And if you
22          call to report a claim, Electrolux will tell you we
23          only accept a claim if you have the model number and
24          the serial number, which is burned off on the vast
25          majority of dryers.  And so they, it looks like
```



JACK L. SANDERSON
June 18, 2010

Page 117

1    Q.    Tests done either by you or at your direction?

2    A.    Yes.

3    Q.    And were these initiated as a result of your being

4          retained for the Hunter matter?

5    A.    I don't know that they're specifically because of the

6          Hunter matter.  There's, you know, 300 or so of these

7          that we're involved with, and so they're just

8          generally.

9    Q.    And 300 or so tests?

10   A.    300 or so cases.

11   Q.    300 or so cases that you're involved with.

12   A.    Actually, probably closer to 400 now.

13   Q.    And do you have a list of those cases?

14   A.    Not in this file, no.

15   Q.    Yes, sir.  I'd like to request a list of those cases,

16         if you could get that for me at the break.

17   A.    I don't think that will happen real quickly.

18   Q.    You don't keep a list of the cases that you're working

19         on?

20   A.    No.

21   Q.    Do you have your testimony list as required by the

22         federal rules?

23   A.    Yes.

24   Q.    All right.  Could I have that at the break?

25   A.    It's in one of those green binders.



JACK L. SANDERSON
June 18, 2010

Page 121

1       the opinions that you have with regard to the

2       functioning of the Hunter dryer either prior to or

3       during the fire that occurred in this case?

4    A.  Well, I guess it helps explain why problems with

5        seals, in particular, can cause problems in dryers.

6    Q.  And that's in this manual?

7    A.  I think we would find things that pertain to that,

8        yes.

9    Q.  Okay.  And I see that tab 4 has a number of flags.  Is

10       that because that is the manual that pertains to our

11       dryer?

12   A.  Oh, I don't know that these were done specifically for

13       this dryer, no.

14   Q.  Okay.

15   A.  It's to help us find things in it.

16   Q.  All right.  What, in those -- in those materials,

17       relates to the issues that you've identified with

18       regard to the seals -- or the seal?

19   A.  Okay.  In the 2003 Technical Training Manual, on page

20       33, there's kind of a catchall statement that

21       Mr. Bajzek and Mr. King tend to ignore, I think.

22   Q.  In what?  I'm sorry.  And where do they ignore it?

23   A.  In their analysis of why lint accumulates in

24       Electrolux dryers.

25   Q.  And what is that statement?



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 122

```
 1   A.    It says the vent restriction problem will cause a
 2         buildup of lint inside the cabinet of the dryer.  The
 3         fan will force lint out at the seams of the vent tube
 4         inside the machine and into the cabinet.  This can be
 5         a fire hazard.  If you observe a large amount of lint
 6         inside the cabinet, this could be an indication of a
 7         vent restriction.  If the dryer is operating normally
 8         and you can find no fault with the venting system or
 9         anything else, the fault may lie elsewhere.
10   Q.    And, I'm sorry, did that say something about seals?
11   A.    It says, in effect, that vent restrictions isn't the
12         only thing that can cause lint accumulation in a dryer
13         cabinet.
14   Q.    Yes.  Is the word seal --
15   A.    The word seal is not in that paragraph.
16   Q.    Is the word seal in that document as it relates to
17         lint accumulation?
18   A.    I don't see seal in there, no.
19   Q.    All right, sir.  I think that's all I need from that.
20         If I could just look at it real quick.
21   A.    Sure.
22              MS. EZELL:  When we copy Exhibit 18, can we
23         try to get the tabs?  They're pretty clearly written.
24         I don't know if we will be able to or not.
25   BY MS. EZELL:
```



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 125

| 1 | A. | This is 18. |
| 2 | Q. | All right, sir. |
| 3 | A. | On page 47. |
| 4 | Q. | And what is there of particular relevance or import? |
| 5 | A. | There is a description here that talks about customers |
| 6 | | complaining of it taking too long to dry clothes, |
| 7 | | which Mr. Bajzek, Mr. King have -- have opined, I |
| 8 | | think, previously that that is a clear indication that |
| 9 | | there is a vent restriction problem, and this refutes |
| 10 | | that claim. |
| 11 | Q. | In what way? |
| 12 | A. | They say it's a vent restriction.  Here they explain |
| 13 | | that the cause is not enough air restriction in the |
| 14 | | exhaust system causes extended drying times. |
| 15 | Q. | Okay.  And what does that mean for you in regard to |
| 16 | | the opinions that you have in this case? |
| 17 | A. | It means that Mr. Bajzek's claim, that I suspect we |
| 18 | | will hear, is that if Mrs. Hunter said that she |
| 19 | | couldn't get her clothes dry sometimes in one cycle -- |
| 20 | | although she only said she only put it on for |
| 21 | | 15 minutes, which I wouldn't expect it to get dry in |
| 22 | | that length of time -- but he may be saying that the |
| 23 | | fact it doesn't get dry means there's a vent |
| 24 | | restriction, and, in fact, the Electrolux manuals say |
| 25 | | the lack of vent restriction can cause the same |



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 131

1   Q.   Okay.

2   A.   But your summary of what I said earlier is incorrect.

3   Q.   The record, as stated before, will speak for itself

4        and it is accurate as stated; fair enough?

5   A.   That's fine.

6   Q.   All right.

7   A.   There's an indication in 2004 that there's a changed

8        air duct seal and that it was changed previously in

9        2001, along with a felt glides -- felt -- upper and

10       lower felt and glide.  So they would have had a duct

11       seal that was changed, redesigned in 2001, also.  And

12       now it's been redesigned again in 2004.

13  Q.   All right.  Have we covered now -- I mean, we've had

14       that marked as an exhibit.  Have we covered now all of

15       the bulletins that pre-date the manufacture of the

16       Hunter dryer now that we're up to 2004?  Are they in

17       chronological order?

18  A.   Yes.

19  Q.   Okay.  Is there anything else in that binder that you

20       have in front of you then that relates to designs or

21       changes that you believe should have been implemented

22       prior to the design or manufacture of the Hunter dryer

23       that would have prevented the fire which occurred in

24       this case?

25  A.   Could you read that back to me, please?  I'm sorry.



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 132

1              (The requested portion of the record was
2              read by the reporter at 12:19 p.m. as
3              follows:  "Okay.  Is there anything else in
4              that binder that you have in front of you
5              then that relates to designs or changes
6              that you believe should have been
7              implemented prior to the design or
8              manufacture of the Hunter dryer that would
9              have prevented the fire which occurred in
10             this case?"
11             THE WITNESS:  Well, yes, the redesigned
12      front seal, the thicker upper -- actually, it's just
13      the upper pad would have prevented air leaks and poor
14      air flow, and also the subsequent inclusion of the
15      heater shield baffle I think probably would also
16      discourage accumulation of lint in the heater panel
17      where it's more likely to be ignited.
18  BY MS. EZELL:
19  Q.  What date did the redesign front seal to prevent
20      leaking occur?
21  A.  It was announced in December of 2004.
22  Q.  And you indicated, however, that there were issues in
23      2008.  Was this the same -- were these issues with
24      this redesign?
25  A.  Actually, it is, as listed, as being a change in the



JACK L. SANDERSON
June 18, 2010

Page 133

```
 1        felt seal to a 30 to 70 blend of wool and polyester
 2        instead of a 50/50 blend of wool and polyester that
 3        caused the increased wear.  So I don't know if you'd
 4        call that a redesign or a different -- fabricated out
 5        of a different material.
 6   Q.   Okay.  And let's just get the time line correct.  So
 7        prior to December of 2004, what was the fabrication?
 8        What was the fabrication blend, if you know?
 9   A.   I don't know.
10   Q.   Okay.  So in December of 2004, what was the
11        fabrication?
12   A.   Actually, the way they described it as being thicker,
13        they don't say that the -- the fabrication was
14        different.
15   Q.   Okay.  When did this 50/50 modification occur?
16   A.   Well, it says it affects dryers serial number X --
17        XD628.  So that would be, what, July of 2006.
18   Q.   So between December of 2004 and July of 2006, do you
19        believe that the redesign front seal was an
20        appropriate and reasonable front seal?
21   A.   The history of problems with it seems to be much less,
22        yes.
23   Q.   Okay.  So as you sit here today, you have no
24        criticisms of the Electrolux front seal on the dryers
25        between December of 2004 and July of 2006?
```



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 134

1   A.   Right.

2   Q.   Okay.  All right.  Are we -- I think we're going

3        through the -- there were no additional changes other

4        than the redesign of the front seal and the heater

5        shield baffle that would have made the fire, in your

6        opinion, less likely, which occurred after the date of

7        manufacture; is that correct?  Electrolux changes.

8   A.   Well, other than the design to the new Affinity style.

9   Q.   And the Affinity, yes.  Thank you.  And as it relates

10       to one of these, either the Affinity, the front seal,

11       or the heater shield baffle, or all of them in

12       combination, you have not done any testing to

13       determine whether or not they would have performed

14       different than the Hunter dryer?

15  A.   Well, no.

16  Q.   Okay.

17  A.   That's not exactly true.

18  Q.   Let me separate it out.  You haven't done any testing

19       on the Affinity?

20  A.   No.

21  Q.   You haven't done any testing on the heater shield

22       baffle?

23  A.   No.

24  Q.   Okay.  So you have done testing with regard to the

25       December 2004 through July 2006 redesign front seal on



JACK L. SANDERSON
June 18, 2010

Page 135

| | | |
|---|---|---|
| 1 | | Electrolux dryers? |
| 2 | A. | No. |
| 3 | Q. | All right.  What testing have you done? |
| 4 | A. | We have simulated an air leak to see the effect in the |
| 5 | | dryer. |
| 6 | Q. | Which dryer? |
| 7 | A. | In the Electrolux dryer of this generic type, gas or |
| 8 | | air. |
| 9 | Q. | What year, approximately, if you know? |
| 10 | A. | Maybe 2007. |
| 11 | Q. | All right.  And is that what is contained in these |
| 12 | | test binders? |
| 13 | A. | Among other things. |
| 14 | Q. | Okay.  So we'll -- we'll talk about that when we get |
| 15 | | there.  And based on -- but let me just ask this |
| 16 | | question, because I will go through with you the setup |
| 17 | | for those tests and what you discovered when you did |
| 18 | | those tests.  But based on the testing that you did |
| 19 | | and the simulated air leak in a generic gas dryer, do |
| 20 | | you have an opinion that the redesign front seal would |
| 21 | | have prevented or made less likely the fire in the |
| 22 | | Hunter dryer? |
| 23 | A. | Well, that's not specifically the purpose of the test, |
| 24 | | but I think I could say yes to that. |
| 25 | Q. | All right.  Did you, in your testing -- and we'll go |



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 139

1        photographs from the Hunter case I believe are on

2        there, but those photographs are also on CDs that are

3        in -- or DVDs that are in the green binders that are

4        in front of you.

5    Q.  Okay.  All right.  Are there any materials contained

6        on these, on group Exhibit 6, CDs or DVDs, whatever

7        they are, that is not contained in paper format or on

8        DVDs in the Hunter binder?

9    A.  There's probably a lot more parts manuals that aren't

10       here.

11   Q.  Okay.  All right.  Thank you.

12                All right.  Now, do you remember when you

13       were first retained to work in the Hunter case?

14   A.  Not without looking at one of my binders.

15   Q.  All right.  Would it be the little blue binder?

16   A.  Actually, it would be number 1 of 1 in the green

17       ones --

18   Q.  All right.

19   A.  -- is probably the one I'd like to see.

20   Q.  All right.  Here you go.

21   A.  Yes.

22   Q.  All right.  When were you first retained?

23   A.  January 30th, 2006.

24   Q.  Okay.  And when did you issue your first report in

25       this case?



JACK L. SANDERSON
June 18, 2010

Page 140

1   A.   August 22, 2006.

2   Q.   Okay.  By whom were you retained?

3   A.   Mary Williams of State Farm Insurance Company.

4   Q.   All right.  And what specifically were you asked to do

5        at the initial retention?

6   A.   We just listed it as a C&O.

7   Q.   What does that mean?

8   A.   Cause and origin.

9   Q.   And what is your understanding, when you're retained

10       to do a C&O, of what the scope and the breadth of that

11       engagement includes?

12  A.   We've listed it as a cause and origin, but the

13       additional information indicated that it was a dryer,

14       which by the way she thought was a Whirlpool, and we

15       would be -- typically, our understanding would be that

16       we would go over, talk with her, and examine the

17       scene.  If it does appear that there's reason to

18       believe that -- that it is, for instance, a dryer or

19       any specific product, and if there might be

20       subrogation possibilities, that we would then probably

21       notify our client in this case -- Mary Williams does

22       that sort of thing -- and tell them, because she would

23       be the one typically to put someone else on notice,

24       and then we would go back and continue our

25       investigation.  So the first kind of every -- every



JACK L. SANDERSON
June 18, 2010

Page 143

```
 1        do a lot of things that involve construction issues
 2        with products.  It could be a product, it could be
 3        the -- actually the use of the product in
 4        landlord/tenants situations, could be installers of
 5        the product, could be maintenance workers that have
 6        touched the products.  It really could be quite a wide
 7        list.  It could be the seller of the product.
 8   Q.   And of all of the potential targets of your
 9        subrogation investigation, what percentage is the
10        product manufacturer relative to all of the others?
11                  MR. HESSEN:  Object to the form of the
12        question.
13   BY MS. EZELL:
14   Q.   You can answer.
15   A.   I don't know if I can.  That's not something we track.
16        I don't know off the top of my head.  Now, in the last
17        few years, there were so many Electrolux dryer fires
18        that whatever statistics we'd normally have would be
19        really skewed by that.  Prior to Electrolux burning
20        down the world, I would say it would be far more
21        frequent that we would be dealing with tradesmen of
22        some sort.
23   Q.   How long has Electrolux been burning down the world?
24   A.   We investigated our first Electrolux fire in 2004, I
25        think.
```



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 146

1        the previous year, I don't recall off the top of my
2        head.
3    Q.  Do you have anger toward Electrolux?
4    A.  No, I don't have anger toward them.  I wish that they
5        would recognize that they have a problem with their
6        product and -- and do something about it.  Because
7        there's, according to their dryer census, 1,800 people
8        have had fires with their dryers, and certainly an
9        awful lot of them are fires that have been caused by
10       Electrolux dryers.  And I think that when we look at
11       other people's recalls -- there was a recall the other
12       day for somebody's product that it caused 12 fires.
13       You know, here's 1,800 fires.  I have dealt with
14       people who have had fires for 30-some years now, and I
15       know what an interruption that is in their life, and I
16       think that's unfortunate that that continues to
17       happen.
18   Q.  And do you think that -- do you have an opinion, based
19       upon science, as to whether or not Electrolux has a
20       disproportionate number of dryer fires since 2004
21       relative to other dryer manufacturers?
22   A.  I can only say what our experience is, and we see way
23       more of them.  I don't know what the order of it is.
24       I would say --
25   Q.  Would you agree with me --



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 148

```
 1        else?
 2   A.   I don't think there is anything published of that
 3        nature; or if it has, I've certainly never seen it and
 4        I don't frankly know where it would be published.  In
 5        peer review, I guess you could say that I -- I speak
 6        with Travelers.  I know they know pretty much what
 7        their population of dryer fires is and they know that
 8        Electrolux is, I think, 60 percent of their dryer
 9        fires, something like that, in the last few years.  I
10        don't know specifically what time frame that covers.
11        I know some other groups like ours that investigate
12        fires and examine products see vastly more numbers of
13        Electrolux dryers than anybody else's dryers.  And to
14        a lesser extent, I get to other laboratories around
15        the country for examinations and so forth, and I -- I
16        can't always wander through their storage facility --
17        and I see where there's more Electrolux dryers there
18        than anybody else's.  So that's the only way I have of
19        judging.
20   Q.   Okay.  So other than your conversations with your
21        insurance companies, your buddies, and your trips and
22        the various labs, do you have any scientific basis at
23        all for your belief that Electrolux fires represent
24        any portion of the market share, whether it's large or
25        small, of dryer fires?
```



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 149

```
 1                    MR. HESSEN:  Object to the form of the
 2         question.
 3                    THE WITNESS:  I think I've answered that
 4         and I've explained what the basis is that I have.  You
 5         know, you can take that for what it's worth.
 6    BY MS. EZELL:
 7    Q.   Yes, sir.  And did you want me to read the question
 8         back or do you remember what it was?
 9    A.   I believe I've answered it.  Thank you.
10    Q.   So you don't have any published literature about
11         relative dryer fires among all of the dryer
12         manufacturers?
13    A.   I don't know that such a thing exists.  If there is, I
14         haven't seen it.
15    Q.   All right.  And your perspective on this has been
16         based on your individual conversations and your tour
17         of facilities?
18                    MR. HESSEN:  It's been asked and answered.
19                    MS. EZELL:  I'm sorry?
20                    MR. HESSEN:  This has been asked and
21         answered.
22                    MS. EZELL:  Okay.  Asked and answered is
23         not a form objection.  If you could please abide by
24         the rules of the court and not lead the witness by the
25         type of objections that you provide, that would be
```



JACK L. SANDERSON
June 18, 2010

Page 150

```
 1        most helpful, Counsel.
 2   BY MS. EZELL:
 3   Q.   Do you remember my question, sir?
 4   A.   I remember answering it before.
 5   Q.   Shocker.  Now, have you done -- have you set up any
 6        sort of systematic approach to determinate relative
 7        market share of dryer fires?
 8   A.   We have not done that.
 9   Q.   Have you consulted with statisticians or survey
10        samplers or modelers whose job it is to establish such
11        systematic approaches to evaluating these types of
12        events?
13   A.   I have spoken informally with at least two different
14        insurance companies as to what their experience has
15        been, and Electrolux certainly has more than their
16        share with those insurance companies.
17   Q.   Yes, sir.  And it's not necessary for you to answer
18        all of my questions by saying I talked to insurance
19        companies and everybody says Electrolux has the most
20        fires.  You've now said that in response to every
21        question that I've asked.  My question is now about
22        your methodology and your rigor.  And the -- your
23        opinion is crystal clear.  Now I'm talking about what
24        did you bring to bear before you got there.  Now we're
25        going to your method, okay?  And my question is
```



JACK L. SANDERSON
June 18, 2010

Page 151

```
 1          whether or not you have set up any systematic approach

 2          to deciding that Electrolux has the most fires of any

 3          dryer manufacturer, and I believe the answer to that

 4          question, you've already indicated, is no?

 5    A.    I've told you what our basis is, and if you don't like

 6          it, that's fine.  That's the basis that I have.  We

 7          have not gone about making a study of that.

 8    Q.    Okay.  Thank you.

 9    A.    If that will help you any.

10    Q.    All right.

11    A.    I can just say that anywhere you go, there are lots of

12          them.

13    Q.    Yes, you've said that now, and I accept that.  I'm not

14          arguing with that.  What I'm trying to establish is --

15          and just so you're clear, as an expert, you don't get

16          to just say what you think.  You have to say how you

17          got there.  And what you think is clear.  Now I'm

18          trying to establish how you got there, okay?  And so

19          answering the questions about how you got there

20          doesn't take away at all from what you think.  That

21          part has been made crystal clear.

22    A.    Did I go wrong somewhere here?  I thought at a

23          deposition you ask me questions and I answer them, or

24          is this a lecture of some sort that goes with it?

25    Q.    That part right there, that you just did, is
```



JACK L. SANDERSON
June 18, 2010

Page 153

1      trying to find out if he's going to have additional

2      opinions.  Is that what we're doing here?

3                  MS. EZELL:  Noted.

4   BY MS. EZELL:

5   Q.   Do you remember the question?

6   A.   No.

7                  MS. EZELL:  Do you want to read it back to

8        him.

9                  (The requested portion of the record was

10                 read by the reporter at 1:10 p.m. as

11                 follows:  "What steps of the scientific

12                 method do you intend to utilize in order to

13                 evaluate tests, confirm, and eliminate

14                 possible error rates with regard to this

15                 opinion which you've stated?"

16                 THE WITNESS:  Well, I think you asked me

17       what my experience was, and now you're saying are you

18       going to run some tests to find out if that's true,

19       and the answer is no, I have not had any intention of

20       running any tests nor have I had any intention to hire

21       a statistician to do so.

22   BY MS. EZELL:

23   Q.   And you haven't done that, you haven't hired a

24        statistician and you haven't hired any kind of survey

25        research firm in order to evaluate your hypothesis



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 154

1          with regard to this?

2     A.   I have not.  I don't think that's a hypothesis.  You

3          asked me about this, and I told you what I'd seen.

4          You're making this into a theory of some sort, and I'm

5          just telling you this is my experience and what I've

6          seen.  You can take it for what it's worth.

7     Q.   Okay.  So then am I to understand that this is not an

8          opinion that you hold to a reasonable degree of

9          scientific certainty, this is simply your observations

10         about who has hired you and what you've spent your

11         time doing since 2004?

12                   MR. HESSEN:  Object to the form of the

13         question.

14                   MS. EZELL:  Hold on.  What's wrong with

15         that question?

16                   MR. HESSEN:  We've spent the last

17         20 minutes, probably a half an hour at this point, on

18         something that has nothing to do with this case, and

19         he's been answering the question, saying that this is

20         what his experience has been.

21                   MS. EZELL:  That's not a form objection.

22         I'm asking --

23                   MR. HESSEN:  You know, you don't have to be

24         happy with my objection.

25                   MS. EZELL:  No.



JACK L. SANDERSON
June 18, 2010

Page 160

 1   Q.   Generally.  Do you generally bill for your services?

 2   A.   We try to.

 3   Q.   So without looking at this bill in particular, looking

 4        at your bill across cases, generally, when you look at

 5        a bill, does it show from the beginning of the case to

 6        the last bill, date by date, you have entries for the

 7        things that you've done, the events that have

 8        occurred, and the time that you've billed for each of

 9        those?

10   A.   Typically, you would have that.  The Electrolux matter

11        has involved so many different cases that it's

12        difficult to do that, because testing, as we've

13        discussed here, isn't done -- hasn't been done for a

14        specific case, but it has been done for a number of

15        cases.  So we've tried to allocate that over a number

16        of cases, and sometimes we've been more successful

17        than others.

18   Q.   Yes, sir.  And you indicate on here that on 6/12 of

19        '06 you have a flat rate lab exam for $750.  Is that

20        an allocation fee for testing that you just described?

21   A.   Probably not.

22   Q.   What 6/12 of '06 laboratory examination of evidence --

23        oh, would that be the laboratory examination of

24        evidence in this case then?

25   A.   It says laboratory examination of evidence and that is



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 173

```
 1        soon as it's issued, which I understand it's going to
 2        be within the next day or two.
 3   A.   That one might be a little longer than that.  Yours
 4        will be today, I think, but theirs may be a little
 5        longer than that.
 6   Q.   However, you could probably go in there and generate
 7        an interim bill right now, though, couldn't you?  I
 8        mean, they're recorded; they just haven't been sent?
 9   A.   No.
10   Q.   No?
11   A.   I mean, it would take a while to do that.
12   Q.   Do you put your time in on a regular basis and it's
13        just in the system and you can't gen up a draft bill?
14   A.   We're not like attorneys.  We're probably not that
15        close in accounting for our time.
16   Q.   Yes, sir.  Do you remember my question?
17   A.   I think I answered it.
18   Q.   Yes.  So is the answer yes, you have the information
19        in the computer and you could print it out, or no, you
20        could not, as you sit here right now?
21   A.   No, we do not have it in a computer where we could
22        print it out.
23   Q.   When did you create the document entitled Our
24        Methodology, The Scientific Method?
25   A.   I don't know.  Probably last year.
```



JACK L. SANDERSON
June 18, 2010

Page 174

```
 1   Q.   I'm sorry?
 2   A.   Probably within the last year.
 3   Q.   Yes, sir.  Was it within the last month?
 4   A.   Oh, not the whole thing.  No.
 5   Q.   Explain that to me, please.
 6   A.   It's a computer document.  We're continually adding
 7        and taking things out of it, things like that.
 8   Q.   It's a living document that you edit on a regular
 9        basis?
10   A.   Well, yes.
11   Q.   What was the impetus behind creating this document?
12   A.   It's a document that goes with reports that we issue
13        in some other cases that list things that we've done
14        and how we go about them and things like that.  But it
15        makes a nice guideline for attorneys to say, you know,
16        what did you do in this thing.  We know that, you
17        know, Electrolux, you know, likes to file Daubert
18        challenges, so it makes a pretty good outline of what
19        we've done.  I wouldn't say it's all inclusive, but it
20        shows a lot of things.
21   Q.   All right.  And since you've provided this document to
22        me in the Hunter case, have you gone through this
23        process with regard to your opinions as it relates to
24        this case?
25   A.   Yes.
```



JACK L. SANDERSON
June 18, 2010

Page 175

1   Q.   All of your opinions?

2   A.   I believe so.

3                MR. HESSEN:  All of his opinions in this

4        case?

5                MS. EZELL:  In this case.

6                THE WITNESS:  In this case, yes.

7   BY MS. EZELL:

8   Q.   All right.  And let's just briefly talk about those.

9        You originally issued opinions in August of 2006,

10       correct?

11  A.   Yes.

12  Q.   And subsequent to that, you issued opinions in a

13       letter dated August of 2009?

14  A.   I believe those dates are right.

15  Q.   My question is whether or not, since August of 2009,

16       you have modified, changed, or withdrawn or added to

17       the opinions published in the letter of August 2009?

18       Not what those modifications, changes, withdrawals, or

19       additions are, but just yes or no whether or not you

20       have made any such changes?

21               MS. EZELL:  Let's just take a quick break

22       while he's doing that.

23               (Off the record at 1:41 p.m.)

24               (Back on the record at 1:42 p.m.)

25               THE WITNESS:  I think the answer is yes.



JACK L. SANDERSON
June 18, 2010

Page 177

1      about those.

2                    MR. HESSEN:  That's fine.

3                    MS. EZELL:  If I can even do that today.

4      Although, I'm optimistic.  And then we can take our

5      lunch break, if that's okay.

6                    MR. HESSEN:  I'm not advocating necessarily

7      to take a lunch break.  Why don't we find out what's

8      going on with this answer, and then we can figure out

9      what we're going to do.

10                   MS. EZELL:  Can we go off for a second?

11                   (Off the record at 1:45 p.m.)

12                   (Back on the record at 1:45 p.m.)

13     BY MS. EZELL:

14  Q.  Go ahead.  All right.  And could you, please, tell me,

15      in an orderly fashion, starting at the beginning of

16      your opinion, which each of the enumerated opinions,

17      one by one, what those modifications, changes,

18      withdrawals, retractions are.

19  A.  I think the really only difference is in number 8,

20      where we said we have no information whether an

21      authorized service cleaner cleaned the Hunter dryer as

22      instructed, and we have confirmed that it has not been

23      cleaned.

24                   MR. HESSEN:  That's why I wanted you to

25      finish that.



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 184

1   Q.   Right.

2   A.   We'd rather that they spray Halon in the room and

3        everything went out and we could see just exactly the

4        way it was, but that never happened.

5   Q.   But is there anything else that happens like that,

6        that you can think of, other than them disassembling

7        the dryer?

8   A.   Well, the fire itself does things that makes it more

9        difficult.  Fire burns up evidence or it makes it hard

10       to reconstruct evidence.  So the more extensive the

11       fire is, oftentimes the harder it is to reconstruct

12       it.  So the quicker they get it out, the better we

13       like it.

14  Q.   All right.

15  A.   So that -- you know, it's a fire that did a fair

16       amount of damage for being a witnessed event and being

17       in the town, but it's in an area that the fire

18       department may not be the best.

19  Q.   Okay.  And I'm going to hand you what I've previously

20       marked as Exhibit 36 to your deposition, and I just

21       want you to confirm that that is, in fact, your 2006

22       report in this case; is that correct?

23  A.   It appears to be.

24  Q.   Okay.  And would you agree with me --

25  A.   Whoops.  Wait a minute.  Wait a minute.  Yep.



JACK L. SANDERSON
June 18, 2010

Page 185

1    Q.    Okay.  And then it is true -- and we've discussed it
2          earlier -- that you also prepared and submitted a
3          report in 2009, correct?
4    A.    That's correct.
5    Q.    And the two things that you described to me, the fact
6          that the firemen disassembled the dryer and that fires
7          burn evidence, would be equally true in 2006 and 2009
8          for purposes of the Hunter case?
9    A.    Yes.
10   Q.    And those two facts would not justify any difference
11         of opinion between 2006 and 2009?
12   A.    No.
13   Q.    All right.  Have you ever been found to be not
14         qualified for any reason to testify as an expert?
15   A.    No.
16   Q.    Have you ever, irrespective of your qualifications,
17         not been permitted to testify as an expert on any
18         subject matter?
19   A.    Not that I'm aware of.
20   Q.    Have you ever participated in a Daubert hearing, that
21         you're aware of, where the issue of the scope of your
22         testimony or the extent of your qualifications was
23         challenged?
24   A.    Yes.
25   Q.    How many times?



JACK L. SANDERSON
June 18, 2010

1        pointing to that, as -- as we see with Mr. Bajzek, you

2        know, we are essentially in agreement as to what

3        happens with these lint ignition fires.

4    Q.   So when you issued your report in 2006, it is true

5        that at least some of the 130 dryer fires that you

6        reviewed in the interim were available for you to

7        review but you did not review them, correct?

8    A.   I'm sorry.  I think that's a no, but I want to hear

9        the question again.

10   Q.   In August of 2006, you had not reviewed any of these

11       130 other fires, correct?

12   A.   Those are 130 fires that occurred after 2006, or we

13       examined those dryers after 2006.

14   Q.   Right.

15   A.   The fires might have been before, but they hadn't been

16       examined yet.

17   Q.   That's exactly my question.  The fires had occurred

18       prior to 2006 in some instances, but you did not

19       examine them until after 2006, correct?

20   A.   I'd have to go back and look at them and see if they

21       occurred before 2006, but I suspect that some of them

22       had.  It takes us about six or eight months to get

23       Electrolux to come and examine a dryer, so it's

24       entirely possible that some of them had.

25   Q.   Okay.  And a number of the Service Bulletins that you



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 198

```
 1          became more familiar with and a number of the
 2          documents existed prior to the issuance of your 2006
 3          report; isn't that correct?
 4     A.   I -- subsequently, we learned that they did.  We had
 5          not seen them.
 6     Q.   Whether you've seen them or not, they have been
 7          published and were available prior to the date that
 8          you issued this report?
 9     A.   Looking at the dates of them now, I assume that that
10          was the case.
11     Q.   And you understand that in federal court, when you
12          issue a report, that that is a report that you are
13          signing off on as being a report issued to a
14          reasonable degree of scientific certainty?
15     A.   Yes, but I -- to be perfectly frank, I didn't know it
16          was in federal court.
17     Q.   You didn't know which -- which case this was or what
18          case you were working on?
19     A.   I don't think a case had been filed at the time I
20          wrote that report.
21     Q.   So whether it was or it wasn't, you don't know?
22     A.   Are you talking about the original report?
23     Q.   Yes, sir.
24     A.   I'm sure it wasn't filed at that time.
25     Q.   All right.  So whether it was filed in federal court
```



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 200

1    A.    We thought we did, but we've learned that there's a
2          lot more material available out there.
3    Q.    No, sir.  Irrespective of whether or not you got it
4          wrong, did you engage in a rigorous methodology that
5          evaluated and eliminated other potential causes prior
6          to the issuance of your 2006 report?
7    A.    Yes.
8    Q.    And where is the evidence of that rigor and that
9          methodology?  Is it on your billing statement; is that
10         where we would find it?
11   A.    I'm not sure I know how to answer that.  I suppose we
12         could go back and reconstruct all the dryers that
13         we've looked at and the things that we have examined
14         prior to that time, and I don't know what we would add
15         to that, but I suspect that we would add something.
16   Q.    Okay.  So I'm looking at Exhibit 3, the invoices tab.
17         And on the invoice, the first invoice which you
18         issued, which is your 2006 invoice, you have a number
19         of entries.  The first one is contact with experts and
20         Electrolux, coordinate scene inspection, lab
21         examination, notification letters, then you traveled
22         to and from Livonia, then you did an initial on-site
23         inspection, then you traveled to and from Livonia.
24         You charged six hours to and from Livonia.  So you
25         charge for travel time?



JACK L. SANDERSON
June 18, 2010

Page 201

```
 1   A.   We do.

 2   Q.   And then you did an on-site inspection, an interview

 3        with Ms. Hunter, and a collection of evidence.  You

 4        did a phone interview with the fire department.  You

 5        did a flat-rate lab exam, and then you wrote your

 6        report.  And altogether, we've got 9, 10, 11, 18,

 7        23 -- you have less than 30 hours; does that sound

 8        about right?  Exclusive of the flat-rate lab exam.

 9   A.   You're counting them, I can't see, but it sounds about

10        right.

11   Q.   Okay.  And the total invoice prior to your first

12        report, $3,585; does that sound about right?

13   A.   I don't think that's prior to it.  I think that

14        includes it.

15   Q.   Including, yes.  Thank you.  So that includes the

16        preparation of this first report; does that sound

17        right?

18   A.   Yes.

19   Q.   All right.  But you were wrong?

20   A.   I believe we were wrong.

21   Q.   Okay.  What day did you find out you were wrong?

22   A.   I don't know that I can give you a day.

23   Q.   Can you give me a month?

24   A.   I don't know if I can give you a month.

25   Q.   Why not?
```



JACK L. SANDERSON
June 18, 2010

Page 202

1   A.   It's a little like asking when did I realize I was
2        bald.  Maybe not until my grandson told me.  You come
3        by knowledge gradually.  And I think not long after --
4        not long after our 2006 report, we saw some dryers
5        that were very telling.  This -- I think that dryer,
6        the Hunter dryer, was less than the 40th dryer that we
7        saw.  And, of course, depending on which -- you know,
8        which dryer you see, if you see 40 that are just
9        burned to a crisp, you don't necessarily learn a whole
10       lot.  If you see -- if you see some that are very
11       specific, then you start to learn more.
12                  Not long after this, we realized that there
13       is another failure mode that we had not identified and
14       that was causing fires that were very similar to this,
15       and then we started seeing that it could cause this
16       same fire.  But an accumulation then of saying, okay,
17       you know, what was happening with these fires -- with
18       these dryers really takes an accumulation of more of
19       them to see what's the common denominator.  And the
20       common denominator we came to see was when the dryers
21       were manufactured.  And when you first -- and when you
22       first see 40 of them, then that may not just jump
23       right out at you and say here's when -- here's when
24       these dryers were manufactured that we're having these
25       problems.  After you've seen, you know, 150 or 200, or



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 203

1       whatever it may be, and you start plotting them out,
2       apparent cause versus time that was manufactured, then
3       you have to go back and say, okay, what's different
4       now?  Which is what led us into -- to go back to
5       research the company documents to see what was
6       different.
7                    Had we looked for this, these company
8       documents at the time of our first report, even the
9       things that we found probably would not have spoken to
10      us and told us, oh, hey, here's something that you
11      should be looking for.  So it's the accumulation.  You
12      asked what's changed during the course of time.  It is
13      the dryers that we've seen and it is the number of
14      dryers that we have seen.
15  Q.  And do you recall how long elapsed between your moment
16      of -- your tipping point of understanding this new
17      scientific theory and your notifying Electrolux of
18      this new theory?
19  A.  Well, we didn't notify Electrolux of this new theory.
20      We notified Mr. Johnson of the new theory when we
21      learned that this case was in litigation.  And that
22      was on August 21st, actually, we talked to him within
23      probably a month of that time, and got a report out to
24      him.
25  Q.  Okay.  And how long between the moment of discovery of



JACK L. SANDERSON
June 18, 2010

Page 204

```
 1          the inaccuracies in your first report and the
 2          preparation of your second report?
 3    A.    I don't know that I know an answer to that.  You're
 4          back again to, you know, when did you know what you
 5          knew.  And as I said, not long after in 2006, we knew
 6          that there was something else going on.  In 2006
 7          through 2007, I think we refined that and saw more
 8          things that were happening with it.  And someplace
 9          along in there, actually that little article that you
10          saw in the Appliance Service News, is one of the
11          things that really tipped it to us and said, wait a
12          minute, there's a seal issue here.  And then when we
13          went back and reviewed that and had an appreciation
14          for what it meant, probably would be, you know,
15          2007/2008 time frame.
16    Q.    In this case, did you conduct the scene inspection or
17          did Nathan Dwyer do it?
18    A.    Yes.
19    Q.    You understand that was an/or?
20    A.    It wasn't an/or.  It was a yes.  Both of us did.
21    Q.    All right.
22    A.    I was there initially and he was there when the
23          evidence was gathered.
24    Q.    Okay.  How did you become aware of the 130 Electrolux
25          dryers that you investigated between the time of your
```



JACK L. SANDERSON
June 18, 2010

Page 213

1   Q.   All right.  Did you, for purposes of the Hunter case,

2        sort out and only use, for purposes of your analysis,

3        those dryers that were installed with flexible duct

4        installation or all methods of installation?

5   A.   We're looking at all the dryers that have lint fires,

6        and we're looking at them then to say, okay, how many

7        of those have foil vents, for instance, how many of

8        them are 15 months old or less.

9   Q.   Thank you.

10  A.   How many dryer fires occurred in the first ten

11       minutes.

12  Q.   I'm all set.

13  A.   I don't care.  You're going to hear the rest of the

14       answer, because you don't seem to understand it.

15  Q.   Whether I do or not, it doesn't matter.  The record is

16       good.

17            So it would be safe to say, then, in order

18       to render the opinions that you've rendered in this

19       case, you did not take a subset of your database that

20       included gas dryers installed with flexible ducts that

21       were purchased new and that were two years old and do

22       your analysis based only on that subset; is that fair?

23  A.   No.  We would not -- we did not do our analysis only

24       on that subset.

25  Q.   Okay.  Thank you.



JACK L. SANDERSON
June 18, 2010

Page 214

1   A.   But that would be a subset that we look at.

2   Q.   Okay.  Thank you.  How long has Nathan Dwyer been with

3        your company?

4   A.   Seven years.

5   Q.   All right.  Did he take any notes at his inspection?

6   A.   He did.

7   Q.   Did you take any notes at your inspection?

8   A.   I did.

9   Q.   Are those contained in these --

10  A.   They are.

11  Q.   -- green binders?  Where are they?

12  A.   Well, I think probably if you look at the one that's

13       open in front of you, where the -- where the -- you're

14       getting real close to it.  Right there.

15  Q.   Exam roster?

16  A.   Where the plastic sticks out.  Little bit farther.

17       Little bit farther.  Little bit farther.  Little --

18       right there.  That's his notes, right there.

19  Q.   All right.  These are his notes?

20  A.   Back up, you'll probably find mine.  Back up the other

21       way, not forward.

22  Q.   The typewritten notes are yours?

23  A.   Look around in that area.  I think -- go back another

24       page.

25  Q.   Who interviewed the fire marshal?



JACK L. SANDERSON
June 18, 2010

Page 217

```
 1          there.  Her activities at the time of the fire that
 2          led up to it, she came out of the basement to put her
 3          dinner on and she went to get the laundry out of the
 4          dryer and she saw smoke coming from the lint trap and
 5          she went to call Consumers Energy.  Before she could
 6          call, she heard a whomp and leaned -- and leaned in
 7          the door and she could see fire and the dryer door was
 8          still open.  She told me the load was put in probably
 9          about ten minutes before the fire.  The load was
10          sheets.  The lint trap was in place.  The dryer was a
11          year-and-a-half old.  They had no previous problems or
12          service.  It was purchased at Home Depot.  The
13          occupants of the house were she and her husband and
14          two daughters, ages 31 and 24.  And the house was new
15          when purchased.  There was no electrical or mechanical
16          problems.  Those are the things that she told me.
17    Q.    Did you review the bill of sale for this dryer?
18    A.    I've never seen the bill of sale for the dryer.
19    Q.    Did you review the service records?
20    A.    I don't think there were any service records.
21    Q.    You did not review the owner's manual?
22    A.    I believe it was burned up in the fire, but I think I
23          have a copy of it.
24    Q.    You didn't review the original owner's manual?
25    A.    I did not.
```



JACK L. SANDERSON
June 18, 2010

Page 219

1   A.   I don't believe so.  Naturally, when you didn't ask

2        about Mrs. Hunter, when I said Mr. Hunter, I reviewed

3        both of them because he's been deposed twice.  I also

4        reviewed hers, and she's been deposed twice.

5   Q.   Yes, you indicated that earlier today.

6             Have you read the testimony of Tom Bajzek?

7   A.   I have.

8   Q.   Have you read the testimony of Donald Duvall?

9   A.   I did.

10  Q.   What are the areas that you believe that you are

11       prepared to offer opinions with regard to in this

12       case?  Just general areas of subject matter.

13  A.   Fire cause and origin investigation.  Electrical fire

14       investigation.  Gas and fire investigation.  Dryer

15       fire investigation, Electrolux dryers in particular.

16       Operations of the Electrolux dryers.  Operation of the

17       dryers in particular, in general.

18  Q.   You are not an engineer, correct?

19  A.   That's correct.

20  Q.   You are not a design engineer?

21  A.   I am not.

22  Q.   You're not an expert in design?

23  A.   I never designed a dryer.  Have designed a few

24       go-carts.

25  Q.   But you're not an expert in design, and you don't hold



JACK L. SANDERSON
June 18, 2010

1         yourself out to be an expert in design?

2    A.   I do not.

3    Q.   You're not an expert --

4    A.   I would say that one area that I would say while not

5         an expert in design, I am certainly prepared to

6         comment on alternative designs between one dryer

7         manufacturer and another.

8    Q.   Okay.  And I'll make a note of that.  You do not hold

9         yourself out -- well, do you hold yourself out as an

10        expert in human factors?

11   A.   No.

12   Q.   Ergonomics?

13   A.   No.

14   Q.   You're not prepared to offer any opinions in those

15        areas today?

16   A.   No.  When you say human factors, there are certain

17        things that I probably would qualify in.  It's not the

18        things you normally think of as human factors.  I

19        think in a couple of court cases that I was qualified

20        to talk about is reactions of people to fires, which,

21        as I recall a judge saying, is something that's kind

22        of a human factor, so it dances on that area.  But not

23        what you traditionally think of as human factors.

24   Q.   And that's not an issue in this case?

25   A.   I don't believe so.



JACK L. SANDERSON
June 18, 2010

Page 221

1  Q.  Okay.  Are you an expert in warnings?

2  A.  No.

3  Q.  And are you prepared to offer any warnings opinions in

4      this case?

5  A.  Well, there is a warning that -- that might be

6      appropriate if -- in light of Mr. Bajzek is claiming

7      that the problem is that there's a foil vent.  Other

8      manufacturers put on warnings on their dryer in close

9      proximity to their vents saying what you should or

10     should not do, and it is something that Electrolux

11     does not do.  So from that aspect, that might be

12     something about warnings that I might testify to the

13     fact that they don't put them on there.

14  Q.  Have you already testified today that you don't

15      believe that the foil vent is in any way causally

16      related to the fire?

17  A.  I've testified -- I don't think we have testified to

18      that.  I have testified to the fact that I believe it

19      was permissible to use a foil vent.  That was the

20      question I think you asked.

21  Q.  Do you have an opinion as to whether or not it's

22      causally related to the fire?

23  A.  I don't think it is.

24  Q.  So if -- so if the foil vent is not causally related

25      to the fire, would it also be your opinion that a



JACK L. SANDERSON
June 18, 2010

Page 222

 1        warning with regard to the foil vent would not have

 2        been causally related to preventing any injuries or

 3        damages associated with the fire?

 4    A.  That's probably true.

 5    Q.  Okay.  So if you take away that warning, do you have

 6        any other warnings that you contemplate discussing in

 7        this case?

 8    A.  I don't believe so.

 9    Q.  All right.  I did hand you your C.V., and I think it

10        was attached to some other stuff.  Did we mark that as

11        an exhibit?  You corrected me and told me that that

12        was not just your C.V., but it was some other things.

13    A.  Yes.

14    Q.  What's that exhibit number, please.

15                    MR. HESSEN:  I don't think it was -- was

16        yours marked?

17                    MS. EZELL:  Yeah, I gave him the marked

18        copy.

19                    THE WITNESS:  34.

20                    MS. EZELL:  34, okay.

21    BY MS. EZELL:

22    Q.  So after having reviewed this, if you -- well, let me

23        ask you this.  Strike all that.  What is the

24        difference, as you understand it, between establishing

25        a fire cause and origin opinion and an opinion with



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 223

1          regard to a design or manufacturing defect?

2                    MR. HESSEN:  Is the question what is the

3          difference; is that what the question was?

4                    MS. EZELL:  Yes.

5                    THE WITNESS:  I think that the

6          manufacturing or design defect would be a highly

7          refined cause analysis.  In other words, it is taking

8          cause to a much deeper level -- level than sometimes

9          is necessary.  I guess that's probably the best way I

10         could put it, is it is a more advanced or more

11         in-depth analysis of a specific aspect of the cause.

12    BY MS. EZELL:

13    Q.   All right, sir.  Do you have any training in the study

14         of plastics?

15    A.   I do not.

16    Q.   How about physics?

17    A.   Well, I have a little.  I had high school physics.

18    Q.   I'm sorry.  I apologize.  All of my questions are

19         related to college or post-graduate education.  How

20         about physics?

21    A.   Thermodynamics would probably come under physics.  I

22         did take a college course on thermodynamics.

23    Q.   Yes, sir.  Is that the mail order class that you took?

24    A.   Yes, it was.

25    Q.   Yes, sir.  And did you have to do any kind of test



JACK L. SANDERSON
June 18, 2010

Page 224

 1        after that?

 2   A.   I did.

 3   Q.   All right.  And what sort of marking or college credit

 4        did you receive for that?

 5   A.   I don't recall.  I think it's strictly a pass/fail, as

 6        best I can remember.

 7   Q.   And there was no pre-qualification in order to be

 8        admitted into taking that class, was there, sir?

 9   A.   I don't remember.

10   Q.   All right.  You are not trained nor have you taken any

11        classes in mechanical engineering?

12   A.   I have not.

13   Q.   Structural engineering?

14   A.   I have not.

15   Q.   Industrial engineering?

16   A.   Nope.

17   Q.   Electrical engineering?

18   A.   I've not taken any classes in it.

19   Q.   Statistics?

20   A.   No.

21   Q.   Survey research?

22   A.   I take that back.  I did have a statistics class in

23        college.

24   Q.   Intro to statistics or some sort of advanced

25        statistical regression analysis?



JACK L. SANDERSON
June 18, 2010

Page 225

1    A.   I don't remember.

2    Q.   All right, sir.  How about survey research?

3    A.   No.

4    Q.   Warnings?

5    A.   No.

6    Q.   Human factors, we've already talked about that, but

7         have you been trained in that area?

8    A.   No.

9    Q.   How about psychology?

10   A.   I think I took some college classes in that, too.

11   Q.   But any sort of advanced --

12   A.   No.

13   Q.   -- training in that?

14             And do you have any sort of advanced

15        training or certification in consumer behavior?

16   A.   No.

17   Q.   All right.  Could you tell me what a thought

18        experiment is?

19   A.   Thought experiment is conceptual visualization of what

20        might happen in a given circumstance.

21   Q.   And do thought experiments require any sort of

22        physical manifestation or recordation, as far as your

23        definition is concerned?

24   A.   No.  I would -- I would not think so.  I would think

25        Einstein's thought experiment of riding on a light


BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 227

```
 1          question specifically -- specifically not about
 2          dryers -- was whether or not you can have a science
 3          experiment -- a science -- a thought experiment where
 4          you simply just think about something or whether or
 5          not it is necessary to have rigor and design and
 6          methodology that is written out in advance and
 7          followed up on afterward or whether or not you just
 8          close your eyes and think of something as you
 9          understand the generic, non-dryer-related definition
10          of that term?
11     A.   Well, I don't think it's necessary to publish
12          something.  You know, I'm sure there's been a
13          gazillion thought experiments that have not been
14          published.
15     Q.   I agree with you, but that has nothing to do with the
16          question.
17     A.   They may lead to physical experiments that you could
18          perform, which would be a physical manifestation
19          and/or it may be an experiment that says that won't
20          work, which leads you to tell you no sense in doing a
21          physical experiment then.  But yes, I think that that
22          experiment process, thinking about how things happen
23          and what may occur, is a very important part of
24          science.
25     Q.   So why do you call it a thought experiment?  Why don't
```



JACK L. SANDERSON
June 18, 2010

Page 229

1          one investigator or scientist could have the same

2          insight from the same insight.  It does not

3          necessarily mean that it's provable at that point.  It

4          may become provable later on.

5    Q.    I'm sorry, provable is not my question.  Provable and

6          repeatable are completely different issues in the

7          scientific method.

8    A.    I'm sorry.  I used provable, and I should have used

9          repeatable.  But I think that --

10   Q.    Are you honestly sitting there, sir, and telling me

11         that I could have a thought experiment, right here,

12         with my eyes closed, and then you could repeat it

13         without me in any way communicating what my -- my

14         thought experiment was?

15   A.    No.  I think you'd have to tell me about it, and I

16         could do the same thought experiment, and maybe I

17         would come up with the same results.

18   Q.    So it is necessary to commit it to paper and to

19         outline the design of the thought experiment?

20   A.    No.

21   Q.    It isn't?

22   A.    That's what I said.

23   Q.    And this is an opinion that you hold to a reasonable

24         degree of methodological scientific certainty, that

25         you can conduct these experiments in your head and



JACK L. SANDERSON
June 18, 2010

Page 230

```
 1          that that is a valid approach to problem solving in

 2          your area of expertise?

 3    A.    It is an approach to allow you to visualize what can

 4          happen, and then you may want to run tests after that,

 5          on the basis of that thought experiment.

 6    Q.    Yes, sir.

 7    A.    Or you may learn, from the basis of that thought

 8          experiment, here's why that won't work, and so we

 9          won't do that.

10    Q.    Yeah.

11    A.    That's exactly -- that's what it's all about.

12    Q.    Okay.  So do you remember what my question was?

13    A.    I don't think it was very intelligent, but I -- you'd

14          better give it to me again.

15    Q.    Well, thank you, sir.  Your commenting on my relative

16          intelligence is not necessarily part of the deposition

17          process, but it may be very informative for the court.

18          So feel free to continue and indulge in that.

19          However, I will ask the court reporter to read back to

20          you the question, and perhaps she could read it slower

21          for you so you can pay better attention.

22                   (The requested portion of the record was

23                   read by the reporter at 3:19 p.m. as

24                   follows:

25                   "And this is an opinion that you hold to a
```



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 231

```
 1                        reasonable degree of methodological
 2                        scientific certainty, that you can conduct
 3                        these experiments in your head and that
 4                        that is a valid approach to problem solving
 5                        in your area of expertise?"
 6   BY MS. EZELL:
 7   Q.    That's a yes-or-no question.
 8   A.    It is a method recommended and specified by NFPA 921,
 9         Guide to Fire and Explosion Investigations, and it is
10         recognized as a way of approaching a scientific
11         problem.  It is not the end all, be all of any
12         scientific endeavor, but it is a step sometimes on a
13         route.
14   Q.    All right.  So is the answer to my question yes then?
15   A.    I don't think it's -- I don't think it can be answered
16         yes or no.
17   Q.    And do you believe, as you sit there, that the way you
18         and I have discussed this thought experiment process
19         is the same way that NFPA 921 envisions the thought
20         experiment?
21   A.    I do.
22   Q.    All right.
23                        (Off the record at 3:20 p.m.)
24                        (Back on the record at 3:21 p.m.)
25   BY MS. EZELL:
```



JACK L. SANDERSON
June 18, 2010

Page 232

1   Q.   You've never designed an appliance, have you, sir?

2   A.   I have not.

3   Q.   You've never designed any consumer product, have you?

4   A.   No.

5   Q.   Have you -- and you've never written a warning?

6   A.   No.

7   Q.   You did, however, use thought experiments with regard

8        to your lint accumulation opinions that you have

9        provided in the Hunter case?

10  A.   I can think of one specifically.

11  Q.   You indicated earlier that you are prepared to offer

12       opinions with regard to alternative designs.  You have

13       already testified today with regard to alternative

14       designs.  My question is whether or not you are

15       prepared to testify in this case about any alternative

16       designs that we have not already discussed in the

17       course of your deposition today?

18  A.   Well, I think we've talked about them, yes.

19  Q.   All right.  All right, sir, if you could please

20       explain for me what your opinion is in this case with

21       regard to the -- well, if you have an opinion in this

22       case, sir, with regard to the seal in the dryer of the

23       Hunter Electrolux dryer.

24  A.   My opinion is that the seal was too thin and

25       compressed and allowed a leak at the dryer which



JACK L. SANDERSON
June 18, 2010

Page 235

1       many of those loads are there.  So there's a big

2       variable there.  But we can say that it looks like a

3       year-and-a-half to two-and-a-half to three years it

4       seems to be when we first start seeing problems with

5       them.

6   Q.  And what is the classification that you would give to

7       the dryer in the Hunter case?  What do you call it?

8       Is it this year to this year?  Is it a certain type?

9       What is that dryer for you?

10  A.  It's a gas dryer manufactured in November of 2003.

11      It's a free-standing model.

12  Q.  Is it --

13  A.  I'm not sure what you mean by classification.

14  Q.  Yes, sir.  And this seal becoming a thin and

15      compressed issue, in your opinion, does it only exist

16      in the Hunters' dryer or does it exist across a -- a

17      range of Electrolux dryers?

18  A.  By Electrolux's admission, it is dryers that are

19      manufactured between December of 2001 and I think it

20      was November of 2004.

21  Q.  All right.  So the --

22  A.  And then, again, in 2000 -- whatever the -- 2008, or

23      whatever it is.

24  Q.  Well, you would agree with me, wouldn't you, that

25      whatever happened in 2008 is irrelevant for purposes



JACK L. SANDERSON
June 18, 2010

Page 240

1    BY MS. EZELL:

2    Q.   You're familiar with Angelo DiMonte, right?

3    A.   Yep.

4    Q.   And you sent him this e-mail on July 7th of 2006?

5         You're Jack at Fire Findings, right?

6    A.   Right.  I was just looking for a date.  Yep.

7    Q.   And this was one month before you released your

8         initial report, correct?

9    A.   Right.

10   Q.   And in this e-mail, it says, friction is still the

11        issue with Electrolux manufactured dryers, correct?

12   A.   Yep.

13   Q.   But doesn't it also say, we have not as yet duplicated

14        this event?

15   A.   That's correct.

16   Q.   But that you think we have an idea of how these fires

17        may be happening?

18   A.   Yes.

19   Q.   All right.  So you were willing to opine about a

20        defect mechanism even though you could not duplicate

21        your theory?

22   A.   Yes.

23   Q.   And you didn't -- you didn't conduct any testing in

24        the one month between this e-mail and the report that

25        you issued where you were able to duplicate that, did



JACK L. SANDERSON
June 18, 2010

Page 242

1    Q.   You understand fully well, sir, don't you, that you
2         were the one who was disclosed as the testifying
3         expert in this case?
4    A.   I don't know that.  I'm assuming, because I'm here,
5         that that's the case, but I don't know that.
6    Q.   How many cases has Mr. Dwyer testified in?
7    A.   I don't know.
8    Q.   More than five?
9    A.   I don't know.  Maybe if it is, it's not many more.
10   Q.   How many trials?
11   A.   I don't know.
12   Q.   None, right?
13   A.   No, that's not true.
14   Q.   Okay.  Are you familiar with an article entitled
15        Analysis of Heating by Friction in Plastic Clothes
16        Dryer Components that was published in the Journal of
17        Failure Analysis and Prevention in 2007?
18   A.   I believe I've read it.
19   Q.   And is that included in any of these materials that
20        we've looked at today?
21   A.   It would be in here someplace, yes.
22   Q.   And that was authored by whom, if you recall?
23   A.   Donald Duvall and Nelson Koopman, maybe.  I don't
24        remember.  Or maybe it was Tom Bajzek.  I'm not sure
25        who it was.  There were two authors from me aside.



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 243

```
 1   Q.   And that article disagrees with your friction theory
 2        from your first report; isn't that true?
 3   A.   It does.
 4   Q.   And the Electrolux experts in this case disagreed with
 5        your friction theory in your first report; isn't that
 6        true?
 7   A.   They did.
 8   Q.   And they were right?
 9   A.   That is a data point that we considered, and I think
10        that they are right.
11   Q.   And, in fact, after you read that article and their
12        report, you figured out you were wrong?
13   A.   That's correct, the timing would be after that is when
14        we realized that there are other mechanisms that are
15        involved.
16   Q.   All right.  In looking at your report in this case,
17        your first opinion is contained in the conclusion,
18        correct?  Paragraph number 1.  That the physical
19        evidence shows the fire resulted from ignition of lint
20        by the gas burner and was blown through the drum where
21        the burning pieces of lint ignited additional lint
22        that had accumulated in the vent duct; is that your
23        opinion?
24   A.   Yes.
25   Q.   Is that still your opinion today?
```



JACK L. SANDERSON
June 18, 2010

Page 248

1   Q.   Okay.  Did you ask the Hunters when the last time was
2        that they cleaned the lint filter?
3   A.   I think that she told us she cleaned it between every
4        load.
5   Q.   Did you ask her -- was this a specific part of your
6        inquiry of her when you interviewed her?
7   A.   I know that I asked her if it was in place at the
8        time, and I think that she told me that's something
9        the people usually volunteer that they do that.  But I
10       don't remember it specifically.  It may be in
11       Mr. Dwyer's notes.  He may have notes of that.
12  Q.   In your opinion, point number 1, you have the word
13       lint pieces, right?  What is the size of the lint
14       pieces to which you are referring?
15  A.   Well, they can be various sizes.  It depends on how
16       big a piece breaks off of the lint that's accumulated
17       there.
18  Q.   And what testing have you done to verify what size
19       lint pieces are or are not capable of causing the
20       result that you've identified?
21  A.   I can't imagine how you would do that, because as
22       pieces --
23  Q.   Well, sir -- I'm sorry.  We're starting to run out of
24       time.  So the answer is -- what testing -- I haven't
25       done any.  Because if you can't imagine, then you



JACK L. SANDERSON
June 18, 2010

Page 249

```
 1        haven't done it, correct?  You haven't done it?
 2   A.   I can't imagine how you do it.  No, we have not done
 3        it.
 4   Q.   So do you know what the density is of the lint pieces
 5        you've described in opinion number 1?
 6   A.   No.  It could be various densities.
 7   Q.   Okay.  How do you know, without testing, that this
 8        lint is capable of being blown through the dryer into
 9        the vent duct?
10   A.   Well, the Consumer Product Safety Commission study on
11        lint shows that.  And if you take a look at the videos
12        that were given, you'll see lots of times where it
13        happened.
14   Q.   The CPSC, have you looked at that test setup?  Do you
15        understand those are not real dryers?
16   A.   Those are not real dryers.
17   Q.   Okay.  So -- and in these videos, I'll see a piece of
18        lint that is the size that you opine occurred in the
19        Hunter case, and what will I see happen to it, and
20        I'll see a fire?
21   A.   You'll see lint blowing through the dryer and into the
22        vent duct.
23   Q.   And a fire?
24   A.   You'll see a fire in the dryer, sure.
25   Q.   Yeah.  But will I see those same things happening at
```



JACK L. SANDERSON
June 18, 2010

Page 250

```
 1          the same time; will I see a piece of lint going
 2          through the dryer causing a fire like you opine
 3          occurred in this case?
 4    A.    I don't know if you'll see one that ignites material
 5          in the vent, the vent duct.
 6    Q.    Do you have a test number or something --
 7    A.    No.
 8    Q.    -- you can refer me to?
 9    A.    You just have to look at them.  I don't know.  We've
10          done a lot of those tests.
11    Q.    It's your opinion that you have actually done a test
12          that duplicates what you believe happened in the
13          Hunter incident and you can't refer me to it?
14    A.    Oh, we've not burned up a dryer and we've not
15          specifically allowed one to burn like the Hunters did,
16          no.  We have started -- we've seen fires start in the
17          back of the dryer blow material through it and end up
18          in the vent duct, burn in the -- in the lint filter
19          and so forth.  I have seen others that have done that
20          test where that has occurred.
21    Q.    What other tests are you referring to?
22    A.    I've seen ones done by the Wright Group.  I've seen
23          ones done by Travelers Laboratories.
24    Q.    And you've confirmed that those test setups were done
25          in such a way that they actually have applicability to
```



JACK L. SANDERSON
June 18, 2010

Page 251

1       the Hunter case?

2   A.   It would be similar.

3   Q.   And what similarity have you confirmed?

4   A.   The same kind of dryers.

5               MR. HESSEN:  I'm sorry.  Same kind of

6       dryers?

7               THE WITNESS:  Same kind of dryers.

8   BY MS. EZELL:

9   Q.   Other than the same kind of dryers -- and by that I'm

10       assuming that you mean they were manufactured between

11       December of 2001 and November of 2004?

12   A.   Not necessarily.

13   Q.   So not even within this same time period that you've

14       identified as being the time period of relevance?

15   A.   I don't know the answer to that.

16   Q.   So you've seen some dryer catch on fire, and you're

17       saying that that's similar enough to have relevance in

18       the Hunter case?

19   A.   Yes.

20   Q.   What, other than --

21   A.   It's the mechanism that we're talking about.  The

22       mechanism works kind of irregardless of the dryer.

23   Q.   I understand that you believe that fervently.

24       However, I'm going to require a little bit more

25       scientific rigor than that.  And since your opinion in



JACK L. SANDERSON
June 18, 2010

Page 252

```
 1          this case is related to the specific interplay of the
 2          mechanisms and the seal and the air flow of the Hunter
 3          case, my question is whether or not you have a test
 4          that duplicates the multi-factorial issues in a fire?
 5    A.    You may not like the test, but I think the test
 6          duplicates what happens in a dryer like that.  It may
 7          or it may not be in the same year dryer, it may not be
 8          the same color dryer, but it simulates what happens.
 9    Q.    Oh, and I appreciate that it may not be the same
10          color.  Thank you for that.  Does it have all of the
11          other design and manufacturing and mechanical issues
12          that you've identified in points 1 through 9 of your
13          issues and complaints about the Hunter dryer?
14    A.    I think they would be very similar.
15    Q.    Yes, sir.  And I appreciate that you think that they
16          would be very similar.  But what have you done to
17          confirm that they are, in fact, not just similar but
18          the same so that those tests actually have scientific
19          applicability in this case?
20    A.    I don't know how you could exactly replicate a dryer
21          of any kind.
22    Q.    Yes, sir.
23                    MS. EZELL:  I'm sorry.  Move to strike.
24                    THE WITNESS:  Every dryer has its -- you
25          want to have an answer to this, and you're going to
```



JACK L. SANDERSON
June 18, 2010

Page 253

```
 1      get it.  I don't understand how you could possibly
 2      have a dryer --
 3              MS. EZELL:  Counsel, I'm sorry, could you
 4      please help your witness?
 5              MR. HESSEN:  He's trying to answer the
 6      question.
 7              MS. EZELL:  No, he's not.  He's trying to
 8      give some sort of dialogue that is totally
 9      non-responsive.
10  BY MS. EZELL:
11  Q.  Now, my question --
12  A.  I'm not done yet.
13  Q.  Yes, neither am I.
14  A.  Are you going to shut up and let me answer the
15      question here or not?
16              MS. EZELL:  Now, Counsel, I'm going to
17      insist that you instruct your witness not to be
18      abusive to me.  I have -- I have sat here all day and
19      listened to him be non-responsive.  I'm not going to
20      sit here and have this man talk to me and tell me to
21      shut up.  That is completely inappropriate.  There is
22      some decorum that is required in this proceeding, and
23      that is not appropriate.
24              MR. HESSEN:  Are you going to let him
25      answer the question?
```



JACK L. SANDERSON
June 18, 2010

Page 254

1          MS. EZELL:  I'm going -- I've asked you to
2     give him an instruction with regard to decorum.  Now,
3     would you please read the question back.
4                    (The requested portion of the record was
5                    read by the reporter at 3:53 p.m. as
6                    follows:
7                    "Yes, sir.  And I appreciate that you think
8                    that they would be very similar.  But what
9                    have you done to confirm that they are, in
10                   fact, not just similar but the same so that
11                   those tests actually have scientific
12                   applicability in this case?"
13    BY MS. EZELL:
14    Q.   And I'll withdraw that question, and I'll ask you for
15         the document that shows the similarity between those
16         tests which you have identified and the conditions
17         which you have identified as being present in the
18         Hunter dryer.
19    A.   I think you would have to look through the testing
20         binders, and I think you would probably find that
21         material.
22    Q.   And, sir, you are the expert, and I'm asking you to
23         point me to anything in these testing binders that has
24         not just one piece of similarity but that has the
25         confluence of similarity which would make it relevant



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 256

```
 1   Q.   And --
 2              MR. HESSEN:  Hold on.  Counsel, please
 3        stop.  I'm going to object, because you're being
 4        compound with your question and he's being compound
 5        with his answer.  Let's take it level by level.
 6              MS. EZELL:  That's an objection to form,
 7        but it's a good one, so I appreciate that.
 8              MR. HESSEN:  Go back to the book.  What was
 9        the first question, Counsel?
10   BY MS. EZELL:
11   Q.   Between December of 2001 and November of 2004.
12   A.   The dryer that we used was not manufactured during
13        that period of time.
14   Q.   So in all of your testing, you don't have a dryer that
15        resulted in a fire that was manufactured between the
16        time period that you've identified that has the too
17        thin and compressed seal issue from the Hunter case?
18   A.   Actually, it does have a compressed seal with it, but
19        it was not manufactured during that period.
20   Q.   Okay.  My question was, if you'll recall, we
21        testify -- you testified earlier about a certain time
22        period which you identified was the time period that
23        the Hunter dryer fell into, that had a free-standing
24        gas dryer, and a too thin and compressed seal; do you
25        recall that?
```



JACK L. SANDERSON
June 18, 2010

Page 257

1   A.   I do.

2   Q.   And that was from December of 2001 to November of

3        2004.  Is that -- did I write down those dates?

4   A.   That's correct.

5   Q.   Okay.  So my first question is:  Can you find a dryer

6        in your testing that you were able to duplicate a fire

7        manufactured between December of 2001 and November of

8        2004, and I understand your answer is no?

9   A.   The answer is no.

10  Q.   All right.  Now, you have answered, however, that you

11       are able to find one that had a thin and compressed

12       seal; is that correct?

13  A.   The dryer that was used had a thin and compressed

14       seal.

15  Q.   And tell me what year of manufacture that dryer was.

16  A.   2007.

17  Q.   Okay.  However, that dryer, as we talked about

18       five hours ago, had a thin and compressed seal with a

19       different part and configuration than the thin and

20       compressed seal of the dryers in 2001, 2004 as a

21       result of another change in material; is that correct?

22  A.   That's correct.

23  Q.   All right, sir.  Can you tell me -- and what are you

24       looking at there, please?  What is the date and the

25       title of the test that you have flipped to in that



JACK L. SANDERSON
June 18, 2010

Page 267

1   Q.   All right.  First, can you tell me whether or not that

2        testing was done on a dryer manufactured by Electrolux

3        between December of 2001 and November of 2004?

4   A.   It was not.

5   Q.   Was it conducted on a dryer that was between

6        one-and-a-half and two-and-a-half years old?

7   A.   It was new when we started.

8   Q.   Did the dryer have a thin and compressed seal

9        condition?

10  A.   Certainly not when we started.

11  Q.   Did you manifest a thin and compressed seal condition

12       at any point during the testing?

13  A.   Actually, it compressed during the course of the

14       testing.

15  Q.   Is this a gas dryer?

16  A.   Yes.  I'm sorry.  It's an electric dryer.

17  Q.   This is an electric dryer?

18  A.   Right.

19  Q.   And does this have rigid or flexible venting?

20  A.   Actually, it has metal venting, I believe.  Metal

21       venting.

22  Q.   But not flexible metal?

23  A.   Not flexible.

24  Q.   Okay.  And so based on this testing that you did with

25       your lint accumulation study that you've just



JACK L. SANDERSON
June 18, 2010

Page 272

```
 1   Q.   Okay.  Now, we've already discussed the fact that your
 2        2006 report was later established to have been
 3        incorrect.  If this 2009 report is also incorrect with
 4        regard to its analysis of the cause of the fire, have
 5        you considered other potential causes of the Hunter
 6        fire?
 7                  MR. HESSEN:  Just since the issuance of
 8        this report; is that what your question is?
 9                  MS. EZELL:  No.
10   BY MS. EZELL:
11   Q.   Just what other potential causes could there be for
12        the fire?
13   A.   We have considered that and don't see that there is
14        another explanation for the Hunter fire.
15   Q.   So what other potential causes did you consider and
16        rule out prior to the issuance of your 2009 report?
17   A.   Well, I think if you take the -- take the cause in two
18        steps and say the cause is the lint is ignited, in
19        this case in the heater pan by the gas burner, and
20        blows through the -- through the drum either igniting
21        things in the drum or in the vent trap, I think that
22        there is pretty wide acceptance of that by Electrolux
23        experts, as well as by other people who are not
24        Electrolux experts.  So I think that is pretty much a
25        given.  What the -- what it really comes down to today
```



JACK L. SANDERSON
June 18, 2010

Page 273

1          is a debate between -- debate as to why that lint

2          accumulates.  And Mr. Bajzek, Mr. King say that the

3          reason and the only reason is a restricted vent.

4          Electrolux's own documents shows that that's not true.

5          Air flow problems can be caused by other things, and

6          they say so in their service manual and they have for

7          years.

8                    Then when you go back and look at it in

9          terms of when these fires occurred, when the dryers

10         were manufactured that have -- that sustained these

11         fires, and you see something which is not explicable

12         in terms of the venting, then it has to be something

13         different than that.  And the thing that's different

14         than that is the time that they occur is the time when

15         the vent -- when the seal is -- was defective.  And

16         that, to me, makes the case that it is the seal that

17         is the issue.  Although I think probably venting can

18         contribute to it, as well.  But people had bad vents

19         in 2000, and they had bad vents in 2009.  But they

20         didn't have as many Electrolux dryer fires as they did

21         in those years, as they did in 2002, 2003, and 2004.

22  Q.     But that prevalence issue is interesting, perhaps,

23         from a macro perspective.  But I'm curious to

24         understand how that assists you in ruling out venting

25         as a causative issue as it relates to the Hunter fire.



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 274

1   A.   Okay.  The Hunter fire, we know -- we know that the
2        Hunters have a flexible foil vent on it.  She says
3        that.  There's remains of it.  All the evidence points
4        to that.
5   Q.   Okay.
6   A.   There is evidence that it largely burned up, which is
7        a pretty good indication that it doesn't have an awful
8        lot of lint in it, because lint will actually protect
9        surfaces for a while, which is why we find unburned
10       lint in the vent duct of many dryers, even after
11       extensive fires.  We can reconstruct, by looking at
12       the photos, how this dryer was vented.  And while it
13       has some turns in it, it's not essentially long, and
14       there's no reason to believe that it has accumulated
15       lint in it, plus the fact that she's not really having
16       problems with clothes not being dry, which is the
17       number one problem with an obstructive vent.  She says
18       that they're not dry sometimes when she puts them in
19       for 15 minutes, and I don't think they're ever going
20       to be dry in 15 minutes.  The dryer just doesn't work
21       that fast.
22                 And so there is no evidence other than
23       Mr. Bajzek says, oh, look, it has a foil vent.  You
24       can't have a foil vent.  And it's long and it's
25       curved.  It must have had lint in it.  But there isn't



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 275

1        anything that supports that.  His answer is, well, it
2        had to be because you had a fire, and that's not --
3        you can't say that.
4    Q.  But you'll agree that she said that her clothes
5        weren't drying?
6    A.  She said that her clothes were not drying, but she was
7        putting them in for 15 minutes at a time, and they're
8        not going to dry in 15 minutes.
9    Q.  Did you ask her why she was putting her clothes in for
10       15 minutes if she was expecting them to be dry?
11   A.  I don't know that I asked her that, no.
12   Q.  You work with dryers a lot.  You talk to people who
13       have dryers a lot.  Do people put their clothes in for
14       15 minutes and expect them to be dry?
15   A.  There are a surprising number of people who do.
16       They'll put them in for 15 minutes and check, go for
17       another 15 minutes and check, and come back in another
18       15 minutes, and do it every day, and they're never
19       dry.  I say, why don't you come back in a half an
20       hour?  Well, I don't want them to get too dry.
21       Something happens to them when they get too dry, so I
22       check them.  There are, it surprises me, a lot of
23       people that do that.
24   Q.  But, nevertheless, one of the signs of improper
25       venting is your clothes don't dry, right?



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

Page 281

1       selection bias?

2    A.    I am.

3    Q.    What is that, as you understand it?

4    A.    If you look at only certain things, then that's what

5          you're going to see is those.  And so in a case like

6          this, you may be saying, well, you know, people are

7          only sending dryers that are manufactured in a

8          particular time frame to us, and so you see more of

9          those fires.  You could say that would be a sampling

10         bias, but the problem is the people that send us the

11         dryer don't know how to date them.

12   Q.    Right.  Right.  There's no question pending yet.  The

13         only question was do you have a definition of a sample

14         selection bias.  And the question is:  Do you agree

15         that based on your unique position as it relates to

16         investigation of dryer fires, being a consultant

17         assigned predominantly to evaluate post-fire dryers,

18         that you have a sample selection bias as it relates to

19         dryer performance as opposed to dryer fires?

20   A.    Well, I guess you could say that, you know, we're a

21         fire laboratory, and so we're going to see fire --

22         dryers that have fires.  We're not going to see ones

23         that the heating element breaks and doesn't cause a

24         fire.

25   Q.    And you don't see the ones that perform as designed



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

JACK L. SANDERSON
June 18, 2010

1                        CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                      ) SS

4    COUNTY OF OTTAWA  )

5

6              I, PEGGY S. SAVAGE, certify that this

7    deposition was taken before me on the date

8    hereinbefore set forth; that the foregoing questions

9    and answers were recorded by me stenographically and

10   reduced to computer transcription; that this is a

11   true, full and correct transcript of my stenographic

12   notes so taken; and that I am not related to, nor of

13   counsel to, either party nor interested in the event

14   of this cause.

15

16

17

18

19

20

21   _____

22        PEGGY S. SAVAGE, CSR-4189, RPR

23        Notary Public,

24        Ottawa County, Michigan.

25   My Commission expires:  7-13-13



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888