### UNITED STATES DISTRICT COURT
### EASTERN DIVISION OF MICHIGAN
### SOUTHERN DIVISION

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, as Subrogee
of GLEN HUNTER,

                                        Case No. 2:08 CV 11150

        Plaintiff,

v.                                      Honorable Denise Page Hood
                                        Magistrate Judge R. Stephen Whalen

ELECTROLUX HOME PRODUCTS, INC.,

        Defendant.

---

### PLAINTIFF'S RESPONSE TO ELECTROLUX HOME
### PRODUCTS INC.'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN
### TESTIMONY OF PLAINTIFF'S DISCLOSED EXPERT JACK SANDERSON

Plaintiff, by and through its attorneys, Kreis, Enderle, Hudgins & Borsos, P.C. and for its Response to Electrolux Home Products Inc.'s Motion *in Limine* to Exclude Certain Testimony of Plaintiff's Disclosed Expert Jack Sanderson,  states as follows:

1.      In this subrogation action, State Farm claims that a General Electric gas dryer, which Electrolux designed and manufactured in November 2003, was defective, and that this alleged defect caused a fire in the home of its insured, the Hunters, on January 24, 2006. (Am. Compl. " 4, 6, 8.)' To attempt to support this claim, State Farm offers testimony from fire investigator Jack Sanderson.

**RESPONSE:**      **Plaintiff admits the allegation contained in paragraph 1.**

2.      In his first report, dated August 22, 2006 (prior to the filing of this action), Mr. Sanderson opined as to the alleged cause and origin of the fire. Specifically, he opined that the fire originated in the dryer and was caused by "heat generated by friction of moving parts at the blower ...." (Sanderson lnit. Rep. at 1, Aug. 22, 2006.) He further opined "that the dryer was defective." *(Id.)*

**RESPONSE:**      **Plaintiff admits the allegation contained in paragraph 2.**

3.      On August 21, 2009, approximately three years later, and after State Farm filed and served its Complaint, Mr. Sanderson prepared a "supplemental" report contradicting his prior report and offering nine entirely new opinions on several different and far-ranging areas of purported expertise ranging from fire cause and origin to clothes-dryer design and manufacture, disproportionate risk, warnings, other incidents, and a purported survey of clothes-dryer service providers, among others. (Sanderson Supp. Rep. at 2-3, Aug. 21, 2009.)

**RESPONSE:      Plaintiff admits Mr. Sanderson had a new opinion.   Sanderson, after investigating the Hunters' dryer and issuing his August 22, 2006 Report, investigated dozens more burned Electrolux dryers, finding evidence that 'friction' theory of ignition was incorrect.   He developed a revised theory of ignition, consistent with the evidence he had gathered from all the investigations he had conducted, and designed a battery of tests on exemplar Electrolux dryers to confirm or disprove his revised theory.   The tests confirmed his revised theory, proving that a properly-installed, properly-maintained Electrolux dryer can cause a fire.   He had developed and tested the theory by November 1, 2007, but he did not provide an updated report for this action until 2009, when he received notice that the Hunter case was in litigation.   Sanderson's Deposition, Page 196,** Exhibit A**.**

4.      Federal Rule of Evidence 702 requires testimony in the form of expert opinions or scientific evidence be "based upon sufficient facts or data, ... the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case." As counseled by *Daubert* and its progeny, courts evaluate the reliability of expert testimony based on a set of non-exhaustive factors. *See Mike's Train House, Inc.* v. *Lionel, L.L.c.,* 472 F.3d 398, 407 (6th Cir. 2006) (citing *Daubert* v. *Merrell Dow Pharms., Inc., 509* U.S. 579, 593-94 (1993)).  Expert testimony must not only be reliable, it must also be relevant. *See* Fed. R. Evid. 702; *see Clay* v. *Ford Motor Co.,* 215 F.3d 663, 667 (6th Cir. 2000).

**RESPONSE:      Admit.   Further, Sanderson's expert opinion is the product of reliable principles and methods, specifically, rigorous testing under the scientific method.**

5.      Mr. Sanderson is wholly unqualified to present the testimony that he offers in his report and elaborated on in his deposition. Moreover, his methodology for his proffered

testimony, where one even exists, is wholly unreliable and produces, by Mr. Sanderson's admission, results that are simply "wrong."

**RESPONSE:   Plaintiff denies paragraph 5 as untrue.  Sanderson is qualified to testify as to his opinion.  Sanderson has been involved in fire investigation since 1972 and has investigated more than 4,000 fires in his long career.  See Sanderson's CV attached as Exhibit J to the Brief in Support of Response.  Since 1986 he has conducted laboratory analysis of appliances suspected of dryer fires, including from 1997 to the present in his capacity as the owner of Fire Findings, Laboratories, LLC, an independent forensic laboratory specializing in examination of products suspected of causing fires or explosions. *Id.*  He has received over 1,000 hours of fire-investigation training, in addition to training specific to dryer-fire investigation and training provided by dryer manufacturers.  *Id.* He is well-published, having authored more than 400 articles regarding fire investigation, including at least eight articles pertaining to residential clothes dryers.  *Id.* He frequently lectures, not only on general fire investigation, but also specifically on dryer-fire investigation; he has conducted more than 120 seminars specifically related to dryer-fire investigation.  His seminars are attended not only by fire investigators, but also by design engineers who work for dryer manufacturers.  *Id.* He has also investigated more than 120 fires related to Electrolux dryer fires, and conducted many experiments to test his theory: Lint Generation Test, Long-Term Lint Accumulation Test, Ignition of Lint in the Heater Pan Test, Airflow Testing, Temperature Testing, Temperature testing – High Heat vs. Low Heat, Airflow Opening in Dryer Drums.**

6.      Specifically, and as explained more fully in the accompanying brief, Mr. Sanderson offers the statistical opinion that "gas dryers, like the Hunters' unit, are disproportionately at risk for fires." (Supp. Rep. at 2.) For this opinion, he relies primarily on his own personal experience that "we see way more of them." (Sanderson Dep. 146:22-23.) In addition to his utter lack of training, experience, and expertise in the area of statistics, this *ipse dixit* opinion violates Rule 702 and *Daubert* because it is based solely on Mr. Sanderson's subjective observations, rather than an objective, scientific, and reliable methodology. Therefore, the Court should exclude it entirely.

3

**RESPONSE:    Plaintiff denies paragraph 6 as untrue.    Sanderson, in his November 1, 2007 Report, explained that by that date he had inspected 39 Electrolux "blower-housing" fires and 27 of the 39 were gas dryers, and only 12 were electric dryers. Electrolux sells about four times as many electric dryers than gas dryers, but Sanderson found that about two times as many gas dryers burn than electric.  Sanderson can testify that he found a disproportionate number of gas dryers burn than electric because it is a simple mathematical observation.**

7.    Mr. Sanderson also offers opinions on product defect. *(See* Supp. Rep. at 2-3.) Yet, he admits that his initial defect theory was completely "wrong." (Sanderson Dep. 201:20.) Instead, he now opines that the Electrolux dryers "encourage[] lint accumulation in the vent duct" as well as a "defective front seal" that causes lint to accumulate by the gas dryer's heater pan and burner. (Supp. Rep. at 2.) That lint by the burner ignites, then migrates through the heater pan, through the grill on the back of the dryer's drum, through the dryer's tumbling drum-- which, in the Hunters' case, had wet sheets in it-through the lint screen, and into the vent duct, where it ignited the accumulated lint there, setting the dryer on fire. *(Id.)*

**RESPONSE:    Plaintiff admits that Sanderson opined that Electrolux dryers, including the Hunters' Electrolux dryer, burned as a result of a product defect.  Admit that Sanderson opined the "design and manufacture of Electrolux dryers is such that it encourages lint accumulation in the vent duct."  August 21, 2009 Report, p2,** Exhibit G**. Admit that Sanderson opined that lint by the heater's burner ignited and was blown through the drum into the lint screen, igniting more lint and causing a major fire.**

8.    By his own admission, Mr. Sanderson is not an expert in clothes-dryer design. (Sanderson Dep. 219:25-220:2). Beyond this admitted lack of expertise, the Court should exclude his defect testimony because it is based on flawed and serially erroneous methodology as well as wholly unsupported by any reliable testing (and, in fact, contradicted by Mr. Sanderson's own testing). Further, his defect opinions are not relevant because he failed to provide a valid, tested alternative feasible design, as required by Michigan statute. As a result, the Court should exclude any and all defect testimony from Mr. Sanderson.

4

**RESPONSE:**      **Plaintiff admits that Sanderson is not a clothes-dryer designer, but deny that he is not qualified to offer his opinion.  He based his opinion on his examination of over 100 burned Electrolux dryers and subjected his theory to a battery of tests.  The tests confirm the theory.   Deny that Sanderson cannot opine on alternative designs; Sanderson is qualified to opine regarding alternative designs because he has observed that the alternative designs he proposes make the Electrolux dryers less prone to cause fires.**

9.      Mr. Sanderson further opines as to the efficacy of the warnings provided by Electrolux for this dryer. *(See* Supp. Rep., Ex. 3; Sanderson Dep. 221:3-13.) This is another area in which he admitted to having no expertise. (Sanderson Dep. 221:1-2.) Moreover, his warnings opinions do not "fit" the facts of this case because (l) he cannot demonstrate that a different warning would have made any difference in the Hunters' actions, (2) he did not analyze the literature that accompanied the General Electric dryer owned by the Hunters, and (3) he failed to provide an alternative, reasonable warning, as required by Michigan law. Additionally, his analysis, such as it is, consists solely of his subjective belief that the warnings are vague and confusing-a truly unscientific methodology. These numerous flaws require the exclusion of his warnings testimony as well.

**RESPONSE:**      **Plaintiff denies the allegation contained in paragraph 9 as untrue.**

10.      Mr. Sanderson also makes several claims about the training and knowledge of Electrolux's authorized service providers. (Supp. Rep. at 3.) However, this proposed testimony, like other of his proposed testimony, is wholly irrelevant because, as he admits, the Hunters never had their dryer serviced (Sanderson Dep. 177: 14-23), he has no service records of what happened with this dryer after it left Electrolux's hands *(id.* at 217:19-20), and, most importantly, service is not an issue in this case and he has no opinions with regard to service, *(id.* at 61 :23-63:8.) Nonetheless, to support his service opinions, Mr. Sanderson offers a "survey" of a small sampling of Electrolux service providers. *(See* Supp. Rep., Ex. 3-E.) But Mr. Sanderson is not qualified to conduct or analyze such a "survey," and he admits he has no training or experience in conducting surveys. (Sanderson Dep. 225:2-3.) A plethora of fundamental methodological flaws also renders this "survey" devoid of any indicia of reliability. Thus, the Court should exclude this irrelevant and inadmissible evidence.

5

**RESPONSE:    Plaintiff denies that this Court should exclude Sanderson's proposed testimony regarding conversations with Electrolux's Authorized Service Providers.  Those conversations are admissible as 'not hearsay' under Fed. R. Evid. 801(d)(2)(D).  Electrolux directs its customers to those service providers when users have service issues, thereby indicating that the service providers are Electrolux's agents with respect to service questions, rendering the service providers' statements not hearsay.**

11.    Mr. Sanderson is, at most, and without waiving Defendants' right to challenge his qualifications and testimony on this area at trial if offered, a fire-cause-and-origin witness. Whether he is qualified and offers competent reliable expert testimony is an issue that will need to be addressed at trial, as will the possible relevance of his testimony, given that there is no real dispute about the true cause and origin of this fire, which is that ignited lint caused the fire to originate within the dryer. Anything beyond this true cause-and-origin opinion falls well outside any possible expertise Mr. Sanderson may have, and his flawed and often non-existent methodologies in these areas render his unqualified testimony all the more improper.

**RESPONSE:    Admit that Sanderson is a fire-cause-and-origin expert witness, but deny that his testimony regarding the defects in Electrolux's dryers is unreliable or that his methodologies were flawed.  Admit that the fire originated within the dryer.**

12.    To be clear, at this time, Electrolux is not challenging Mr. Sanderson's opinions that the fire originated in the laundry room and was caused by ignited lint within the dryer. Indeed, Electrolux shares that position on fire cause and origin. What Electrolux challenges are his opinions that go beyond far beyond that and that are unqualified, unsupported, unreliable, and inadmissible under the Federal Rules, *Daubert,* and law of this Circuit.

**RESPONSE:    Admit that the fire originated within the dryer.  Plaintiff denies that Sanderson's opinions regarding Electrolux's design flaws are inadmissible under the Federal Rules, *Daubert*, or the laws of the Sixth Circuit.**

13.    Pursuant to Local Rule 7.1 (a), counsel for Electrolux sought consent for this motion from counsel for State Farm and, after explaining the nature of this motion and its legal basis, requested but did not obtain concurrence in the relief sought.

**RESPONSE:**     Plaintiff admits the allegation contained in paragraph 13.

Wherefore, State Farm, for the reasons stated herein and the accompanying brief, respectfully requests that this Court deny Electrolux's motion in its entirety.

KREIS, ENDERLE,
HUDGINS & BORSOS, P.C.

Dated: November 4, 2010                  BY:____/S/   Stephen J. Hessen_____
                                               Stephen J. Hessen (P41663)
                                               Kreis, Enderle, Hudgins, & Borsos, P.C.
                                               Attorneys for Plaintiff
                                               P.O. Box 4010
                                               Kalamazoo, MI 49003-4010
                                               269-324-3000
                                               shessen@kreisenderle.com

### PLAINTIFF'S RESPONSE BRIEF TO ELECTROLUX HOME PRODUCTS INC.'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN TESTIMONY OF PLAINTIFF'S DISCLOSED EXPERT JACK SANDERSON

**I.     Introduction:**

By Electrolux's own admission, Electrolux has received notice of at least 1,800 Electrolux dryer fires.  As is typical for these types of fires, Electrolux cites "improper vent installation" or "failure to clean the vent duct" as the cause.  This is another in a long series of cases where an Electrolux's dryer caused a fire, and Electrolux, rather than accepting responsibility for the fires, blames the homeowners.

Not everyone involved in these dryer fires has accepted Electrolux's claims, however, especially when, as here, it appears that there is scant evidence to support Electrolux's claims: here the culprit dryer was an almost new (about two years old), and professionally installed.

Jack Sanderson is a fire investigator with nearly forty years' experience.  He has investigated numerous fire scenes involving Electrolux dryers, and doubted Electrolux's excuses. Consequently, he conducted an extensive, well-documented series of scientific tests to determine whether a properly-installed, properly-maintained dryer can still cause a fire.  In addition, he

examined scores of burned Electrolux dryers, meticulously examining the burn patterns, and interviewed the homeowners, all in an effort to gather as much evidence as possible regarding the cause of the fires.

His tests proved his hypothesis: properly-installed, properly-maintained Electrolux dryers can self-ignite due to a defective design.  Defendants Motion seeks to exclude his testimony by ignoring Sanderson's years of documented testing and confirmed results by calling Sanderson's work "patently unreliable."  This, despite that fact that Electrolux itself has admitted—through its expert report and its own service bulletins—there its dryers can suffer from the problems identified in Sanderson's testing.  This motion is merely a recitation of Electrolux's argument that this Court already rejected, in *Fire Ins Exchange v. Electrolux Home Products*, 2006 U.S. Dist. LEXIS 76161, (E.D. Mich 2006).  This Court should follow its own precedent, and deny Electrolux's motion.

## II.    Issues:  Electrolux's *Daubert* motion presents the Court with four issues:

- Sanderson had inspected scores of burned Electrolux dryers, finding that more than twice as many gas dryers burn than electric, even though Electrolux had sold about four times as many electric as gas dryers.  Under *Daubert*, a witness need not be a statistician in order to testify about simple math.  Should the Court allow Sanderson to testify that he discovered a disproportionately large number of gas dryers burning?

- Sanderson's defect theory involved the hypothesis that Electrolux dryers naturally suffer from "restricted airflow."  He conducted a series of documented experiments on exemplar dryers, which proved the hypothesis.  Electrolux's expert admits that "restricted airflow" is a problem that can cause lint to accumulate in their dryers' heater mechanism, (a dangerous place for extremely flammable lint to accumulate).  Under *Daubert*, if an expert's theory has been scientifically tested, the expert should be allowed to testify.  If Sanderson's defect theory has been confirmed through testing, and Electrolux admits that it can cause a dangerous condition, should the court exclude Sanderson's testimony as unreliable?

- Electrolux's design flaws can be somewhat prevented in two different ways:  First, install a felt seal that actually works.  Second, install a "heater baffle," which guards the dryer's heater, making the dangerous lint-accumulation less likely to start a major fire.  Sanderson conducted a test that confirmed that a non-defective seal helps cure the defect.  He also inspected dryers with the baffle, confirming that they are safer.  If Sanderson's testing and investigation confirmed that the alternatives help resolve the problems, should the Court permit Sanderson to so testify?

8

- Statements by a party's agent are not hearsay. Electrolux promises to "care and service [its] products throughout their lifetime," and directs customers with service questions to their "Authorized Electrolux Service Providers." Sanderson spoke to some of Electrolux's Authorized Service Providers. If Electrolux directs customers to those providers for service questions, are their statements admissible as admissions by a party opponent?

## III.   Background:

**The fire:**

Glen and Mattie Hunter, residents of Livonia, bought a new gas-fired Electrolux dryer and had it professionally installed in their home. Mattie Hunter's Deposition, 14:16, and 15:7-10. **Exhibit B**. Mattie Hunter, along with her daughter, used the dryer twice a week—Tuesdays and Thursdays—to dry their laundry, averaging two to four loads each laundry-day, never experiencing any trouble with it. *Id*. at 20:19, 27:14, and 35:15-17.

About a year-and-a-half after the Hunters purchased the Electrolux dryer, on January 24, 2006, Mattie Hunter was doing laundry, as usual, when she opened the dryer and saw smoke coming out of the dryer. *Id*. at 38:20. Moments later, she heard a "whoosh," *Id*. at 40:6-8, and saw flames coming out of the dryer. She called for her daughters, and they all left the house. The fire department was called and the firefighters extinguished the blaze, but not before the fire caused substantial damage to the house and its contents. State Farm insured the home and paid the Hunters' insurance claim, at a cost of more than $425,000.

**The investigation and Sanderson's tests:**

State Farm retained Jack Sanderson, a certified fire cause and origin inspector, to determine the cause and origin of the fire. After a thorough investigation, Sanderson determined that the Hunter fire was another of the then-growing number of Electrolux fires. Sanderson has been investigating fires for almost forty years, having investigated more than 4,000 fires in his career, and of those, approximately 600 were suspected dryer fires. Sanderson, in 2004 and 2005, had noticed a pattern in the dryer fires he was investigating: there were a large number of Electrolux dryers involved in fires—in fact he first noticed this pattern when he was called to two fires on the same day, and the two fires exhibited nearly-identical burn patterns in the Electrolux dryers. Sanderson's Deposition, 145:22-24. **Exhibit A**.

9

Sanderson set out to determine what was causing these Electrolux dryers to ignite. By November 5, 2005, Sanderson had examined 18 Electrolux dryers and had found two failure modes associated with Electrolux dryers: First, a failure of the rear drum bearings; second, fires that appeared to originate within the dryers' blower housing. November 1, 2007 Report, p1. **Exhibit C**. (The second failure mode is the one at issue in the Hunter dryer).[1]

Sanderson developed a hypothesis as to how the blower-housing fires were caused. *Id*. He found that the blower-housing fires originated in the blower-housing. Where there is an origin there must be a cause, and Sanderson found evidence of what he believed to be the cause: some of the blower-housing fires showed evidence that the plastic in the moving parts of the blower had rubbed against each other, causing friction, which heated the plastic to its ignition point. *Id*. at p3.

It was while operating under this theory that Sanderson inspected the Hunter dryer. He found that the Hunter's Electrolux dryer bore the same burn patterns as the other Electrolux dryers that had the blower-housing type fire. He issued his August 22, 2006 report to State Farm, identifying the fire's origin as a blower housing, and the cause as friction between the blower's plastic parts. Sanderson's August 22, 2006 Report. **Exhibit D**.

After issuing his opinion, Electrolux dryers continued to ignite,[2] giving Sanderson many more examples to examine blower-housing fires, and allowing him to confirm precisely how the blower housings ignited. Some of the dryers that he obtained had suffered only minor fire damage within the cabinet. November 1, 2007 Report, p9. Those dryers provided valuable insight into the exact location of fire origin because with only minor damage, the precise location of the origin was much clearer. In late 2007, Sanderson examined the least-damaged Electrolux dryer that he had yet found and that dryer confirmed that the blower-housing fires did not originate directly within the blower housing as he had first thought. *Id*. Instead, the burn patterns showed that the fire had originated in the lint screen, which is <u>above</u> the blower housing. This was a curious discovery, because the lint trap contains combustibles (lint and plastic) but nothing that would ignite on its own[3] Indeed, although Sanderson had long observed that the lint

---

[1] The first failure mode is not at issue in this case, but this Court has been briefed on the failure mode in the past, denying Electrolux's motion to exclude the expert testimony. *Fire Ins Exchange v. Electrolux Home Products*, 2006 U.S. Dist. LEXIS 76161, (E.D. Mich 2007).

[2] November 1, 2007 Report, p1 (by the date of this report, he had inspected an additional 69 Electrolux dryers.)

[3] Sanderson submitted the lint trap to laboratory testing, which ruled out any ignitable liquid residue or material that might cause spontaneous combustion. November 1, 2007 Report, p.10.

trap was involved in the blower-housing fires, the lint trap lacked an ignition source. This led him to believe that the lint trap had burned as a result of the blower-housing igniting. This dryer, however, confirmed that the fire origin was the lint trap. *Id*.

Armed with this discovery, Sanderson reviewed his theory, revising it to account for the new information. He developed a new, migrating-lint theory. To confirm this theory, he conducted a battery of tests and closely inspected over one hundred burned Electrolux dryers. *Id*. at p2. His scientific tests and close examinations confirmed his theory—a properly-installed, properly-maintained Electrolux dryer can cause a fire.

To explain his theory, a brief description of how a dryer operates is helpful, with a special emphasis on the airflow of the air through the dryer. **Exhibit E** is a diagram that shows the airflow in a dryer as it is designed to operate. (Although, as detailed below, that is not the way the air always flows).

Air enters the dryer's cabinet and flows into the combustion chamber, where the air is heated by open flame (#1, on **Exhibit E**). From there, the air is pulled behind the drum (#2 and #3) and then into the drum, where laundry tumbles (#4). The air in the drum picks up lint and the lint/air is then pulled into the lint filter (#5), which collects lint. The air then flows through a vent duct, into the blower/exhaust housing (#6), which is the fan that creates the air pressure that creates the airflow throughout the dryer. Finally, the air is blown out of the dryer through the exhaust duct (#7).

No. 1 in **Exhibit E** is the combustion chamber (which is located in the area Sanderson identifies as near the "heater pan assembly.") The heater pan assembly is "up-wind" of the drum—that is, air flows first into the heater pan and then from there into the drum. For that reason, the heater pan does not accumulate the same measure of lint that the parts accumulate "down-wind" of the drum. (Indeed, the heater pan, in the vicinity of open flame, should remain lint-free.) Sanderson discovered that in the dryers that sustained blower-housing fires, there was lint accumulating in the heater pan assembly (near open flame). *Id*. at p8. The lint in the heater pan assembly comes into contact with the open flame and ignites. The burning lint follows the airflow through the dryer: from the heater pan assembly (#1), into the back of the drum (#2 and #3), through the drum (#4), into the lint trap (#5). There—where the burning lint enters the lint trap—the burning lint comes into contact with the lint that is within the trap, igniting more lint,

11

where it migrates and spreads to the lint duct (where Electrolux admits lint does and can accumulate) and the fire continues and expands.

Again, the defect that Sanderson discovered was that lint builds up in the heater pan assembly. That lint buildup is caused by the airflow failing to pull the lint "forward" through the drum, allowing lint instead to flow backward into the heater pan, where it comes into contact with open flame. That "backward flow" defect in the Electrolux dryers is caused by restricted airflow. Indeed, this fact is not in dispute—Electrolux's expert admits it in his report. See Bajzek's Report p2. The distinction between Bajzek's theory and Sanderson's is that Sanderson showed that the conditions causing restricted airflow are *naturally-occurring*.

Sanderson identified at least two defects in the dryers that naturally resulted in this dangerous restricted airflow. First, he tested a properly-installed properly-maintained dryer, and found that even that dryer suffered from massive amounts of lint accumulation, which in turn causes restricted airflow. Second, he discovered that front seal of the dryer drum was defective, which adversely affects airflow through the dryer. The fact that there was a defective seal—and that Electrolux knows about it—is proven by Electrolux's own documents. In December 2004, Electrolux issued a service bulletin, admitting: "…the upper felt [the seal] may compress causing a gap between the lower felt and the drum glide." December 2004 Service Bulletin, **Exhibit F**. Those two problems: the massive lint accumulation in the vent duct, and the defective seal, both resulted in restricted airflow, which caused lint to enter the heater pan and come into direct contact with open flame. That burning lint migrates through the dryer, landing in the lint accumulation in the vent duct, causing a major dryer fire.

This migrating-lint theory, based on Sanderson's detailed investigation into scores of burned Electrolux dryers, explains how the blower-housing fires are caused. This theory explains what caused the Hunter dryer-fire. Sanderson had developed and tested this theory by November 2007 and he issued a supplemental report detailing his testing and his findings. *Id*. It is also the theory that Sanderson provided in his Supplemental Report, dated August 21, 2009. **Exhibit G**. The theory was supported by the burn patterns that he observed in the 39 blower-housing-fire Electrolux dryers that he had investigated by that date and has been reconfirmed by the dryers he has inspected since. This theory, however, is based on far more than just his inspection of burned dryers. Sanderson conducted a series of documented scientific tests on exemplar dryers, confirming each step of his theory. See Testing Materials Binder, **Exhibit H**:

12

- Lint Generation Test
- Long-Term Lint Accumulation Test
- Ignition of Lint in the Heater Pan Test
- Airflow Testing
- Temperature Testing
- Temperature testing – High Heat vs. Low Heat
- Airflow Opening in Dryer Drums

The tests results confirmed his theory—Electrolux dryers, properly installed and properly maintained, accumulate massive amounts of lint and are at risk of lint accumulation within the heater pan, which ignites, passes through the drum and ignites the lint in the lint screen.

Despite Sanderson having confirmed his theory by his numerous tests, Electrolux brings this motion, essentially ignoring his tests, claiming that his theory is unsubstantiated. Electrolux is simply wrong.

Sanderson's testing confirms that lint in a properly-installed properly-maintained dryer accumulates in the heater pan (i.e., lint will flow backward from the drum to the heater pan). This is confirmed two different ways.

First, by an admission by Electrolux's expert, Bazjek, in his expert report: " restricted airflow conditions … cause lint to circulate into the cabinet and to accumulate in an abnormal fashion in the heater 'pan' area, the cabinet, the air duct, and the exhaust duct." Bajzek's report, p2, **Exhibit I**. Sanderson's Lint Accumulation Study confirmed that Electrolux dryers are susceptible to "restricted airflow" conditions that Bazjek claimed were only possible with improperly-installed dryers.

Second, Sanderson's testing confirmed that the Electrolux-dryer design allows for burning lint to pass through a tumbling load of laundry while still burning and land, still burning, in the lint screen, causing a fire in the lint screen. Sanderson ran a test where he observed that very phenomenon—Sanderson reported a burning lint ember passed through the drum, still burning.[4] If Sanderson's test was not enough, the Consumer Product Safety Commission ran a similar test with similar results. Sanderson's Deposition, 249:10-14, **Exhibit A**. Electrolux asks this Court to ignore those tests because they confirm that Electrolux dryers are designed at real risk of fire. The Court should decline that invitation.

---

[4] Ignition of Lint in Heater Pan Testing, (located within the Testing Materials Binder) p6 (**Exhibit H**).

IV.     **Law and Argument:**

A.      **Legal standards for *Daubert* motions:**

Before expert testimony reaches the jury, the Court must act as a gate-keeper, allowing experts with relevant and reliable testimony to testify, but keeping out "junk science."  The leading United States Supreme Court cases detailing the trial court's gate-keeper role are *Daubert* and *Kumho Tire,* which, along with Rule 702, require that (1) a witness be qualified by "knowledge, skill, experience, training, or education," (2) the testimony must be relevant, meaning that it will assist the fact-finder to understand the evidence or determine a fact at issue, and (3) the testimony must be reliable.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-177 (6th Cir. 2009); *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517.528 (6th Cir. 2008).

Here, State Farm has proffered Sanderson as an expert and Electrolux has challenged his opinions on a number of grounds.  Specifically, Electrolux challenges (1) Sanderson's testimony that Electrolux gas dryers are disproportionately higher-risk for causing fires than Electrolux electric dryers; (2) Sanderson's opinion that Electrolux's dryers have a defect that renders them fire-prone; (3) Sanderson's testimony of the inadequacy of Electrolux's warnings; and (4) Sanderson's survey of Electrolux-authorized service providers.  State Farm will address each challenge in turn.

B.      **Sanderson's observation that gas dryers are disproportionately more at-risk of burning is based on simple math, therefore, Sanderson is qualified to testify to it.**

In his 2009 report at Conclusion 5, Sanderson noted that "gas dryers, like the Hunters' unit, are disproportionately at risk for fires." August 21, 2009 Report.  Electrolux devoted about six pages of its Brief arguing that Sanderson cannot testify to that conclusion because he is not a statistician.  Electrolux missed the point of his conclusion.  Electrolux assumed (incorrectly) that Sanderson was concluding that Electrolux dryers are more likely to burn than non-Electrolux dryers.  This is not what Sanderson was saying in Conclusion 5.  He was concluding that *gas* Electrolux dryers are disproportionately more likely to burn than *electric* Electrolux dryers. November 1, 2007 Report, p.8, **Exhibit C**.

14

This conclusion which Electrolux did not even address in its Brief is a simple mathematical observation that does not require statistical experts to explain. Sanderson's statistics are simple and explained in his November 1, 2007 report. As of that date, he had inspected 39 Electrolux dryers that had sustained blower-housing fires. *Id.* Of those 39 dryers, more than twice as many gas dryers burned as electric dryers (27 gas and 12 electric). Electrolux sells about four times as many electric dryers than gas. *Id.* Since Electrolux sells approximately four times as many electric dryers than gas and he observed two times as many gas-fires as electric-fires, Sanderson reasoned the heat source must play a role in causing the fire. This statistic supports Sanderson's lint-ignition-migration theory—a gas heating element, with open flame, is more likely to ignite nearby lint than an electric heating element without open flame.

In its Brief, Electrolux did not even argue that Sanderson could not testify to that simple mathematical fact because Electrolux failed to understand his opinion. Even if Electrolux had raised that argument, the Court should reject it. Sanderson's conclusion is a simple mathematical observation—gas dryers burn at a disproportionately-higher frequency than electric dryers. Because it is so straightforward, Sanderson does not need to qualify as a statistics expert to offer that conclusion. *Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1453 (D.C. Cir. 1988) (holding that experts are not always required to explain statistical data); *see also Stratton v. Department for the Aging*, 132 F.3d 869, 877 (2d Cir. 1997); *Tagatz v. Marquette University*, 681 F. Supp. 1344, 1351 (E.D. Wis. 1988).

**C      Sanderson's observation that Electrolux dryers comprise a disproportionately high number of dryers that cause fires is admissible because it is his reliable observation following decades of dryer-fire study.**

In his deposition, Sanderson commented that based on his observations, far more Electrolux dryers burn than non-Electrolux dryers. Sanderson's Deposition, 143:16-22, **Exhibit A**. What Electrolux argued in its Brief was not related to the conclusion that Sanderson put in his report; instead Electrolux argued that Sanderson should not be able to testify regarding the comment made at his deposition because he is not qualified as a statistician.

Sanderson readily admitted that he did not know the statistical magnitude of Electrolux's dryer-fire problem. "…we see way more of them [Electrolux dryer fires]. I don't know what the order of it is." *Id.* at 146:22-23. He readily admits that he is not a statistician. *Id.* at 103:3-4.

Nonetheless, this Court should not forbid Sanderson from testifying to those observations simply because no statistician has performed multiple-regression analysis on Sanderson's observations. Sanderson's observations are admissible because he is qualified to offer them, his observation is reliable, and they are relevant.

He is qualified to offer them because he has been investigating dryer fires for almost forty years, investigating over 600 dryer fires in that time. Sanderson's CV, p1. **Exhibit J**. His experience in investigating dryer fires is so extensive that he believes that there are few investigators who have examined more suspected dryer fires than he has. *Id*. Moreover, in recent years, he has found a dramatic increase in the number of Electrolux dryer fires. Indeed, the fact that Electrolux dryers were a potential fire risk was brought to his attention in 2004, when his company, Fire Findings, investigated two Electrolux dryers in the same day; the two dryers looked identical, which piqued his interest in wondering if there was a pattern. Sanderson's Deposition, 145:22-24, **Exhibit A**. Since that time, he has seen relatively many more Electrolux dryer fires than those of other manufacturers. Simply put, he has observed that Electrolux fires are more common than non-Electrolux dryer fires: as he stated in his deposition, there are "way more of them." *Id*. at 146:23-25.

Electrolux claims that he is offering a statistics opinion that only a statistician can offer. But Electrolux's argument misconstrues Sanderson's testimony—Sanderson is not attempting to give a formal statistical model of the risk that any given dryer leaving the factory has of catching fire. Instead he offers the relevant and reliable testimony of one who can testify as to what he has seen—he has seen far more Electrolux dryers ignite than Electrolux's market share. Moreover, he has confirmed that his observation is the norm throughout the industry. *Id*. at 147:2-19.

Other Courts, when faced with *Daubert* challenges to similar testimony, have admitted the testimony. In *United States v. Vaghari*, 653 F. Supp. 2d 537 (E.D. Penn. 2009), the government claimed that certain defendants had evaded trade tariffs against Iran by shipping goods from the United States to Iran through an intermediary in the United Arab Emirates. The government called an expert, Dr. Levitt to testify "on efforts to evade U.S. trade sanctions governing trade with Iran." *Id*. at *3. Dr. Levitt had experience in "Iran sanctions violations," and the proffered testimony regarding the *modus operandi* of people avoiding Iranian trade sanctions. The defendants argued that his testimony was unreliable because it was based

primarily on his observation of shipping vessels and interviews of boat captains.   The court denied the *Daubert* motion because Dr. Levitt had substantial academic and practical experience regarding Iran sanctions, the pertinent literature was nearly unanimous regarding sanction-violations in Iran, and Dr. Levitt had gained first-hand knowledge of the topic.   "That he cannot offer precise statistics relating to the quantity of goods trans-shipped from the United States to Iran through Dubai, does not render his opinion unreliable for *Daubert* purposes. The availability of corroborative mathematical data, or lack thereof, is a matter of weight and not admissibility." *Id*. at \*17.

*Vaghari* is analogous here.   Sanderson has observed the phenomenon, he has spoken with colleagues in the fire-investigation field and has read, written, and spoken on the topic for decades.   Like Dr. Levitt in *Vaghari*, he does not have precise statistics regarding the precise numbers of house-fires have started because of Electrolux dryers, but his observation, training, and experience make his opinion regarding the relative danger of Electrolux dryers reliable.   The Court should allow him to so testify.

>    **D.   Sanderson is qualified to opine on the design flaws of Electrolux's dryers because he has inspected hundreds of burned dryers, run a battery of tests on exemplar dryers, and has proven—through exemplar testing—that his theory is reliable.**

Under *Daubert* and its progeny, a preliminary finding with respect to admitting expert testimony is to determine if the proffered expert is qualified to offer the opinion he or she will testify to.   That inquiry is a flexible one and a court must look at the knowledge, skill, experience, training, and education of the witness.   F.R.E. Rule 702; *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).   Courts construe F.R.E. Rule 702 broadly and qualify witnesses as experts where their testimony will assist the jury.   *Davis v. Combustion Engineering, Inc*., 742 F.2d 916, 919 (6th Cir. 1984).   Because the rule is broad, "experts" are viewed not in narrow sense and trial judges must not rely on labels, but must investigate the witness's competence. The witness "need not have complete knowledge of the field in question … [h]e need only be able aid the jury in resolving a relevant issue."   *Mannino v. International Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981).   Accordingly, a trial court is given broad discretion in determining that a proffered expert meets *Daubert's* and Rule 702's criteria for qualification.   *Norton v. Hamilton*

*Beach/Proctor-Silex, Inc.*, 2009 U.S. Dist. LEXIS 27322 (E.D. Mich. Mar. 30, 2009), citing *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

Electrolux claims that because Sanderson is not a 'design engineer', he is unqualified to opine on the findings of his tests and his opinions regarding how Electrolux's dryer-design causes dryer fires.  Under the Sixth Circuit's standards for qualifying as an expert, Electrolux's analysis is far too narrow because it focuses solely on the particular 'label' that Sanderson has, rather than on Sanderson's "knowledge, skill, experience, training, or education," which is an incorrect analysis:

> According to the Federal Rules of Evidence, a proposed expert witness should not be required to satisfy an overly narrow test of his own qualifications.  An expert need not have certificates of training, nor memberships in professional organizations.  Nor need he be, as the trial court apparently required, an outstanding practitioner in the field in which he professes expertise. Comparisons between his professional stature and the stature of witnesses for an opposing party may be made by the jury, if it becomes necessary to decide which of two conflicting opinions to believe. But the only question for the trial judge who must decide whether or not to allow the jury to consider a proffered expert's opinions is, whether his knowledge of the subject matter is such that his opinion will most likely assist the trier of fact in arriving at the truth.  *United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir. 1977) (overturning the trial court, citations omitted); See also *Mannino v. International Mfg. Co.*, 650 F.2d 846, 850-851 (6th Cir. 1981).

Under the proper test—whether Sanderson's knowledge, skill, experience, training, or education will assist the jury to arrive at the truth—Sanderson qualifies as an expert.  He is a highly-qualified, certified fire investigator with almost forty years' experience inspecting dryer fires, (Sanderson's CV p1), he has investigated approximately 600 dryer fires,[5] and has examined over 150 Electrolux-designed dryers that are of the same or similar design as the Hunter dryer.[6] He has attended dryer-manufacturer training seminars, lectured over 100 times on the topic of dryer fires, and written numerous articles on the topic.  Sanderson's CV.

From 1986 to 1997, he worked for Barker and Herbet Analytical Laboratories, Inc., where he conducted laboratory analysis of appliances suspected of causing fires. Sanderson's CV Appendix F (**Exhibit J**).   He continued that practice from 1997 to the present, working for Fire

---

[5] Lint Accumulation Test, (located within Testing Materials Binder) (**Exhibit H**).
[6] Utilizing the Scientific Method, p2.  (This is Exhibit 1 to Sanderson's August 21, 2009 Report) (**Exhibit G**).

Findings Laboratories, L.L.C., an independent forensic laboratory specializing in examination of products suspected of causing fires or explosions. *Id.*

Significantly, Sanderson has conducted numerous scientific experiments specifically related to Electrolux's dryers: Lint Generation Test, Long-Term Lint Accumulation Test, Ignition of Lint in the Heater Pan Test, Airflow Testing, Temperature Testing, Temperature testing – High Heat vs. Low Heat, Airflow Opening in Dryer Drums (**Exhibit H**). In all of these experiments, he followed the scientific method, proving by each test that his theory is reliable.

Importantly, not only is Sanderson's expertise well-known throughout the dryer-fire-investigation community, his reputation extends to the *dryer design* community as well. Design engineers from General Electric and Maytag have attended his seminars on dryer fire investigation. Sanderson's CV, p4. If men and women who design dryers for a living attend Sanderson's seminars, they presumably believe that he has something to teach them about how to design a dryer that does not burn. If design engineers can learn something from him, this Court can comfortably find that Sanderson may aid the jury in deciding the same. Electrolux also ignores the knowledge, skill, experience, training, and education of Nathan Dwyer who also signed the report attacked by Electrolux. Mr. Dwyer holds a Bachelor of Science in Electrical Engineering and is a Certified Fire and Explosion Investigator.

### E.   Sanderson's theories are reliable because his tests followed the scientific method and resulted in reliable, testable, repeatable results.

After a Court determines that an expert is qualified to testify, the Court must determine whether the expert's testimony is reliable.  Accordingly, an expert may not rely only on mere speculation; the expert must support his or her opinion by appropriate validation which means that the opinion must be well-grounded and based on the known facts. *Daubert*, 509 U.S. at 591. Put another way, the court must examine the opinion's trustworthiness.  *Id*. at 591 n9. Measuring an opinion's trustworthiness can take a number of forms, and while the *Daubert* court laid out a number of criteria that a trial court may examine, the court emphasized that there are many factors that bear on this inquiry, with a focus on whether the proposed testimony is based upon good science. *Id.*. at 593.

One of the most important factors to examine with respect to whether a theory is reliable, is for the expert to test it. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 432 (6th Cir.

2007).  Here, this factor weighs entirely in favor of allowing Sanderson to testify because he has run a battery tests to scrutinize his theory— Lint Generation Test, Long-Term Lint Accumulation Test, Ignition of Lint in the Heater Pan Test, Airflow Testing, Temperature Testing, Temperature testing – High Heat vs. Low Heat, Airflow Opening in Dryer Drums.  He performed all these tests in order to determine how the Electrolux dryer fires were caused, with each test playing a role in confirming different aspects of his theory, and each test confirming that his theory is reliable.

In Electrolux's Brief, it argues at length that Sanderson's testing was unreliable, couching its argument on (a) easily-distinguishable cases and (b) minor, irrelevant distinctions between the conditions of the dryers in Sanderson's many tests and the Hunter dryer.    State Farm will address those arguments in turn.

**1)**   **The cases Electrolux primarily relies on, *Coffey* and *Camacho*, are not applicable here because unlike Sanderson, the experts in those cases did not test their theories.**

The first case that Electrolux claims is analogous is *Coffey v. Dowley Mfg.*, 89 Fed. Appx. 927 (6th Cir. 2003).  In *Coffey*, the plaintiff was using a "Super Hub Shark" to remove a hub from an automobile, when the tool's bolts failed, causing him to fall, injuring him.  The plaintiff brought a design-defect claim and hired an expert to opine on the strength of the tool's bolts.  The expert performed some calculations (without examining an exemplar tool).  He applied the wrong "loads" in his formula, producing "wildly inaccurate" results.  When his obviously-inaccurate results were brought to his attention, he reworked his calculations and even under the new calculations, he found that the bolts were designed too weak for the tool's intended use.

The Court found his second opinion unreliable as well, excluding it for two reasons.  First, in reaching his opinion he relied on "guesstimations" regarding the plaintiff's weight and how he had used the tool and those factual 'guesstimations' were proved incorrect, undermining his conclusions. Second, the tool-manufacturer's expert had run tests on actual exemplars (which the plaintiff's expert never bothered to do) and he found that the tool actually performed vastly better than the plaintiff's expert had predicted, casting strong doubts on that experts' methodology.  The Court reasoned that by relying on factual 'guesstimations' and not running a physical test (which he could have done), his testimony failed *Daubert's* standards.

20

Electrolux claims that *Coffey* is analogous here because Sanderson's 2006 opinion differs from his 2009 opinion. Electrolux is wrong for two reasons. First, the *Coffey* court did not exclude the expert's second opinion because it was simply a "second opinion." The court excluded the expert's second opinion because that opinion was substantively inadequate. The second opinion, on its own, failed *Daubert's* reliability standard. The fact that it was a 'second' opinion did not affect the Court's reasoning, and in fact, the Court did not even mention the fact that it was a second opinion in its analysis of why the second opinion failed *Daubert*.

*Coffey* does not hold that the mere fact that an experimenter changes his or her theory renders the second theory inadmissible. Indeed, the history of scientific inquiry abounds with circumstances where brilliant experimenters 'got it wrong' repeatedly before discovering the correct solution and confirming that they reached the correct solution by <u>testing it</u>, which Sanderson did to his migrating-lint theory. In *Coffey*, the basis for the Court's exclusion of the expert's second opinion was because the expert did not conduct actual physical testing of the tool, despite his ability to have done so. Unlike the *Coffey* expert, who ignored the real world and relied only on his theoretical calculations, <u>Sanderson actually tested Electrolux dryers</u>. This Court should find that *Coffey* is easily distinguishable from this case and permit Sanderson to explain to the jury the numerous tests he ran, the conclusions he found, and his theory on how the Hunters' dryer burned their house.

The second case that Electrolux relies on is not even a federal court case, nor does it rely on the Federal Rules of Civil Procedure or *Daubert*; it is a Texas Supreme Court decision, not binding on this Court: *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631 (Tex. 2009). In *Camacho*, a mobile home burned, killing one of the inhabitants and destroying the home. The injured parties sued Whirlpool, alleging that a Whirlpool dryer was designed improperly, causing the fire. Following a verdict in plaintiff's favor, the Texas Supreme Court overturned, holding that the expert's theory of the fire was unreliable for a number of reasons, but primarily because he failed to test his theory, relying instead upon tests of dissimilar dryers. (This fact alone makes the case easily distinguishable, because Sanderson conducted numerous tests on Electrolux dryers that were the same design as the Hunters'.)

The reason that Electrolux cites *Camacho* is because one of the tests that the Camacho's expert relied on was conducted by the Consumer Product Safety Commission and Sanderson, in his 2007 report, cited that same CPSC test as supporting his opinion. The fact that Sanderson

21

cited the report does not invalidate his tests, even if the CPSC test did not test Electrolux dryers. Sanderson does not need to rely on the CPSC results to prove his theory because he actually tested numerous Electrolux dryers and his test results confirmed his migrating-lint theory. This obviously is very different than the *Camacho* expert, who did not run any of his own tests. *Id*. at 640 ("He did not personally test his theory.")

> **2)** **The factual distinctions that Electrolux raised between Sanderson's exemplar testing and the conditions of the Hunter fire are minor and do not render his opinion inadmissible.**

Electrolux, finally recognizing that Sanderson tested his theory, raised seven factual distinctions regarding the conditions of the exemplars that Sanderson used in his tests compared to the conditions of the Hunter dryer. Those factual distinctions are minor and to the extent that the distinctions are even supported by the record, they only address the weight of Sanderson's opinion; the factual distinctions do not render his testimony inadmissible. *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 530 (6th Cir. 2008); *United States v. L.E. Cooke Co*., 991 F.2d 336, 342 (6th Cir. 1993) (where an expert opinion has a reasonable factual basis, it should not be excluded).

First, under Sanderson's theory, lint ignited in the Hunter dryer's heater pan, and flowed through the drum's grate (the 'grate' is the small holes in the back panel of the drum). Electrolux claims that Sanderson did not identify the *size* of the ignited lint particles that passed through that grate. Electrolux's Brief, p.22-23. This is a strange argument to raise, as Sanderson has tested and proven that lint particles can, in fact, ignite, flow through the grate, and into the drum.[7] What size were the lint particles that passed through the Hunter dryer's grate? Probably roughly the same size as the lint particles that passed through the exemplar-dryer's grate in Sanderson's study. The fact that the Hunters' lint particles were consumed in the fire, making it impossible to measure their size, does not render Sanderson's theory unreliable, and certainly does not render it inadmissible.

Second, under Sanderson's theory, burning lint flowed from the back of the Hunter dryer's drum to the lint trap in the front of the drum, remaining lit while tumbling through the laundry. Electrolux claims that Sanderson cannot demonstrate how a burning ember could travel through the drum without being extinguished by the tumbling laundry. For this argument,

---

[7] Ignition of Lint in Heater Pan Testing, (located within Testing Materials Binder) (**Exhibit H**).

Electrolux largely ignored Sanderson's Ignition of Lint in the Heater Pan Testing study.  Instead, Electrolux argued that Sanderson relied on a 2003 Consumer Products Safety Commission ("CPSC") report, which found that loads of laundry in Electrolux dryers sometimes "ride the rim."  With clothes "riding the rim," the lint could easily pass through the drum, although, as Electrolux points out, the CPSC did not disclose how long into the dryer's cycle the load begins to "ride the rim."  Without that information, the information regarding how many minutes into the dryer cycle it takes for the clothes to "ride the rim," Electrolux claims that Sanderson cannot opine whether the Hunter load was "riding the rim".

Electrolux is wrong on this point for two reasons.  First, Sanderson did not rely *solely* on the CPSC report, as Electrolux claims—Sanderson ran his own test, the Ignition of Lint in the Heater Pan Test—and proved that burning lint can in fact pass through a load of laundry. Whether the clothes "ride the rim" or not, or how long it takes for them to do so, is irrelevant— Sanderson proved that burning lint can pass through the drum, which is the point of the test. Second, the CPSC test was conducted under a similar scenario as the Hunter dryer fire; to the extent that the test was factually distinguishable, Electrolux may argue that the distinctions weigh against Sanderson's theory, but the theory is still admissible.  *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 530 (6th Cir. 2008).

Third, the Hunter dryer was manufactured in 2003, while Sanderson's exemplar was 2007.  Electrolux does not identify how that distinction makes any relevant difference. Electrolux Brief, p.25.  Nor can it do so.  The two models are almost identical.

Fourth, Sanderson's exemplar was vented with a rigid metal exhaust duct, while the Hunters used flexible foil venting.  *Id*.  It is remarkable that Electrolux even raised this distinction because one of the points of Sanderson's study was to show that Electrolux dryers can ignite even when they have the rigid venting.   Moreover, Electrolux's expert, Bajzek, acknowledges that if foil venting is properly installed, the distinction between foil and rigid metal is immaterial. Bajzek's Deposition, 110:10-15.  **Exhibit K.**  This factual distinction is meritless, and certainly does not go to the admissibility of Sanderson's well-tested opinion.

Fifth, in Sanderson's Ignition of Lint in the Heater Pan Testing, he placed lint in the heater pan assembly.   Electrolux claims that this "artificial" condition renders his result dissimilar from the Hunter dryer, and unreliable.  Electrolux is wrong.  Sanderson confirmed that lint accumulation in the heater pan occurs naturally when the front seal is defective (as was the

23

case in the 2003 dryers), a finding that is essentially confirmed by Bajzek's testing. Bajzek's Report, p2, **Exhibit I**. Thus, it was reasonable to conduct a test with that condition present, as Sanderson did, and confirm what occurs as a result of that naturally-occurring condition.

Sixth, in Sanderson's Ignition of Lint in the Heater Pan Testing, he added lint to the lint screen, rather than allow lint to accumulate there "naturally," so Electrolux cried foul. This is a difference without a distinction, as almost every load of laundry produces lint that gets trapped in the lint screen (that is why the screen is there). Placing lint in the lint screen is far from an "artificial condition" as Electrolux argues.

Seventh, in Sanderson's Ignition of Lint in the Heater Pan Testing, he momentarily restricted airflow (which caused the lint to ignite), and Electrolux claims there is no evidence of the Hunter dryer undergoing that momentary airflow restriction. Again, Electrolux ignored Sanderson's testing as well as Bajzek's. In Sanderson's Long-Term Lint Accumulation Test, Sanderson confirmed that a properly-installed dryer will accumulate large amounts of lint within the airflow chambers. Bajzek admitted in his report that the presence of lint naturally causes irregular airflow which is comparable to Sanderson's "artificial" momentary airflow restriction.

In short, Electrolux pointed out a number of distinctions between Sanderson's exemplar testing and the Hunter's dryer, blaming Sanderson for not being able to duplicate the "perfect conditions" that existed at the Hunter house: "…running a test and failing to duplicate a theory is part of the scientific method, which Mr. Sanderson fails to appreciate." Electrolux Brief, p. 24. The reason why Sanderson set up these "artificial" conditions (which he confirmed do occur) and then ran a series of controlled experiments is precisely because the "perfect conditions" are rare—admittedly, Electrolux dryers dry clothes without problem almost every time. It is that rare exception where everything happens 'just right' and the dryer burns. Sanderson—step by step, using the scientific method, proved that lint can accumulate, ignite, and cause a fire even in properly-installed Electrolux dryers, proving it by his long series of controlled experiments, his countless tests, his rigorous application of the scientific method.

Sanderson ran a battery of scientific tests to confirm or dispel his theory and the test results proved it. The factual distinctions between Sanderson's controlled experiments and the Hunter conditions are minor. But minor factual distinctions do not render an opinion inadmissible. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008). Instead, minor factual distinctions are left for cross examination. This Court should deny Electrolux's

motion, and permit Sanderson to testify regarding his well-tested, confirmed, lint-migration theory.

**F.      Sanderson should be permitted to testify as to the adequacy of Electrolux's warnings because of his extensive testing of Electrolux dryers and thorough review of Electrolux's manuals.**

Electrolux argued that Sanderson should not be permitted to testify regarding his review, analysis and opinion regarding Electrolux's warnings.  This court should reject Electrolux's request because Sanderson's opinion will assist the jury in reaching a finding of fact regarding the adequacy of those warnings.  In its Brief, Electrolux relies on *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008), a case that actually supports State Farm's position.

In *Pineda*, the court held that the plaintiff brought a failure-to-warn claim, but the proffered expert (a highly-qualified design engineer) "freely admitted that he is not qualified as a warnings expert and that he does not purport to be one."  The District Court, based on that admission, excluded his testimony regarding adequacy of warnings.  The Circuit Court overturned the decision, noting that under F.R.E. Rule 702, there is a "liberal policy of admissibility" regarding the admissibility of experts.  The expert was qualified to testify as to adequacy of the warnings because he found that the defect in the product (in that case, the tailgate of a Ford Explorer) could be "non-defective" if the user was warned on how to use it properly.  Thus, the design engineer's testimony was helpful to the jury, even if the design engineer was not the "best qualified" or lacked the "specialization that the District Court deemed necessary." *Id.* at 245.

Here, Electrolux claims that Sanderson should be excluded from testifying because he is not a "warnings expert."  But Electrolux's argument suffers from the same short-sightedness as the *Pineda* District Court.  Sanderson's opinions, like the *Pineda* expert's opinions, will be helpful to the jury because he can testify that there are dangers associated with Electrolux dryers that simply are not warned against. Sanderson should be permitted to opine on warnings regarding the dangers that Sanderson discovered in his testing, which Electrolux failed to warn its users about.

**G.     Sanderson's opinions on alternative designs are admissible because they are simple, practical and easily-implemented design changes that he has observed work in other dryers.**

Sanderson's theory involves the hypothesis that Electrolux dryers accumulate lint and have defective front seals.  Further, those defects cause the air-flow in the dryers to make lint accumulate in the heater pan (which ignites, migrates to the lint screen and starts a fire).  Sanderson offers two simple ways to alleviate this problem, including (1) installing a non-defective front seal, and (2) installing a "heater shield baffle."  Electrolux claims that he should not be permitted to testify regarding those 'fixes.'  Sanderson, by his years of investigation and training, is more than qualified to opine on the effectiveness of these simple alternatives.

The first fix, installing a non-defective front seal, is hardly an "alternate design" at all because Sanderson simply proposes that Electrolux should have installed a seal that performed as Electrolux had designed it to do.  The dryer's seal was designed to eliminate a gap between the drum and the dryer cabinet, but it did not.  Put another way, the seal was designed to seal.  It did not seal because the design was inadequate.  Electrolux's argument that State Farm cannot prove an "alternate design" is strange indeed where the seal that Electrolux used for its dryers failed to perform the function for which they were designed, i.e., seal the drum.  Moreover, Electrolux cannot claim that Sanderson is unable to testify that an alternative design would cure the problem, because Electrolux itself has since redesigned the seal, largely curing the problem—the new seal does seal. Sanderson's Deposition, 132:21, **Exhibit A**.

Sanderson can properly testify regarding the "redesigned seal."  Under Michigan law, the plaintiff in a design defect case need only present testimony that reasonable alternative designs existed at the time of manufacture.  *Phillips v. Hardware Wholesalers, Inc*., 762 F.2d 46, 48 (6th Cir. 1985).  Here, Sanderson can certainly testify regarding the alternatively-designed seal because he has been inspecting dryers for decades, testing the Electrolux design for many years, and Sanderson has in fact tested an Electrolux dryer with the 'redesigned' front seal and confirmed that there was less lint accumulation at the heater pan.[8]

Sanderson's second alternative design was that to install a "heater baffle" which would have created a longer distance between the heater pan and the location where the lint passed through the grate at the back of the drum. Sanderson's Deposition, 77:2-25, **Exhibit A**.  This

---

[8] Email exchange between Jack Sanderson and David Beauregard, **Exhibit L**.

increased distance would have made it more difficult for burning lint to enter the drum. Electrolux began installing the heater baffles in its dryers in 2007 which indicates that such a design change was both reasonable, available, and practicable. Sanderson's Deposition, 77:2-25, **Exhibit A**. See also MCL 600.2946(3), and *Fire Ins Exchange v. Electrolux Home Products*, 2006 U.S. Dist. LEXIS 76161, (E.D. Mich 2006) (holding that where the expert's testimony is sufficient to defeat a *Daubert* challenge where the expert had seen the alternative design in use). Sanderson has seen the heater baffle in use in other dryers, including newer Electrolux dryers. This Court should follow its precedent set in its *Electrolux* decision, *Id*. and hold that Sanderson is qualified to testify that a heater baffle is a practical alternative design.

   **H.    Sanderson can testify regarding his conversations with the Authorized Service Providers because those conversations are not a statistical "survey" as Electrolux suggests and they are admissible as 'not hearsay' under Federal Rule of Evidence 801(d)(2).**

   According to Electrolux's website, Electrolux follows a philosophy of providing "care and service of our product throughout their lifetime."[9]   To that end, it provides two ways of servicing its appliances: First, if an appliance is under warranty, the user is advised to call one of its "Platinum Star Service Specialists."  Second, if an appliance is no longer under warranty, the website provides a search by which a user can locate one of Electrolux's "Authorized Electrolux Service Providers."

   Fire Findings Investigations L.L.C, Sanderson's company, used the website search to locate twenty-six "Authorized Electrolux Service Providers."[10]   Those Authorized Service Providers were called and asked number of questions regarding the service they provided, including if they would clean a Frigidaire dryer and how much such service would cost.  Notes from the conversations were kept and Sanderson provided a summary of the conversations.  He found that many of the Authorized Service Providers actually provided the service that Electrolux deems vitally important, but many stated that they did not deem the recommended service important.

---

[9] http://www.electroluxappliances.com/servicelocator, attached as **Exhibit M.**
[10] Fire Findings located the service providers from Electrolux's and Frigidaire's websites, see Sanderson's Summaries of Contacts with Electrolux's Authorized Service Providers.  (Exhibit 3-E of Sanderson's August 21, 2009 Report) (**Exhibit G**).

Electrolux seeks to restrict Sanderson from testifying about the conversations, arguing that Sanderson's "survey" suffered from methodological flaws related to conducting a "survey." Electrolux missed the point of the proffered testimony. State Farm does not seek to introduce the evidence as a formal survey and have Sanderson qualify as an expert survey-conductor. State Farm seeks to introduce the conversations as party admissions. Those party admissions pertain to what Electrolux's own Authorized Service Providers know about the service that Electrolux claims it warns its users is vitally important, and the cost to obtain it. That testimony is admissible.

Generally, statements made by people who are not testifying, are inadmissible hearsay, but there are many exceptions to that general rule. F.R.E. Rule 802. One such exception is found in F.R.E. Rule 801(d)(2), which provides: A statement is not hearsay if … [t]he statement is offered against a party and is …(D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. *Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005).

Here, the statements fall under that exception because Electrolux's Authorized Service Providers were agents of Electrolux, and they made those statements within the scope of the agency. In order to establish a principal/agency relationship, the principal must indicate that the agent will act on his behalf and subject to his control, and the agent must manifest consent to so act. *Auger v. ABB Flexible Automation, Inc.*, 34 Fed. Appx. 160, 164 (6th Cir. 2002) (citing Restatement (Second) of Agency, §1).

In order to establish a principal/agent relationship, Electrolux must indicate that the Authorized Service Providers will act on its behalf. Electrolux and the Authorized Electrolux Service Providers satisfy that test. On Electrolux's website it promises "Electrolux Authorized Service," and directs its customers to "Authorized Service Providers" to obtain that service. By doing so, Electrolux has authorized those service providers to speak on its behalf with respect to Electrolux service, making those service providers its agents.

Under the party-agent hearsay exception, when a party's agent makes a statement within the scope of its agency, the statement is not hearsay. F.R.E. Rule 801(d)(2)(D). Here, Electrolux's agents' statements were within the scope of their agency because the statements related to the servicing Electrolux dryers. The Court should deny Electrolux's motion, and allow Sanderson to testify regarding those statements.

V.      **Closing comments: Sanderson's second opinion, his fax to State Farm, and Michigan's favorable product-liability law.**

1.      **The second opinion.**

Electrolux argues that this Court should not permit Sanderson to testify about his test results because the test results represent a second opinion.  The purpose for the scientific method is to confirm a hypothesis by experimental testing, and, if the hypothesis is disproved, to form another.  Sanderson adhered to those principles and continued to test his original hypothesis, continued to investigate Electrolux dryer fires, and kept an open mind through the process.  When he discovered that his hypothesis did not answer the question, he formed a new hypothesis.  The new hypothesis is the hypothesis that he put through the battery of tests.  Those tests prove that his theory is the correct one.    Sanderson's ability to keep an open mind regarding his opinion and his rigorous application of the experiment-based scientific method do not render his opinion inadmissible as non-reliable, but rather renders that well-tested opinion an example that other experts should emulate.

2.      **Sanderson's fax to State Farm.**

Shortly after Sanderson investigated the fire, he communicated his opinion to Mary Williams, a State Farm representative.  He told her his opinion regarding the cause and origin of the fire, advising that he believed that the Hunter fire was another of the Electrolux-defect fires, and closed by asking her "Let me know where you think you'll be heading with this and we'll get you a report to match."

Electrolux claims that the closing line in this fax indicates that Sanderson was asking Mary Williams what she wanted his opinion to be, but Electrolux's analysis is misleading.  He had already told her what his opinion was: "it's our opinion that this is another blower housing fire."  He was not asking her about what she wanted the *substance* of his written opinion to be—he had already reached his opinion, he was only asking her if she wanted him to provide a full written report, something he would ordinarily do only if she wished to pursue subrogation.  If she did not want a full report, he would close the file and save State Farm the money he charged to draft the report.  This topic was never explored with Sanderson at his deposition and Electrolux

is interpreting the document as an advocate.  Electrolux can argue its erroneous interpretation to the jury.  It does not impact the admissibility of Sanderson's opinion.

### 3.       Michigan product liability law favors State Farm.

As this Court has already held in a case remarkably analogous to this one, Michigan product liability law includes not only claims for "design defect," "failure to warn," and "manufacturing defect."  It also includes the claim of breach of implied warranty.  *Fire Ins Exchange v. Electrolux Home Products*, 2006 U.S. Dist. LEXIS 76161, (E.D. Mich 2006).  The elements of that claim are 1) a defect attributable to the manufacturer, 2) when the product left the defendant's control, and 3) this defect caused the plaintiff's injuries.  *Id*.  Importantly, in order to prevail on a breach of implied warranty claim, a **plaintiff is not required to prove a specific defect**, *Id*. (emphasis added), and expert testimony regarding a is generally not required to prove an implied warranty claim.  *Mall v. Honda N. Am., Inc.*, 2007 U.S. Dist. LEXIS 63198 (E.D. Mich. 28, 2007) (citing *Holloway v. General Motors Corp., Chevrolet Div.*, 271 N.W.2d 777, 784 (Mich. 1978).  In order prevail on an implied warranty claim, the plaintiff must simply demonstrate a "demonstrable defect," such as a product causing a fire.  *Fire Ins Exchange v. Electrolux Home Products*, 2006 U.S. Dist. LEXIS 76161, (E.D. Mich 2006).

Here, the Hunters' dryer ignited, which is a demonstrable defect.  *Id*.  Thus, State Farm properly pled breach of warranty, in addition to its negligent design and manufacture claims.  Electrolux, to its credit, properly did not file this motion as a Motion for Summary Judgment under Rule 56; it filed this motion as a "Motion *In Limine* to Exclude Certain Testimony of Plaintiff's Disclosed Expert Jack Sanderson."  Even if this Court disagrees with everything State Farm argued above, the Court should still schedule this case for jury trial.  The Hunter's Electrolux dryer burned down their house.  Electrolux admits as much.  A jury should decide whether the fire was the Hunter's mistake, or Electrolux's.

## VI.    Conclusion:

Sanderson reached the not-surprising opinion that a dryer that burns down a house is not properly designed.  The fact that he took two tries to figure out precisely *how* this design burned down the Hunters' house is not a sign of his tested opinion's "unreliability."  Rather, it is a sign of his admirable perseverance to find the right answer.  That answer has been tested over and

over and confirmed over and over. *Daubert* excludes experts with pie-in-the-sky theories and those who reach conclusions based on back-of-the-napkin calculations. It does not exclude experts who have subjected their theories to a battery of scientific tests, as Sanderson has. State Farm requests that this Court deny Electrolux's Motion in full.

> KREIS, ENDERLE,
> HUDGINS & BORSOS, P.C.

Dated: November 4, 2010      BY:    /S/   Stephen J. Hessen    
> Stephen J. Hessen (P41663)
> Kreis, Enderle, Hudgins, & Borsos, P.C.
> Attorneys for Plaintiff
> P.O. Box 4010
> Kalamazoo, MI 49003-4010
> 269-324-3000
> shessen@kreisenderle.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: James F. Hunt and Andrea L. Moody.

> s/ Karen Duymovic
> Assistant to Stephen J. Hessen
> Kreis, Enderle, Hudgins & Borsos, P.C.
> P.O. Box 4010
> Kalamazoo, MI 49003-4010
> (269) 324-3000
> Karen.Duymovic@KreisEnderle.com

234591

31